IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

XINGJIAN SUN, XING ZHAO,    )
and AO WANG,    )
      Plaintiffs,    )
 v.    )    Case No.: 2:19-cv-2242
GARY GANG XU,    )
      Defendant.    )

## ANSWER TO COMPLAINT and COUNTER-CLAIM

The Defendant, Gary Gang Xu, by his attorney, James A. Martinkus of Erwin, Martinkus & Cole, Ltd., states the following for his Answer to the Complaint:

## NATURE OF THE ACTION

1.    Defendant Gang ("Gary") Xu ("Xu") was an associate professor at the University of Illinois Urbana-Champaign ("UIUC") from the early 2000s until he resigned in 2018. In 2012, UIUC made Xu department head of the Department of East Asian Languages and Culture ("EALC").

ANSWER:

The Defendant denies the allegation that he "was an associate professor at the University of Illinois Urbana-Champaign (UIUC) from the early 2000s until he resigned in 2018." The Defendant affirmatively states that he was an Assistant Professor at the University of Illinois from 2001 to 2007, and received a promotion to Associate Professor with Tenure on 2007. The Defendant admits the allegation that in 2012, UIUC made Xu department head of the Department of East Asian Languages and Culture ("EALC"). The Defendant affirmatively states that he stepped down from the Department Head position in 2015. The Defendant denies the remaining allegations of Paragraph 1.

2.    From the beginning of his career, and particularly after receiving the additional pedigree of department head from UIUC, Xu abused his power and

authority. He felt entitled to take whatever he wanted from his young students, and he did. He raped multiple students, had sexual relationships with many others, and tried to sexually exploit even more. He physical assaulted women.  He played brutal mind games, pitting his students against each other and against other professors, achieving pleasure out of the debris he left in his wake. He earned hundreds of thousands of dollars off the work that his students did for him, while paying them nothing.  He let his teaching duties slide, showing up unprepared and distracted, quick to anger when anyone questioned him. He caused many of his students to leave UIUC early, abandoning degree programs and irrevocably changing their career paths, because his predatory conduct became unbearable.  He created an environment where his students, particularly the young Chinese women who made up the majority of his students, were afraid to question, afraid to report, afraid to do anything that might jeopardize their position with him. They believed, based on actions he took with them and had taken with other students, that any questioning of Xu could lead to expulsion from UIUC and from the United States, where they resided on student visas.

ANSWER:

The Defendant denies the allegations of Paragraph 2.

3.      The professors in the EALC department, too, could not stand up to Xu and the power he wielded as department head. They saw young women coming into his office and the door closing. They heard rumblings of his sexual exploits with students. They witnessed his bullying, and, at times, were targets of it. They put up with it, not knowing what else to do.

ANSWER:

 The Defendant denies the allegations of Paragraph 3.

4.      Sun entered into a sexual relationship with Xu, her professor, when she was 19 and he was 45. She was new to the country, isolated, and so young. She was the perfect target for him. Xu was a typical domestic abuser. He raised Sun up, only to throw her back down. He told her he loved her and then threatened to leave her. He

violently raped her, then told her it was because he couldn't help himself in the face of her beauty. He tried to pimp her out to Chinese artists for commercial gain. He forced her to arrange a threesome for him with another student while she was pregnant with his child. Hanging over the entire relationship was the huge power imbalance between them. She was his student. He could fail her, drop her from his course. She could lose her F1 student visa status and be forced to leave the country if she displeased him. He could beat her if she refused—he had before. Sun was so strung along by Xu that she would do whatever he asked, even having an abortion performed against her will. The despair she felt over the loss of her baby caused her to attempt suicide.

ANSWER:

The Defendant denies the allegations of Paragraph 4.

5.      On several occasions, Sun attempted to stop the cycle of violence and reported Xu's abuse to UIUC. As is typical of a victim of domestic violence, she dropped these reports shortly after making them to protect her safety — Xu beat her and threatened to hurt her and her family if she did not.  UIUC took no meaningful action in response to these reports, allowing Xu continued unsupervised access to all the young students under his tutelage, including Sun. After the University gave him a letter telling him to have no contact with Sun, she was still allowed to enroll in and take his classes, with no measures in place to prevent this. He flaunted their relationship publicly, but the University did nothing. Even as he began to sexually violate yet another UIUC student, Xu's relationship with Sun continued.

ANSWER:

The Defendant admits the allegations that Sun made a report to UIUC and that "the University gave him a letter telling him to have no contact with Sun" and that Sun was "allowed to enroll in and take his classes" and that Sun "dropped these reports shortly after making them". The Defendant denies the remaining allegations of Paragraph 5.

6.       Finally, in the fall of 2015, an incident occurred that UIUC could no longer ignore. Xu's volatile temper flared again, with Sun as his target.  As Xu began to advance on Sun, she fled her apartment to escape him. She ran down public streets while Xu chased her in his car, attempting to hit her, until she arrived at the Champaign Public Library.  There was a public scene, with many witnesses, and the police were called. Sun told the police about their abusive relationship—his physical assaults, his rapes. Her school advisor was present. This time, UIUC had to take notice.  Sun, through a private attorney, filed a restraining order against Xu.  Their two-year abusive relationship was, at last, over.

ANSWER:

The Defendant admits the allegations that in "2015" Sun, "ran down public streets" and that "she arrived at the Champaign Public Library.  There was a public scene, with many witnesses, and the police were called" and that "Sun, through a private attorney, filed a restraining order against Xu." The Defendant lacks knowledge or information sufficient to form a belief about the truth the remaining allegations in Paragraph 6. The Defendant affirmatively states that the restraining order against him was dismissed with prejudice after a hearing.

7.       Over the course of the entire 2015-2016 school year, the school prepared a report based on its ensuing investigation of Xu. It concluded that there was an inappropriate sexual relationship between Xu and Sun, and recommended appropriate employment action against him. Nonetheless, for two more years—three years from the incident at the library—Xu was allowed to continue as a professor at UIUC, receiving full pay, until he was allowed to resign in August 2018 shortly after his misconduct received attention in Chinese news websites. He even received a $10,000 departure bonus.  During this time, he continued to hold himself out as a UIUC professor and department head, giving him unfettered access to impressionable young students, and continued to perform duties at the University.

ANSWER:

The Defendant admits the allegation that the University conducted an investigation into the allegations raised by Sun, the Defendant states that the final report of the University speaks for itself, and the Defendant denies the remaining allegations of Paragraph 7. The Defendant affirmatively states that he was notified by officials at UIUC on October 23, 2015, that he would be placed on paid administrative leave from the University effective January 1, 2016, during which time he would receive his University pay and benefits. That paid administrative leave ended August 15, 2018. The Defendant further affirmatively states that under the terms of a non-disclosure agreement with the University, he is prohibited from disclosing the existence of, or the terms of, any alleged separation agreement or alleged payment.

8.     Zhao was one of Xu's students from 2013 to 2015. Before she even enrolled at UIUC, Xu wielded his title and authority at UIUC to require her to do countless hours of work for him. She was not compensated or recognized for it, although it made Xu a hefty profit.

ANSWER:

The Defendant admits the allegation that "Zhao was one of Xu's students from 2013 to 2015" and denies the remaining allegations of Paragraph 8.

9.     Xu attempted to sexually conquer Zhao. He sexually harassed her on numerous occasions and grabbed her and attempted to forcibly kiss her on another.  He physically intimidated her—an intimidation made much more real after Zhao witnessed his physical assault of another young woman in her direct presence. He barricaded Zhao in his office and locked her in his car. When it became clear that Zhao would not entertain Xu sexually, he began to humiliate her—at first publicly in class, and then privately by suddenly refusing to be her advisor. Zhao ultimately left UIUC early, without her Ph.D., unable to face Xu any longer.

ANSWER:

The Defendant denies the allegations of Paragraph 9.

10.     Professor Wang knew of Xu by his poor reputation through academic circles, and was friends with a woman (not Sun) who told Wang that Xu attempted to rape her. He was appalled that UIUC allowed Xu to wear the cloak of professorship for years after his confirmed sexual and physical assault of a student. He knew that Xu was a sexual predator who would continue to harass and assault his students. He was concerned that Xu would be able to secure a new teaching job and continue the cycle at a new university.  To prevent him from doing so, Wang posted an article online outlining Xu's history of sexual abuse and assault.  The post soon garnered dozens of responses, many of them from Xu's victims.

ANSWER:

The Defendant admits that Wang posted an article online about Xu and the Defendant further states that the online post speaks for itself. The Defendant denies all of the underlying facts giving rise to Wang's impressions, conclusions or concerns. The Defendant lacks knowledge or information sufficient to form a belief about the truth the remaining allegations in Paragraph 10.

11.     Xu was furious with Wang.  He launched a counterattack, attempting to undermine Wang's professional reputation. Xu, personally and through his network of associates, threatened to kill Wang.  He threatened to, and eventually did, launch a costly and baseless legal action against Wang in China. Wang's health suffered from the stress, causing him to be admitted to the emergency room with heart palpitations.

ANSWER:

The Defendant denies the allegations of Paragraph 11.

12.     Plaintiffs bring this civil action under the federal Trafficking Victims Protection Act (TVPA), 18 U.S.C. §§ 1589, 1590, 1591, and 1595; the Illinois Gender Violence Act, 740 ILCS § 82/5; the Illinois Trafficking Victims Protection Act, 740 ILCS § 128/15; and the torts of intentional and negligent infliction of emotional distress. Plaintiffs seek redress for Defendant's sexual, physical, emotional, and professional abuse in an amount to be determined at trial.

ANSWER:

The Defendant admits that the plaintiffs have brought this action under the statutes stated and the torts referenced, and that they request redress, and he denies the remaining allegations of Paragraph 12, including that he committed any of the acts giving rise to the claims.

### JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this matter as to claims arising under federal law based on 28 U.S.C. § 1331. This Court further has jurisdiction over the sex and labor trafficking claims pursuant to 18 U.S.C. § 1589 *et seq.*

ANSWER:

The Defendant admits this Court has jurisdiction over the allegations of the Complaint, but he denies any allegation that he committed violations of any of the statutes mentioned.

14.    This Court has supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367. Supplemental jurisdiction over those claims exists because they arise from the same common nucleus of operative facts from which the federal claims arise.

ANSWER:

The Defendant admits this Court has jurisdiction over the related state law claims, but denies that he committed violations of any of the acts giving rise to the related state law claims.

15.    The Court further has jurisdiction pursuant to 28 U.S.C. § 1332 because the value of this case exceeds $75,000 and there is complete diversity between the parties, with plaintiffs residing in California, New York, and New Hampshire, and with Defendant residing in Illinois.

ANSWER:

The Defendant denies the allegations that he resides in Illinois, and admits the remaining allegations on Paragraph 15.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Xu resides in this district, and a substantial part of the events giving rise to these claims occurred in this district.

ANSWER:

The Defendant denies that he resides in this district, but admits that the plaintiffs have alleged that a substantial part of the events giving rise to these claims occurred in this district.

## PARTIES

### A. Defendant Gary Xu

17.     Defendant Gary Xu is an individual who currently resides at 4700 Horse Creek Drive, Champaign, Illinois. Xu arrived at UIUC in 2002 under a curriculum development grant. In 2006, Xu was made a tenured Associate Professor in the College of Liberal Arts and Sciences, the Center for East Asian and Pacific Studies and the Center for Global Studies at UIUC. In 2012, Xu was made head of the EALC Department—a position he held until 2015.

ANSWER:

The Defendant denies the allegation that he currently resides at the said address. The Defendant denies that he arrived at UIUC in 2002 under a curriculum design grant. The Defendant denies the allegation that in 2006, Xu was made a tenured Associate Professor in the College of Liberal Arts and Sciences, the Center for East Asian and Pacific Studies and the Center for Global Studies at UIUC. The Defendant denies the allegation that in 2012, Xu was made head of the EALC Department-a position he held until 2015. The Defendant affirmatively states that he was an Assistant Professor at the University of Illinois from 2001 to 2007, and received a promotion to Associate Professor with Tenure on 2007, and that in 2012, UIUC made Xu department head of the Department of East Asian Languages and Culture ("EALC"). The Defendant further affirmatively states that he stepped down from the Department Head position in 2015.

18.     In September 2016, as a result of the facts and conclusions contained in a report by the University's Office of Diversity, Equity and Access ("ODEA") following an extensive investigation into Xu after his assaults on Sun, the EALC department "lost confidence and trust in Professor Xu's ability to carry out his duties as a faculty member," and recommended that he resign or that the University terminate him. As part of a settlement negotiated with the University, however, Xu remained a member of the faculty through August 2018, when he was allowed to resign with a $10,000 separation bonus. Through the date of his resignation, he was paid in full by UIUC, including health benefits.

ANSWER:

The Defendant admits the allegations that the EALC department "lost confidence and trust in Professor Xu's ability to carry out his duties as a faculty member," and the allegations that "Through the date of his resignation, he was paid in full by UIUC, including health benefits". The Defendant denies the remaining allegations of Paragraph 18. The Defendant affirmatively states that he was notified by officials at UIUC on October 23, 2015, that he would be placed on paid administrative leave from the University effective January 1, 2016, during which time he would receive his University pay and benefits. That paid administrative leave ended August 15, 2018. The Defendant further affirmatively states that under the terms of a non-disclosure agreement with the University, he is prohibited from disclosing the existence of or the terms of any alleged separation agreement or alleged payment.

19.     From 2015 through 2018, Xu continued to hold himself out as a professor at UIUC and/or EALC department head. While cloaked in this authority, he held various teaching positions, including at the Sichuan Fine Arts Institute and Stockholm University, where he was put in close contact with other young students.

ANSWER:

The Defendant denies the allegations of Paragraph 19. The Defendant affirmatively states that he was notified by officials at UIUC on October 23, 2015, that he

would be placed on paid administrative leave from the University effective January 1, 2016, during which time he would receive his University pay and benefits. That paid administrative leave ended August 15, 2018. The Defendant further affirmatively states that he gave lectures at the Sichuan Fine Arts Institute in November 2017 as a prominent art curator, and that he visited Stockholm University in summer 2017 and gave two lectures as an art curator without receiving any pay.

**B. Plaintiff Xingjian Sun**

20.     Plaintiff Xingjian Sun is a Chinese citizen currently residing in New York under an F1 student visa.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20.

21.     Sun enrolled at UIUC in the fall of 2012.  She received a bachelor's degree in Media and Cinema Studies from the University of Illinois in May 2016. From the fall of 2013 through the fall of 2015, from the ages of 19 to 21, Sun was in a sexual and abusive relationship with Xu, her professor who was 26 years her senior.

ANSWER:

The Defendant admits that Sun was a student at the UIUC between 2012 and 2016. The Defendant denies the remaining allegations in Paragraph 21.

**C. Plaintiff Xing Zhao**

22.     Plaintiff Xing Zhao is a Chinese citizen currently residing in California under an F1 student visa. Zhao enrolled at UIUC in the fall of 2013 as a Ph.D. student in the EALC department. Xu was her advisor from the fall of 2013 until she left with a Master's degree in the spring of 2015. In the role of her prospective and actual advisor, he required Zhao to perform hundreds of hours of free labor for him, for which Xu received monetary and reputational benefit.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation that "Plaintiff Xing Zhao is a Chinese citizen currently residing in California under an F1 student visa." The Defendant admits the allegations that "Zhao enrolled at UIUC in the fall of 2013 as a" and admits the allegation that "student in the EALC department" and the allegations that Xu was her advisor from the fall of 2013 until she left with a Master's degree in the spring of 2015. The Defendant denies the remaining allegations of Paragraph 22.

### D. Plaintiff Ao Wang

23.     Plaintiff Ao Wang is a renowned Chinese poet and an Associate Professor of East Asian Studies at Wesleyan University in Middletown, Connecticut.  He had numerous interactions with Xu directly and through Xu's associates arising from Xu's sexual assault of plaintiff Sun and others. Xu threatened Wang's life and professional standing, directly affecting his reputation and his health. He currently resides in New Hampshire.

ANSWER:

The Defendant admits that Plaintiff Ao Wang is a Chinese poet and an Associate Professor of East Asian Studies at Wesleyan University in Middletown, Connecticut. The Defendant lacks knowledge or information sufficient to form a belief about the truth the allegations that Plaintiff AoWang currently resides in New Hampshire. The Defendant denies the remaining allegations of Paragraph 23.

<u>STATEMENT OF FACTS</u>

### A. Xu's Early Ventures in Sexually and Emotionally Exploiting Students

a. <u>Xu's Early Sexual Exploitation and Rape of Women at UIUC</u>

24.     Xu arrived at UIUC in 2002. It was well-known in the tight-knit academic circle of East Asian Art and Literature that he was a womanizer. Despite being married, Xu had carried on a public affair with another student in his Ph.D. program at Columbia University, who became pregnant with his child. Xu demanded that she

obtain an abortion. The abortion was against her wishes and moral views, but at Xu's insistence she eventually agreed.

ANSWER:

The Defendant denies the allegations of Paragraph 24, but affirmatively states that he was Assistant Professor at UIUC beginning in 2001.

25.     Xu became an associate professor at UIUC in 2006, and capitalized on the added power and gravitas that came with the title. He developed a reputation for cultivating beautiful young Chinese and Taiwanese students as his "mentees" and advisees. These women became widely known within and outside of UIUC as "Gary Xu's Beauty Corps" due to their youth, physical attractiveness, and devotion to their professor. Xu "seemed to revel in the unusual attentiveness with which his young students obeyed his orders and followed him around campus." The optics of it were so obvious and off-putting that others commented that Xu was "a wolf leading a pack of sheep."

ANSWER:

The Defendant denies the allegations of Paragraph 25, but affirmatively states that he was an Assistant Professor at UIUC in 2006.

26.     These optics were accurate: Xu required that his advisees demonstrate both beauty and loyalty. As Xu bragged in front of his student, Zhao, and a table full of artists and professionals: "You know, you have to be good-looking in order to be my student. That's the bottom line."

ANSWER:

The Defendant denies the allegations of Paragraph 26.

27.     Xu wanted beautiful women as his students because he wanted to exploit them for his own purposes, including having sex with them at his will. One woman who applied to study at UIUC under Xu, for example, met with him at his hotel room in Beijing. She found the choice of location odd, but not wanting to hurt her chances of admission, agreed to this request.

ANSWER:

The Defendant denies the allegations of Paragraph 27.

28.      Once she arrived, Xu aggressively came on to the prospective student sexually.  He told her that she was "special" because she would "look him in the eyes" when speaking to him, while "most girls," apparently awed by him, "wouldn't look at [him] because they are too shy." As he moved in closer to her, he boasted—apparently to impress her—that he had had sex with 20 young women in China, before he went to the United States. Now positioned by her side, Xu suddenly threw his arms around her, then tried to bring her down to the ground so that he could penetrate her. There was no overture, and no indication whatsoever of consent on the woman's part, who was there only to discuss her potential admission to UIUC. The woman reported that she succeeded in pushing Xu off of her, then fled from the room and his attempted rape.

ANSWER:

The Defendant denies the allegations of Paragraph 28.

29.      Rumors of Xu's sexual relationships with students abounded in the period before he became department head.  In 2011, Xu wrote a cryptic Facebook post saying "Little rumors are okay—they cannot hurt. But when you talk about someone's family, people will get hurt." Immediately after posting it, he unfriended one of his students, Huanglan Su, who was also close to Xu's wife. As recounted by one of his former students, Mei Wang, "Many students witnessed this outburst on social media. We had noticed that Xu had developed a very close relationship with one of his students at the time, which would have made his wife unhappy. It is my understanding that Su told Xu's wife that Xu was having an inappropriate relationship with one of his female students, and this is what prompted the cryptic post and subsequent unfriending."

ANSWER:

The Defendant denies the allegations of Paragraph 29.

b. Xu Uses His Authority to Demand Work and Loyalty from Students

30.     Xu abused his authority as a UIUC professor in other ways. Tonglu Li, who received his Ph.D. in 2009, described Xu as taking advantage of his and other Chinese students' vulnerability and precarious status in the United States, which depended upon student visas. Xu required Li, and others, to translate numerous texts for Xu's personal use in a book called *The Cross-Cultural Zizek Reader*. Despite spending over 40 hours on this project, Li received no course credit, recognition, or payment for this work—contrary to academic practice.

ANSWER:

The Defendant denies the allegations of Paragraph 30

c. <u>Xu's Inappropriate and Unprofessional Behavior as a Professor</u>

31.     Xu behaved in "odd" and "inappropriate ways" beyond abusing his students' visa status for his own personal gain. On at least one occasion, Xu got visibly intoxicated in front of his students. While drunk, he insisted on wrestling with one of his advisees, much to the discomfort of all students present.

ANSWER:

The Defendant denies the allegations of Paragraph 31

32. In a 2010 class, Xu engaged in arguments with his students that were so heated, usually over arcane topics, that the students would turn to each other in shock and ask if this behavior was "normal."

ANSWER:

The Defendant denies the allegations of Paragraph 32

33. Even setting aside the overtly inappropriate behavior, Xu was a brazenly underprepared, unknowledgeable professor. Students from the time described him as "unprepared," unresponsive, "totally full of himself," a "posturing idiot," and untrustworthy.

ANSWER:

The Defendant denies the allegations of Paragraph 33.

34.     Despite Xu's lackluster teaching skills, students—particularly his advisees—were compelled to take classes from him. Xu demanded intense loyalty from his students that was out of place in academia and in professional relationships more generally. His levers to obtain it were crude: power over students' financial aid, grades and even ability to graduate, and he used them to make sure he maintained a court of pliant acolytes. For instance, Xu told one of his students—Mark Frank—not to bother applying to receive department travel funding, implying that he had displeased Xu. Frank knew the score; he enrolled in the next class Xu offered.

ANSWER:

The Defendant denies the allegations of Paragraph 34.

**B. Xu Becomes EALC Department Head and His Abuse Become Even More Brazen**

35.     Despite Xu's well-known inappropriate behavior towards women, his overweening demands for loyalty, exploitation of his students' work, poor performance as a professor and poor reputation outside of UIUC, the University of Illinois Board of Trustees made Xu head of the EALC department in 2012. With his promotion came even more power—a power that he crowed about to his students and other professors and used to step up his harassment and abuse of students.

ANSWER:

The Defendant denies the allegations of Paragraph 35.

36.     His students felt they had to go along with Xu's increasingly onerous and harmful demands; their ability to stay in the school and even the country depended on it. As one former student, Mei Wang, described: "For most Chinese students, the more time we spend in the States, the more invested we become in obtaining our degrees. Failure to graduate can also result in students losing their visa status, and having to leave the States all together. Because of this, we feel deeply that we need to please our Chinese professors, the people who have such intense and complete power over our lives."

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth whether or not Mei Wang made the statement. The Defendant denies the remaining allegations of Paragraph 36.

a. <u>Xu's Rape and Exploitation of Xingjian Sun</u>

*i. Xu begins a sexual relationship with his 19-year-old student, Sun*

37.    Sun moved from China to the United States in 2012, when she was 18 years old, to study as an undergraduate at UIUC on a student visa. The spring of her freshman year, 2013, she met Xu. Xu had recently been made head of the EALC department, and Sun asked him to be her instructor for an independent study course in the fall. He agreed.

ANSWER:

The Defendant admits the allegations of Paragraph 37.

38.    That fall, Sun started her course with Xu. Almost immediately, Xu began making sexual overtures. At their third meeting, Xu told Sun that he would have "fallen in love" with her if he were twenty years younger—he was 45 to her 19.

ANSWER:

The Defendant denies the allegations of Paragraph 38.

39.    On September 11, 2013, Xu kissed Sun for the first time behind the closed door of his office at UIUC, obviously taking advantage of his role as instructor.

ANSWER:

The Defendant denies the allegations of Paragraph 39.

40.    The next time Xu was scheduled to meet Sun for independent study, Xu took Sun to his home, which he shared with his wife and two children. Xu asked Sun if she was a virgin. Having been in a serious relationship once before, she was not. He then led her to his marital bedroom, where he demanded sex with her.  He used a condom, saying that she might be "dirty." Sun was not asked if she wanted to have

sex with her professor, nor was there any pretense of pleasure in it for her. The push for sex was all from him and about him.

ANSWER:

The Defendant denies the allegations of Paragraph 40.

41.     That set the stage for future encounters. From this point forward, Xu would generally have sex with Sun several times a week, always at his initiative and insistence. There was no give and take, no effort by Xu to have Sun experience any pleasure. Immediately upon withdrawing from her, he would say to her, "Little girl, you've done a good job."

ANSWER:

The Defendant denies the allegations of Paragraph 41.

   *ii. Xu begins a cycle of violence with Sun*

42.     Sun was only 19 years old when she and Xu became sexually involved. She was an ocean away from her family, friends, and country. She was isolated and naïve. She thought she loved him.  But their relationship was tumultuous.  Xu always required that Sun keep it secret. This isolated her even further, as she could not talk to her friends or family about this central aspect of her life. She became increasingly dependent on him, and correspondingly worried about angering him, even as he became more abusive.

ANSWER:

The Defendant denies the allegations of Paragraph 42.

43.     Xu insulted Sun frequently and vindictively. He often called her a "bitch" and "disgraceful." He mocked her English, despite her fluency. He called her "nothing." He told her that her parents would "detest" her for having had sex with a married man. He belittled her father, maligning his job, his accomplishments, and his manhood. His degradation of her and her family was meant to make him feel more powerful, and her small. It was meant to further isolate her, driving her away from

what few support systems she had. He wanted to be able to bend her to his will. He succeeded.

ANSWER:

The Defendant denies the allegations of Paragraph 43.

44.     In November 2013, Xu was physically violent with Sun for the first time. He asked her to go into detail about her past relationships, and she spoke to him about her ex-boyfriend.  He became enraged. He shouted at her and pushed her against the wall, calling her a "slut" and a "whore." He said that she was easy, and "already used." He threatened to break off with her, declaring they needed to "cool down."

ANSWER:

The Defendant denies the allegations of Paragraph 44.

> *iii. Sun's first suicide attempt*

45.     Sun was devastated. She had believed Xu's earlier promises that he would leave his wife for her and considered their relationship the "real thing." She believed Xu's words about her—that she was trash, used. She fell into a deep depression. On November 14, 2013, Sun slit her wrists. Her roommate found her in a pool of blood. Sun had written a suicide note: "I just want someone to love me." The police records and hospital reports associated with the incident note that Sun's suicide attempt was the result of her breakup.

ANSWER:

The Defendant denies the allegations of Paragraph 45.

46.     Xu came to the hospital to visit Sun during her recovery, and picked her up when she was discharged. While there, though, he did not comfort her, but instead further asserted himself and berated her. He was livid, frantic that her suicide attempt would make him look bad in front of his colleagues and bosses. With Sun sufficiently cowed, he went into damage control mode. He knew that the school would be told that Sun had attempted suicide and why, which would hurt his standing and career.  To put a lid on the incident, he insisted that Sun not complete the eight therapy sessions at

UIUC that she was expected to do. This insistence was in complete contravention of Sun's precarious mental health, but he did not care, telling her it was better that she die than embarrass him.  Sun did not want to anger him again, so she agreed to discontinue her therapy.  No one from UIUC followed up with her as to why she abruptly stopped, or to see whether she was safe.

ANSWER:

The Defendant denies the allegations of Paragraph 46.

*iv. Xu forcibly rapes Sun for the first time*

47.     Shortly after her discharge, Xu raped Sun for the first time.  In a direct echo of Xu's assault of previous victims (see paragraph 28 above), Xu showed up unexpectedly at Sun's door. Immediately after entering her apartment, he grasped her in his arms and forced her into the bedroom. There he pushed her against the wall and rammed his tongue into her mouth. Sun was only weeks out from attempting suicide, and was not in the right mental space to have sex with him.  She told him to stop. He did not. He ripped her clothes off her body and threw her onto the bed. He pulled his penis from his pants and entered her, abruptly and painfully. She told him again to stop, but he continued. He was angry, tearing into her when she was not ready. He said that he owned her, that she was his slave. Sun lay in shock, tears streaming, as he entered her again and again.

ANSWER:

The Defendant denies the allegations of Paragraph 47.

48. After Xu took his pleasure from Sun, he acted like a different person. He told Sun he loved her, and that he had been so worried about her. He told her he wanted a "clean slate."  He wanted to keep her silent.

ANSWER:

The Defendant denies the allegations of Paragraph 48.

*v. Xu insists on Sun arranging a threesome while she is carrying his child*

49.     Sun and Xu's relationship resumed its typical cycle, with Xu raising Sun up only to crash her back down. He would oscillate between being kind and doting, telling her that he loved "every moves [*sic*]" she made, and vicious cruelty. He told her that he wanted to provide for her financially, including pay her rent. He sent her cash "gifts," with the unstated quid pro quo that she would sexually service him whenever he chose.

ANSWER:

The Defendant denies the allegations of Paragraph 49.

50.     In early 2014, Sun became pregnant with Xu's child. She wanted desperately to keep the baby, but Xu could not abide it. He had his reputation to protect, and having a baby out of wedlock with a young co-ed was not in his plans. He told Sun that if she kept the baby, he would never see her again. He said that she would be reviled and hated by everyone because the baby would prove that she was a slut. He said he would deny he was the father, and everyone would believe him over her. He said, menacingly, that if she had the baby, she would not be on his side. Despite it going against her deeply held beliefs, she reluctantly agreed to terminate the pregnancy. She felt she had no other choice.

ANSWER:

The Defendant denies the allegations of Paragraph 50.

51.     In the period before the abortion, despite Sun carrying his child and her fragile emotional state, Xu reignited his obsession with having a threesome. He told Sun that she needed to find another student to satisfy his sexual desires. Sun had never expressed any interest in a threesome, and certainly had no interest in it while contemplating aborting Xu's child. However, Sun knew what Xu was capable of. Not wanting him to hurt her, she agreed to find someone.

ANSWER:

The Defendant denies the allegations of Paragraph 51.

52.     Sun found another undergraduate student named Yibing Pu, also from China. Pu and Sun were friends, and Pu knew about Sun's relationship with Xu. Although Pu did not want to have a threesome, she was worried for her friend, and agreed to join Xu and Sun to see the movie *The Grand Budapest Hotel*, and afterwards join them for a meal at a restaurant, Radio Maria. Pu picked up on Xu's arousal as soon as they entered the theater.  Pu said: "When we sat down in the theater, Xu ensured that he was between Sun and me. The seating felt deliberate to me. I sensed that he was sexually aroused by placing himself between us."

ANSWER:

The Defendant denies the allegations of Paragraph 52.

53.     Any doubt about Xu's intentions disappeared when they went to Radio Maria. Again, Xu placed himself between Sun and Pu.  He spent much of the meal boasting about himself and his importance in the field of Chinese art, and complimenting Pu on her appearance.  When the meal ended, Xu propositioned Pu to have a threesome with him and Sun. Pu declined.

ANSWER:

The Defendant denies the allegations of Paragraph 53.

54.     Sun had hoped that this would be the end of Xu's quest to fulfill his fantasy of having a threesome with two UIUC undergraduates. But he persisted, despite Sun's pregnancy. Again and again, he pestered Sun to text or call Pu to arrange a threesome. Again and again, Pu declined. But soon, Xu saw his opening.

ANSWER:

 The Defendant denies the allegations of Paragraph 54.

55.     On March 22, 2014—just five days before Xu scheduled Sun for an abortion, without her knowledge—Pu was the driver at fault in a car accident. Xu used her accident as a leverage moment. He told Sun to tell Pu that he would help her find a private attorney. Pu explained: "Xu's immediate offer of help seemed extremely odd, as he had only met me once and did not know me well.  I was suspicious that his

unexpected generosity was yet another attempt to coax me into a threesome but—with no one else on whom to call for help—I accepted his assistance." Her suspicions were well-founded. Sun recounted: "He wanted Pu to be in a position where she was financially indebted to him, and felt that she could not refuse his request for a threesome." Xu even accompanied Pu and Sun to the campus legal services office. Luckily for Pu, the University's lawyers were able to help her with the ensuing case in traffic court, and she did not need to hire a private attorney or accept Xu's financial assistance. Pu explained: "I was glad not to take Xu's money, as I understood it to be offered in exchange for a threesome."

ANSWER:

The Defendant denies the allegations of Paragraph 55.

56.     Pu was not Xu's only potential target for a threesome. Xu also asked Sun's roommate, Mingyang Xi, to have a threesome with him and Sun. She also refused.

ANSWER:

The Defendant denies the allegations of Paragraph 56.

57.     On March 24, 2014, Xu drove Sun to the Women's Health Practice to have her abortion.  Xu did not tell Sun ahead of time where they were going.  He handed Sun $400 in cash, telling her to put the charge on her own credit card so that it could not be traced back to him.  Sun desperately did not want to have the abortion, but she saw no way out: She could not support the child on her own, and Xu had threatened to force her out of school and the country if she did not acquiesce. Seeing no choice, she did as Xu demanded.

ANSWER:

The Defendant denies the allegations of Paragraph 57.

        *vi. Sun's second suicide attempt*

58.     Sun's remorse over the abortion was intense. Xu made her mounting depression worse, telling her that the baby did not "count" as a child because it was just a "bundle of cells."  Days afterwards, on March 27, 2014, Sun attempted suicide by

overdosing on Xanax. Again, her roommate, Xi, found her. This time, Xi called Xu, who drove her to the hospital.

ANSWER:

The Defendant denies the allegations of Paragraph 58.

59.     Xu was furious with Sun, because he was concerned for himself—that he would be found out and his reputation suffer. On the way to the hospital, while she was unconscious from her overdose, he beat her savagely.  By the time they arrived at the hospital, the police report noted, "Staff noticed bruising and suspected professor who was with her" of inflicting the injuries.

ANSWER:

 The Defendant denies the allegations of Paragraph 59.

60.     While Sun was in recovery, Xu came to the hospital, where he abused her for threatening his reputation at UIUC. He promised to kill her and her parents if she told anyone about their relationship. Sun believed him. The bruises still marking her body confirmed her fears.  In an abrupt about-face, on his last visit, Xu was all warmth and love.  With Sun in his arms, he told her that he forgave her, and that he would let her continue to be with him if she agreed to be silent. She gratefully, tearfully agreed. Xu drove her home.

ANSWER:

The Defendant denies the allegations of Paragraph 60.

        *vii. Sun's first report to UIUC*

61.     Not long after her discharge, Sun was raped by another student at an off-campus get-together. Sun was frantic and devastated. She sought comfort from the person she believed to be the love of her life. Xu, rather than helping Sun through her trauma, flew into a deep rage. He shoved Sun.  He slammed her face into a wall.  He kicked her.  He kicked the walls around her. He yelled at her, calling her demeaning names. He called her mother demeaning names. He blamed her for being raped, said

she must have been asking for it, must have wanted it. Then, worried that the neighbors might have heard the commotion, he fled.

ANSWER:

The Defendant denies the allegations of Paragraph 61.

62.     Sun fell into a tailspin. She loved and trusted Xu.  If he thought she was worthless, used, an easy woman—maybe it was true. She called him to apologize for being raped. He hung up on her, telling her that he no longer wanted her. She was used and "dirty." She was of no further use.

ANSWER:

The Defendant denies the allegations of Paragraph 62.

63.     Xu stopped picking up his phone.  He did not answer emails.  Sun grew increasingly upset. In the early hours of April 25, 2014, Sun went to Xu's house to confront him. Xu called the police. When they arrived, Sun told the police that she and Xu were in a sexual relationship, which Xu denied. At Xu's prodding, the police arrested Sun for disorderly conduct.

ANSWER:

The Defendant admits the allegation that "Xu stopped picking up his phone. He did not answer emails." The Defendant admits the allegation that "In the early hours of April 24, 2014, Sun went to Xu's house", admits the allegation that "Xu called", admits the allegation that "the police" and "arrived", and "the police arrested Sun for disorderly conduct." The Defendant denies the remaining allegations of Paragraph 63. The Defendant affirmatively states that on April 25, 2014, Sun called Xu on the telephone more than 60 times in 20 minutes, that the Defendant eventually turned off his phone, that after midnight, Sun came to his door, threatening that she was carrying a knife and that she was going to kill his entire family, and that the Defendant called 911. The Defendant affirmatively states that when the police came, Sun kept banging on his house door despite the warnings, and the police had to restrain her and then took

her to jail. The Defendant did not ask the police to arrest her. The Defendant declined to press charges. The Defendant further states that the police report describes the incident.

64.     After being released the same morning, on April 25, 2014, Sun called her advisor, UIUC Professor Julian Parrott, and the ODEA to make a Title IX report.

ANSWER:

The Defendant admits the allegations of Paragraph 64.

65.     Not yet knowing that Sun had reported him to the school, Xu called Sun to berate her again for being so careless as to be raped, and for having shown up at his house, risking exposing him. Over the phone, Sun told him that she had made a Title IX report.

ANSWER:

The Defendant denies the allegations of Paragraph 65.

66.     Xu immediately changed his tune.  He pressured Sun to drop the report. He begged her, telling her that he loved her, that he was going to leave his wife for her and that he would be good to her in the future. Sun was still so manipulated by him that she believed him. In an email dated April 28, 2014, Sun wrote to Parrott that she wanted to take the report back. By way of explanation, she wrote: "I am sure you can understand more how hard it is to get to a position [like professor and Chair of EALC] today. It was an effort of twenty years. I will not be the one to screw everything. I loved, and love him."

ANSWER:

The Defendant admits that Sun withdrew the report. The Defendant denies the remaining allegations of Paragraph 66. The Defendant further states that the email that Sun wrote on April 28, 2014, speaks for itself.

67.     The school was happy to brush the matter under the rug. "You must do what you think is right for you," Parrott wrote in response When Sun emailed the ODEA a few weeks later formally withdrawing the report because the relationship was

"consensual," That was the end of the school's apparent involvement. Xu was allowed to continue to have unfettered access to Sun and to other vulnerable students.

ANSWER:

The Defendant admits that Sun withdrew the report. The Defendant denies the remaining allegations of Paragraph 67. The Defendant further states that Sun's email formally withdrawing the report speaks for itself.

*viii. Xu's beating and rape of Sun in China*

68.     In summer 2014, Xu travelled to Shanghai, China to curate an art exhibit. Xu invited Sun to join him there, so they could "spend time together." Sun knew this was a euphemism, and that her main purpose there would be sexually servicing him. To induce her, Xu told Sun that he would introduce her to several friends who were influencers in the Chinese art world. He also promised that if she came with him, he might divorce his wife and marry her instead. She agreed and joined him at the Marriott Hotel in Shanghai.

ANSWER:

The Defendant denies the allegations of Paragraph 68.

69.     Xu often left Sun alone in their hotel room to meet up with his artist friends to drink and do drugs. He intimated that prostitutes would be present at these parties. Sun was upset. She thought that this was the trip where she would finally be brought out as his partner, not left in a hotel room while he had sex with prostitutes. When Xu finally returned, drunk and stoned, he told Sun that he had told his companions about her—how young and sexy she was, how nubile. He told her that after his description of her to his friends, all of them wanted to have sex with her, and that he thought she should. Sun was shocked and angry. She thought Xu was in love with her, as she was with him. She did not understand why he would want to pimp her out to these men— men who, except for the artist Zhengang Tong ("Tong"), she had never even met.

ANSWER:

The Defendant denies the allegations of Paragraph 69.

70.     Xu told her, condescendingly, that these men were famous, well-respected artists. He wanted to impress them. He wanted them to think of the pleasure they achieved with Sun and associate that with Xu and his "generosity" in letting them have sex with her. He particularly wanted Sun to have sex with Zhang, an artist he described as "next level, whom he told Sun she should be honored to "serve". He tried to convince Sun that having sex with these men would be in her interest as well as his—it would advance her career and allow her to make valuable professional connections. In reality, Xu had no regard for Sun's safety or well-being. His goal was for Sun to debase herself to enhance himself, to make her into a slave that he could "gift" to bolster his reputation in the Chinese art world and at UIUC.

ANSWER:

The Defendant denies the allegations of Paragraph 70.

71.     Sun saw through Xu's proposition. Angry and hurt, she ripped Xu's passport— although not so badly that he was unable to travel with it.  Xu flew into a bitter rage.  Crossing the room quickly, he closed in on Sun and punched her, hard, in the face.  She fell in a pile to the floor. As she struggled to stand, he punched her again. Then a third time.  While Sun lay huddled on the floor, he kicked her in the stomach so hard she threw up blood.  As Sun staggered again to her feet, Xu held her up as if to help her, then pushed her down to her knees, injuring her legs. By the end of his assault on her, her eyes were full of blood.  She could barely walk for several days afterwards or even recognize herself in the mirror.  The beating was so vicious that Xu injured his right hand, requiring him to wear a bandage (Figure 1). His anger satiated, Xu left Sun alone on the floor, bleeding into her own vomit.



ANSWER:

The Defendant admits that this is a photograph of him, but denies that it was taken in July 2014 at art exhibition in Shanghai. The Defendant denies the remaining allegations of Paragraph 65. The Defendant affirmatively states that the photograph shows him at an art exhibition he curated in August 2014. The Defendant further affirmatively states that he scratched his hand on a nail while hanging art works on the wall and he bandaged his hand because the cut would not stop bleeding due to the blood thinners he was taking as treatment for the heart condition he developed due to the stress of the actions of Sun.

72.     Sun knew she needed help. Despite the pain, she managed to pick herself up off the floor and take the elevator down to the hotel lobby.  The hotel workers rushed to call the police, who took her to receive urgent care at the hospital.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation the allegations of Paragraph 72.

73.     After Sun was discharged, she returned to the hotel. She had no other options— she could not afford a hotel room on her own, and she was too embarrassed

to return to her family in a nearby province with her injuries so obvious and acute. Xu was still at the hotel, needing to stay there for his upcoming art exhibition.

ANSWER:

The Defendant denies the allegations of Paragraph 73.

74.     While Sun was still in acute pain from Xu's beating and unable to move freely, he raped her for a second time.  Through her swollen mouth, Sun tried to tell Xu to stop.  Xu did not. Because Sun could not move easily, he manipulated her battered body so that he could penetrate her to achieve his pleasure.  The pain was excruciating. Sun could not stop crying.  Her eyes were so swollen from his beating and from crying that she could barely see him (Figure 2).  Even through her pained cries, he continued to brutally ram himself into her until he ejaculated.

ANSWER:

The Defendant denies the allegations of Paragraph 74.



*Figure 2.* Sun's eye after Xu's beating, Summer 2014.

75.     After Xu raped Sun, he returned to the United States and cut off all contact with her. He showed no remorse or concern for her.

ANSWER:

The Defendant denies the allegations of Paragraph 75.

> *ix. Xu obtains Sun's visa for her and requires her to come back to the States*

76.     Because of the police report Xu made against her in April 2014, Sun's visa went under review, delaying her return to the United States. She could not make progress on her visa until receiving a copy of her arrest record after Xu had her arrested, but the police department was unable to Federal Express the record to her abroad for bureaucratic reasons. She was stuck in China with no obvious way out, and with two of her four years of undergraduate education remaining. Xu was not answering her calls. She thought her situation was hopeless.

ANSWER:

The Defendant admits the allegation that "Xu was not answering her calls" but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 72.

77.     Unsure what to do next, she posted two photographs of herself taken after Xu's attack in Shanghai as a Direct Message to UIUC's official account on the Chinese social media site, Weibo. Upon receiving the photos, the account administrators reported the photos to UIUC and contacted her advisor, Julian Parrott.

ANSWER:

The Defendant admits the allegations that Sun "posted two photographs of herself taken after Xu's attack in Shanghai as a Direct Message to UIUC's official account on the Chinese social media site, Weibo. Upon receiving the photos, the account administrators reported the photos to UIUC and contacted her advisor, Julian Parrott." and denies the remaining allegations of Paragraph 77.

78.     During this time, Sun believed she had no way of returning to the United States, and she wanted time away from Xu, hoping to recover from his physical and psychological attacks. As a result, Sun worked directly with Sondra Schreiber in UIUC's International Student and Scholars Association to cancel her visa. At Sun's

request, UIUC officially terminated Sun's F-1 status for "Authorized Early Withdrawal," which also invalidated her I-20. Sun then contacted Trent Nelson, an academic advisor in her department, requesting a leave of absence because she would not be able to make it back to UIUC before classes began due to her visa issues.

ANSWER:

The Defendant admits the allegations that Sun "invalidated her I-20," but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 78.

79.    Xu learned about Sun's actions in China and got scared.  He realized that Sun could be a liability for him in China where he could not keep an eye on her. He was afraid she would pursue a more visible social media campaign against him, or otherwise make their relationship known. Xu called Sun and told her she needed to return to campus. He said that if she did not go back, if he lost control of her, he would do everything he could to hurt Sun's reputation in China. He said that she would never graduate and that he would make certain that she would never be able to return to America again.  She believed him.  Once again, he figured out a way to thwart her attempts to get away from him. And so she allowed Xu to take control of her visa process.

ANSWER:

The Defendant denies the allegations in Paragraph 79.

80.    Xu coordinated directly with the International Scholar and Students' Association to reinstate Sun's invalid I-20. He also coordinated with the police department to receive a copy of her police report, which was required to reinstate her visa status.  If it were not for Xu's efforts, she would not have been able to return to UIUC that fall.  On Xu's demand, she returned to campus in September 2014, having missed several weeks of classes. Her late return was against the recommendation of her advisor, Julian Parrott, who was concerned that missing two weeks of classes would put her too far behind to catch up.

ANSWER:

The Defendant admits the allegations in Paragraph 80 that he coordinated to reinstate Sun's invalid I-20. The Defendant affirmatively states that Sun contacted the undergraduate office of the School of Foreign Languages and Cultures. Xu was notified of Sun's visa situation by the undergraduate secretary. It was the undergraduate secretary who secured Sun's arrest record and mailed it to China. The Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 80.

*x. Sun makes her second report to UIUC*

81.     With Sun on her way back to the States, Xu needed to bring her in close. He began a campaign of kindness, flooding her with loving texts ("I love you, I love you;" "My heart aches after you blocked me for just one minute" and promises that he would love her better. He evidently hoped that through kindness, he could prevent her from making a full report to UIUC.

ANSWER: The Defendant denies the allegations in Paragraph 81.

82.     Behind the scenes, there was a flurry of ineffective activity at UIUC. The school could not ignore the photographic proof of Xu's abuse. On the other hand, UIUC has one of the highest enrollments of Chinese students of all American universities and they provide an essential financial pipeline for a state school facing constant political pressure to cut spending. A scandal in which a leading Chinese professor beats and rapes a young Chinese student over many months without intervention by UIUC authorities was potential dynamite—particularly in light of the recent high-profile murder of another Chinese student at UIUC. After months of silence, in early September, Sun received an email from Kaamilyah Abdullah-Span at ODEA, casually writing to "follow up" on their conversation in May to "see how everything is going for you." She also was called in for an emergency meeting with her advisor, Julian Parrott, on September 15, 2014. Sun confessed everything to Parrott—Xu's abuse

from the start of their relationship to the beating in Shanghai. She made a report to Abdullah-Span as well the next day.

ANSWER: The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 82. Further, the Defendant states that any email or report speaks for themselves.

83.    Formally, UIUC went through the motions to handle Sun's complaint. Xu had to meet with the Dean of the College of Liberal Arts and Sciences, Barbara Wilson, and Associate Dean Dave Tewskbury, to discuss the allegations, so he knew that Sun had reported him. The University sent Xu a letter telling him to have "no contact" with Sun. But this was form without substance. UIUC did nothing to protect Sun from the foreseeable consequence of informing this repeat domestic abuser, whose abuse photographs of Sun were in its possession, that Sun had exposed his misconduct, or to enforce its no-contact order. UIUC failed to even tell Sun that Xu was not to have further contact with her. After Xu's meeting with the Dean, Xu showed up at Sun's apartment. He burst through the door, shaking with uncontrolled anger. He slapped Sun. He punched her.  He choked her.  Then, with a knife held to her throat, he told her to take back the report.  He told her to say that everything had been a delusion on her part, that she fantasized about the relationship, but it had no basis in reality.  He told her that if she did not do as he said, he would not let other professors write letters of recommendation for her and would do all he could to hinder her college education and prevent her from graduating. He threatened to send her back to China. He threatened to hurt, perhaps even kill, her parents. He had tracked down her father, and knew his name and address.  Crying, Sun agreed.  Xu gave her the script for what to tell the school.  She was to tell them that she had been assaulted not by him, but by another boyfriend (she did not have another boyfriend).  Under this overwhelming pressure, Sun withdrew the report during a meeting with Abdullah-Span on September 17, 2014. UIUC never followed up.

ANSWER: The Defendant admits the allegations that, "Xu had to meet with the Dean of the College of Liberal Arts and Sciences, Barbara Wilson, and Associate Dean

Dave Tewskbury, to discuss the allegations, so he knew that Sun had reported him. The University sent Xu a letter telling him to have "no contact" with Sun." The Defendant admits the allegation that "Sun withdrew the report". The Defendant denies the remaining allegations in Paragraph 84.

### xi. Sun enrolls in Xu's Spring 2015 class

84.     Although Xu was still furious with Sun for reporting, he needed to reconcile with her or risk her reporting again. He insisted that they restart their sexual relationship. She did not see any choice. He still wielded all the power. He had brought her back into the United States and to UIUC.  He warned her that he could just as easily force her back to China.  Sun had invested years in her education. She did not want to lose it all. She had become habituated to obeying. She began having sex with Xu again, against her will.

ANSWER:

The Defendant denies the allegations of Paragraph 84.

85.     After Xu's and Sun's reconciliation, their relationship became more brazen. Xu took Sun to her classes many times a week. He often stopped by her apartment. They traveled to Chicago together and to Indiana University, with Xu paying for transport. Sun took pictures of their travels and posted them to social media. Always, there was the expectation that Sun would have sex with him on these trips or shortly thereafter. He told her that he had earned the sex because he had exposed her to new places and new things that could advance her career.

ANSWER:

The Defendant denies the allegations of Paragraph 85.

86.     At Xu's insistence, Sun enrolled in a course he was teaching in spring 2015. He could better control her if she was dependent on him for her grades; an "F" would put her visa in jeopardy.  Despite the no-contact order, Sun received no pushback

for enrolling in or attending his class from anyone at the University. No one was looking out for her.

ANSWER:

The Defendant denies the allegation that "At Xu's insistence", denies the allegation that "Despite the no-contact order", the Defendant admits the allegation that "Sun enrolled in a course he was teaching in spring 2015" and the Defendant denies the remaining allegations of Paragraph 83.

87.     Xu, emboldened by UIUC's lack of response, flaunted his relationship with the beautiful undergrad.  Several students in Xu's spring 2015 class—and in the EALC department at large—commented on the unusual relationship between Xu and Sun, or seeing them leaving together, sometimes heading towards his office where he would shut the door behind them.

ANSWER:

The Defendant denies the allegations of Paragraph 87.

88.     In late spring of 2015, there was a sudden flurry of interest in Sun's relationship with Xu from the University, after Zhao reported concerns about Xu's relationship with Sun, and her own abusive relationship with him, to Professor Robert Tierney. UIUC had done nothing to enforce its September no-contact order, or follow up to see if Xu was obeying it. It had even allowed Sun to enroll in his seminar. Nevertheless, Zhao's notice to the school that Sun was in Xu's class caused the school to act. In a letter dated April 7, 2015, Dean Wilson wrote to Xu that Sun's enrollment in his class "reflects a violation of the no-contact directive as well as poor professional judgment." Sun was nonetheless allowed to remain in the class, with no apparent oversight from the University.

ANSWER:

The Defendant admits the allegation that, "In a letter dated April 7, 2015, Dean Wilson wrote to Xu that Sun's enrollment in his class 'reflects a violation of the no-

contact directive as well as poor professional judgment.'" The Defendant denies the remaining allegations of Paragraph 88.

89.     Predictably, with his reputation threatened, Xu became enraged. Sun, who had received no warning from the school that Xu was to be contacted again about their relationship, was unprepared for the torrent of abuse Xu unleashed. The school contacted Xu several times in the following weeks to ask about their relationship. Each time, Xu beat her—sometimes with a rolling pin, sometimes with an ash tray, sometimes with his bare hands. He would berate Sun for putting him in a position where his career and family could be jeopardized because of a "slut" like her. This intense level of abuse occurred five to six times that spring.

ANSWER:

The Defendant denies the allegations of Paragraph 89.

*xii. Xu tries to run Sun over with his car; she escapes to the library*

90.     Xu left for China in the summer of 2015, in part to resume a sexual affair with another University of Illinois student.  Sun did not join him there.  When Xu returned to UIUC, he offered to help Sun move to her new apartment. Sun agreed.

ANSWER:

The Defendant admits the allegation that "help Sun move to her new apartment" and denies the remaining allegations of Paragraph 90.

91.     While Xu was moving boxes downstairs, Sun checked his phone, suspicious that he had been having sex with another woman while in China. The passcode for his phone was Sun's birthday.

ANSWER:

The Defendant admits the allegation that "While Xu was moving boxes downstairs, Sun checked his phone", denies the allegation that "The passcode for his phone was Sun's birthday" and the Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 91.

92.     Once Sun unlocked Xu's phone, she was greeted with a pornographic exchange between Xu and his new UIUC girlfriend. The student asked Xu to ejaculate into her "Size E" breasts. "Ah Ah Ah, too beautiful!" "Yeah yeah," Xu replied.

ANSWER:

The Defendant admits that Sun accessed Xu's phone as it wasn't locked, admits that Sun accessed a text exchange on the application WeChat between Xu and a Beijing artist that contained the Chinese words that translated into English as "Size E" breasts. "Ah Ah Ah, too beautiful!" "Yeah yeah,". The Defendant denies the remaining allegations of Paragraph 92.

93.     When Xu returned with the boxes, Sun demanded to know who the woman was. Xu told her it was another UIUC undergraduate. Sun was devastated. Xu, however, was furious with Sun for looking at his phone without permission. He slapped her across the face. Sun was still holding the phone, and Xu began to chase her to get it back. Terrified that he would attack her again, Sun ran towards the stairs and outside, still holding the phone.

ANSWER:

The Defendant admits the allegation that "When Xu returned", that " Sun demanded to know who the woman was. Xu told her", that "Sun ran towards the stairs and outside, still holding the phone." The Defendant denies the remaining allegations of paragraph 93.

94.     At the stairs, Xu pushed Sun hard, causing her to collide into the wall and fall down several stairs, resulting in bruising and an abrasion. She picked herself back up and, in a panic, began to run towards the closest building that she knew would be open—the public library. As she ran toward the library, Xu got into his car and began following, swerving the car over to the sidewalk to hit her.

ANSWER:

The Defendant admits the allegation that Sun, "began to run towards the closest building that she knew would be open—the public library. As she ran toward the

library, Xu got into his car" The Defendant denies the remaining allegations of Paragraph 94.

95.     Fearing for her life, Sun ran into the library and frantically called her advisor, Julian Parrott. She told Parrott that Xu was trying to kill her and that he had to come quickly to the library. Parrott, knowing that the school had investigated Xu in the past, arrived shortly after she called. By this time, Xu had called security—saying Sun had stolen his phone—who then called the police.

ANSWER:

The Defendant admits the allegations that Sun "ran into the library " and that Parrott "arrived" at the library and that Xu spoke with library security who "called the police". The Defendant denies the remaining allegations of Paragraph 95.

96.     The police report details the incident, as well as Sun's and Xu's sexual relationship: "Most recently, [Sun and Xu] had sexual intercourse with each other yesterday, 08-03-15, at [Sun's] temporary apartment…. [Sun] explained that she could provide a condom that [Xu] used with her as proof that they were sexually involved with each other." The report also details Sun's prior abuse by Xu and her reporting to the University: "[Sun] went on to tell me about past abuse by [Xu]. [Sun] advised that Gary frequently intimidated her by telling her things such as, he would not let other professors write her letters of recommendation. [Sun] was led to believe that [Xu] would take actions that would hinder the furtherance of her college education."

ANSWER:

The Defendant states that the police report stands on its own. The Defendant denies the remaining allegations of Paragraph 96.

97.     The police ultimately resolved the dispute as a domestic battery and took no further action, although Sun knew that Xu had called the police in an attempt to get her arrested and further upset her status in the country. His control over Sun's presence in the United States was his primary avenue for retaining control over her, getting her to continue to have sex with him and not reporting him, even as their relationship soured.

This time, his plan did not succeed—and he was furious. As he left the library, he threatened in a low, menacing voice: "You are done."

ANSWER:

The Defendant admits the allegation that, the police took no further action and the Defendant denies the remaining allegations of Paragraph 97. The Defendant states the police report speaks for itself.

### xiii. Sun's third report to UIUC

98.     UIUC could no longer turn a blind eye to Xu's intense abuse of one of its students. As soon as Xu and the police left the library, Parrott called the secretary to the UIUC Provost and UIUC counsel.  Parrott then walked Sun to the UIUC campus where Sun met with these University officials.  She told them everything—setting out, for the third time, her prior disclosures, and filling in details of the more recent abuse, including his physical abuse of her and his requiring her to have sex with him against her will. The officials said they would look into Xu's behavior.

ANSWER:

 The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 98.

99.     The next day, Sun went to the school's Women's Resource Center, where she was encouraged to get a restraining order. The University did not participate in this. An advocate unaffiliated with the University helped Sun fill out the necessary forms. Sun got an initial order of protection on August 10, 2015. In the absence of University assistance, Sun ultimately had to find her own private attorney, spending almost $5,000 over several months of hearings without any financial support. As a young student, this was a major financial burden.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 99.

100.    The August 4, 2015, incident at the library marked the end of Sun's relationship with Xu. A month after their relationship ended, Sun learned that she had contracted chlamydia. Xu was the only person who could have given it to her.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 100.

*xiv. Sun tells her story*

101.    Shortly after the library incident, Xu departed for a fully-paid sabbatical in China. Sun was left reeling, dealing with the emotional and physical fallout of years of abuse. Sun realized that she had fallen prey to a cycle of domestic violence, and fell into a deep depression. She found herself contemplating suicide again, and knew she needed to do something to regain the sense of control that Xu cost her

ANSWER:

The Defendant denies the allegations of Paragraph 101, but affirmatively states that he was on un-paid sabbatical in Hong Kong for the fall 2015 semester.

102.    In an attempt to gain back some of the autonomy that Xu had taken from her during her sophomore and junior years, she decided to tell her story, anonymously and without naming Xu, on a Chinese social media site. Sun wrote, "During the two years I spent with him, I was constantly threatened by him using domestic violence, my recommendation letter and my student status as the tools. . . . He even threatened my parents. Using his position, he used soft imprisonment on me for a year" She continued: "There were a lot of moments that made me feel it was true love, there were several dirty occasions where he found two female students for 'threesome' sexual relations, there were dangerous circumstances where I was arrested by the police and my visa application was rejected, and there were shocking moments when I found there was a fourth person, even though I had long known that I was the third person.  The fourth person was also a student."

ANSWER:

The Defendant admits that Sun made an anonymous post on a Chinese Social Media site. The contents of the post speak by themselves. The Defendant denies the remaining allegations of Paragraph 102.

103.    Sun's statement captured the root of the problem that allowed Xu to exert his "soft imprisonment" on her: she, and other Chinese students in her position "can't seek protection because of their nationality, they can be repatriated at any time." Xu abused this power; the University let him.

ANSWER:

The Defendant states that Sun's posts stand for themselves. The Defendant denies the remaining allegations of Paragraph 103.

104.    Although Sun did not name Xu, someone in the comments did.  Xu's abuse of Sun went viral.  Xu was furious when he read the post.  Although Sun was not named, Xu knew it was her because of the details posted.  To seek revenge, he found Sun's contact information and caused one of his friends to text Sun's father in China. He said Sun was a lunatic who had a crush on an older, well-known professor and had gone crazy when he rejected her, causing her to be admitted to an "asylum." He told Sun's father that Sun did not deserve an American education and should be taken back to China. Xu's lies were humiliating, and caused an irreparable rift between Sun and her traditional Chinese father, as Xu intended. Her father's disapproval only added to Sun's depression and stress. Given Sun's current mental state, and her past suicide attempts, Xu knew full well the consequences of his actions.  Sun's ruined relationship with her father remains deeply upsetting to her.

ANSWER:

The Defendant denies the allegations in Paragraph 104.

       *xv. Xu intimidates Sun to drop the case against him in court and at UIUC*

105.    In October 2015, Sun was in the process of receiving a final restraining order against Xu. Xu knew that this would look terrible for him and hurt his career. He

needed to do all he could to get Sun to drop the case. He called Sun and begged her to drop it. He blamed the entire relationship on her, telling her that she had ruined his life, and that if she did not drop the case, he would kill her. Knowing how upsetting Sun had found it when he contacted her father, he threatened to do it again. He told her that her family would not have a peaceful life in China. He publicly called out her father on social media who, as a Chinese government worker, was very invested in keeping his reputation clean—negative attention could easily cost him his job. Sun feared for her parents' reputation, and also for their physical safety, knowing exactly what Xu was capable of. Under pressure, she dropped her case against him.

ANSWER:

The Defendant denies the allegations in Paragraph 105.

106.    In an email dictated by Xu, Sun recanted her allegations. This time, however, the University decided to continue investigating.

ANSWER:

The Defendant denies the allegations in Paragraph 106.

107.    In May 2016, around the time of Sun's graduation, and nine months after her third report to the school, Xu and Sun received UIUC's final report. The report concluded that Xu and Sun had been in a sexual relationship. Xu again pressured Sun to recant, sending her a draft email of exactly what he wanted her to say from his Hotmail account. She sent the document, unchanged, to UIUC on May 16, 2016. The email he dictated said in part: "I . . . want to thank Professor Gary Xu for everything he's done for me in spite of the troubles I brought to him. The two classes I took from Professor Xu were the most inspiring courses at UIUC." In the letter, he attempted to save himself at Sun's expense, blaming every prior incident and report to the school as Sun's "delusion." The letter concludes, in direct contrast to the school's conclusions, "Everything professor Xu says . . . is true. He never beat me. He never really had sex with me. He had always been really nice to me. I am sorry for giving him so many troubles."

ANSWER:

The Defendant denies the allegation that the UIUC issued its final report in May 2016. The Defendant affirmatively states that UIUC did issue a final report. The Defendant admits the allegation that, "The report concluded that Xu and Sun had been in a sexual relationship." The Defendant admits that Sun sent a letter of apology to the University that said in part: "I . . . want to thank Professor Gary Xu for everything he's done for me in spite of the troubles I brought to him. The two classes I took from Professor Xu were the most inspiring courses at UIUC." The Defendant admits that Sun's letter further said in part: "Everything professor Xu says . . . is true. He never beat me. He never really had sex with me. He had always been really nice to me. I am sorry for giving him so many troubles." The Defendant states the report and Sun's letter of apology speak for themselves. The Defendant denies the remaining allegations in Paragraph 107.

108. Xu's emotional and physical abuse of Sun, and the threats to her family, continue to cause her great pain. She has been diagnosed with post-traumatic stress disorder, is in therapy, and was on antidepressants for several years. She has had to spend many thousands of dollars on mental health care as a result of Xu, and will have to spend many thousands more to continue to heal from his protracted abuse.

ANSWER:

The Defendant denies the allegations that "Xu's emotional and physical abuse of Sun, and the threats to her family" and the Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 108.

### b. Xu's Exploitation and Attempted Assaults of Xing Zhao

*i. Xu recruits Zhao to obtain free work*

109.    Zhao's relationship with Xu began in August 2012, a year before he began having sex with Sun.  Zhao had been following Xu on the Chinese social media site Weibo, where he held himself out to be the great luminary of his field. He frequently

posted photographs of himself at conferences, talks and gatherings with students, and touted the success of his former students.

ANSWER:

The Defendant admits that he "touted the success of his former students" and affirmatively states that many of those were posted on the UIUC website. The Defendant denies the remaining allegations of Paragraph 109.

110.    Impressed by Xu and his representations about UIUC as a center of scholarship in her field, Zhao traveled to Illinois to meet with him in person and tour the university. Xu had recently been appointed head of the EALC department—a promotion he flaunted, impressing upon Zhao his near-unilateral power to grant her admission to UIUC and bestow financial aid. Zhao was made very aware that she would need to impress Xu, and appear impressed by him, if she wanted to study at UIUC.

ANSWER:

The Defendant admits the allegation that "Zhao traveled to Illinois to meet with him in person and tour the university. Xu had recently been appointed head of the EALC department." The Defendant denies the remaining allegations of Paragraph 110.

The Defendant affirmatively states that one of his former graduate students was teaching at the University of Kansas, where Xing Zhao was pursuing her master's degree in art history. My student recommended Zhao to contact me after Zhao expressed to her the desire to become my student. Zhao came to the U of I, uninvited, to seek an interview with him.

111.    During this visit, Xu took Zhao to lunch. Zhao at first thought this was a nice gesture, but the meal soon became awkward. Xu exuded sexual interest. He said that Zhao resembled his ex-girlfriend so much he wondered if they were related. Zhao felt like he was testing the waters to see if she would be sexually available to him. Not wanting to harm her chances at the school, she answered that there was no relation, and then tried to gently steer the conversation in another direction.

ANSWER:

The Defendant admits the allegation that "During this visit, Xu took Zhao to lunch" and the Defendant denies the remaining allegations of Paragraph 111.

*ii.Xu uses his position at UIUC to require Zhao to do hundreds of hours of forced labor for him.*

112.    Nearly as soon as Zhao returned to her home in Kansas, Xu contacted her to have her do work for him, without pay. Zhao knew that Xu's 'request' was a demand—if she wanted admission to UIUC, she had to comply.  Xu reemphasized his importance as head of the department and principal decider of admissions and financial aid.

ANSWER:

The Defendant denies the allegations in Paragraph 112.

113. In particular, Xu required Zhao to do translation work for an upcoming commercial exhibition he was curating in China called *Looking Awry*. A commercial exhibition has little or no academic value—its purpose is to make money for the artist, gallery and curator.  Zhao received no recognition or payment for this work. Xu took all the credit and was paid handsomely for Zhao's efforts.

ANSWER:

The Defendant denies the allegations in Paragraph 113, and affirmatively states that he curated an academic art exhibit. The show's title, "Looking Awry," was taken from Slavoj Zizek's work and closely related to the Defendant's edited volume on Zizek and on psychoanalysis. The Defendant was never paid for his work on academic exhibitions.

114.    Xu also required Zhao to translate dozens and dozens of letters by the Chinese artist Zhang Xiaogang for a book project co-authored by Xu and another professor at UIUC, Jonathan Fineberg.  The book, *Zhang Xiaogang: Disquieting Memories*, was published by Phaidon in 2015. All told, Zhao translated several hundred pages of letters between August 2012 and March 2013, devoting many hundreds of hours to the

project, all without pay.  Because Zhao's English was not very good at the time, Xu used her translations in order to get the basic text correct, and then had another student (again without pay) review the work for grammar and spelling. Xu's work on the translations was, at best, minimal, though Professor Fineberg later told Zhao that Xu claimed the work as his own.

ANSWER:

The Defendant affirmatively states that he requested, "Zhao to translate "letters by the Chinese artist Zhang Xiaogang for a book project co-authored by Xu and another professor at UIUC, Jonathan Fineberg.  The book, *Zhang Xiaogang: Disquieting Memories*, was published by Phaidon in 2015." The Defendant denies the allegation that he "required" and "also", and denies the allegation of "dozens and dozens," and Defendant denies the allegations that, "Xu used her translations in order to get the basic text correct, and then had another student (again without pay) review the work for grammar and spelling. Xu's work on the translations was, at best, minimal".  The Defendant denies the allegation that Zhao, "translated several hundred pages of." The Defendant admits the allegations that "All told, Zhao translated" and "letters between August 2012 and March 2013" and the Defendant admits the allegations that "Zhao's English was not very good at the time".

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation that, "though Professor Fineberg later told Zhao that Xu claimed the work as his own" and the allegation of Zhao, "devoting many hundreds of hours to the project."

The Defendant denies the remaining allegations of Paragraph 114.

The Defendant further affirmatively states that as part of graduate thinking and writing training, he asked Xing Zhao to translate Chinese artist Zhang Xiaogang's letters, revising her translation word by word and instructing her how to write. The Defendant did not think she was good enough to be a U of I graduate student if she couldn't improve her writing skills. The Defendant spent countless hours teaching her.

The Defendant was concerned that Zhao's art history professor at Kansas clearly stated, "Do not admit Zhao," in her recommendation letter for Zhao. This was the most unusual recommendation letter. The Defendant made an inquiry to Zhao about her relationship with her Kansas professor. She simply brushed it aside, saying that the professor was angry with her leaving the Kansas program. The Defendant now knows why the professor would write such an unusual letter: because Zhao had been exposed as a back-stabbing, lying, two-faced student. The translation and written English training was part of the Defendant's effort to dismiss the doubts raised by the Kansas professor. Zhao's translations were so bad the Defendant did not use any of her work in the co-authored book. The Defendant did give her credit in the acknowledgement page, thanking her for her input. This is normal academic practice.

115.    Professor Fineberg also told Zhao, several years later, that because Xu's work was so minimal—largely limited to translations which were included as an appendix—that the publisher felt that Xu's name should not be listed alongside Professor Fineberg's as author and that Xu instead be listed as "translator." This enraged Xu, who angrily threatened Professor Fineberg with a lawsuit if Xu did not get his name on the cover. Xu then began calling the Finebergs' home repeatedly, intimidating his wife as well. Eventually, Professor Fineberg, frightened and overwhelmed, acquiesced to Xu's demands, and the publisher agreed to let Xu on the cover as a co-author.

ANSWER:

The Defendant denies the allegations of Paragraph 115.

116.    Zhao, working behind the scenes, was not aware at the time that Xu had  told Professor Fineberg that he was the translator of the letters.  She only knew that she had to keep her head down and do the work. In January 2013, she received an admission letter from UIUC and a preliminary financial aid offer of $20,000 per year for three years. Many financial aid packages cover only a single year, so this was a big coup. Zhao determined to accept the award, and did not apply for financial assistance at the University of Kansas, where she was finishing up her first year towards her master's

degree and eventual Ph.D. in the school's EALC Department. In practice, this meant that Zhao was giving up her spot at Kansas, as she could not continue there without financial aid.

ANSWER:

The Defendant admits the allegation that "In January 2013, she received an admission letter from UIUC and a…financial aid offer" and further states that the offer made by the UIUC stands on its own. The Defendant denies the allegation of "preliminary". The Defendant denies the remaining allegations of Paragraph 116. The Defendant affirmatively states that graduate admissions decisions are always made by committee.

117.    On April 10, 2013, Zhao received a revised financial aid admission letter to UIUC, which replaced her original admission and financial aid offer.  Instead of receiving $20,000 a year over three years, the revised offer allowed her only $16,000 in financial aid, and for one year only; she would have to reapply the following year. Unlike her first offer, which would have given her a large degree of autonomy from Xu, this revised offer meant he would retain control over her. She would have to continue to please him if she wanted to receive funding and graduate.  Because Zhao had not applied for financial aid at Kansas, however, she had no other option. She enrolled in UIUC's EALC department at the Ph.D. level with Xu as her advisor.

ANSWER:

The Defendant states that the financial aid offers made by UIUC to Zhao are a matter of record and speak for themselves. The Defendant repeats and re-alleges his answer to Paragraph 116 as and for his answer to Paragraph 117.

*iii. Xu asserts his dominance over Zhao in her first semester at UIUC.*

118. Zhao began her Ph.D. program in the fall of 2013. Almost immediately, she came to see that Xu was an intellectual bully who kept his students isolated.

ANSWER:

The Defendant states that when Zhao began her program is a matter of record and those records speak for themselves. The Defendant denies the remaining allegations of Paragraph 118.

119.    In September 2013, a Chinese UIUC student, Mengchen Huang, was murdered in her apartment by a former UIUC doctoral student.  The victim had studied under another professor associated with the EALC department, Dr. Anne Burkus-Chasson. Zhao sought out Dr. Burkus- Chasson to offer her comfort, and in the course of the conversation discussed a paper Zhao was writing. Speaking with professors other than one's advisor is commonplace in academia, and universally encouraged.  It is vital to a student's success, particularly Ph.D. students who will need to present in front of a committee, to form relationships with multiple professors.  However, when Xu found out that Zhao had spoken to Dr. Burkus-Chasson, he became enraged. By email he wrote: "Did you approach [Dr. Burkus-Chasson] to read your paper? That's unbelievable." He told Zhao that if she ever spoke to this professor again, he would immediately kick her out of the program. Zhao did not understand what she had done wrong—though she would soon learn that Xu was hugely competitive with the female professors in the department, routinely defaming them and verbally abusing them. But Zhao did not want Xu to kick her out of the program or to lose her visa, so she agreed not to speak to Burkus-Chasson again.

ANSWER:

The Defendant admits the allegations that, "In September 2013, a Chinese UIUC student, Mengchen Huang, was murdered" and "by a former UIUC doctoral student. The victim had studied under another professor associated with the EALC department, Dr. Anne Burkus-Chasson." The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations that "Zhao sought out Dr. Burkus-Chasson to offer her comfort, and in the course of the conversation discussed a paper Zhao was writing." The Defendant admits the allegation that, "Speaking with professors other than one's advisor is commonplace in academia, and universally encouraged.  It is vital to a student's success, particularly Ph.D. students who will need

to present in front of a committee, to form relationships with multiple professors." The Defendant denies the allegation that, "However, when Xu found out that Zhao had spoken to Dr. Burkus-Chasson, he became enraged." The Defendant further states that the emails speak for themselves. The Defendant denies the remaining allegations of Paragraph 119.

120. Xu also asserted his dominance over Zhao by overtly sexualizing her. In the fall of 2013, Xu commented on her outfit—a sleeveless, tea-length dress—in a way that was obviously sexually appreciative, also running his eyes up and down her body lecherously. She stopped wearing the dress. He would come up behind her and sniff her neck, nearly touching his nose to her bare skin, commenting on her perfume or shampoo. She stopped wearing perfume, but that did not stop him from smelling her hair. On another occasion, noticing her old computer, Xu offered to buy her a new one, saying in a sexy voice, "Instructor would like to buy one for you." Zhao found this wildly inappropriate—the implication from his words and manner was clear: if she allowed him to buy her a computer, he would expect something in return. She declined.

ANSWER:

The Defendant denies the allegations of Paragraph 120. The Defendant affirmatively states that if he spoke with Zhao or asked her about her computer it was because the IT department of UIUC was replacing dated computers in faculty and TA offices every three years.

*iv. Zhao is required to perform hundreds of hours of free labor for Xu at a for- profit commercial exhibition.*

121. As it became more obvious to Xu that Zhao would not willingly have sex with him, he determined to find other ways she could service him. Most often, this came in the form of requiring her to do free labor, under threat of being kicked out of school and the country if she refused. During Zhao's first semester at UIUC, Xu was appointed the curator for an international art exhibition that was part of *Art Sanya*, a commercial art exhibition in China. This was a commercial project, assembled for

profit. Xu likely made an estimated $100,000 for his role in this exhibit. Zhao was one of two curatorial assistants.

ANSWER:

The Defendant denies that the art exhibit was a commercial project. The Defendant admits the allegation that "Zhao was one of two curatorial assistants." The Defendant denies the remaining allegations of Paragraph 121. The Defendant affirmatively states that the art exhibit in Sanya was an academic non-for-profit exhibition. There was no buying or selling at the show. The Defendant was not paid, except he was reimbursed for the flights and lodging. Since Zhao was the only graduate student with an art history background, he agreed to let her serve as his assistant curator when she volunteered. Being an assistant at such an important venue would get her instant recognition and access to artists.

122.    While Xu was happy to pocket large sums for his own personal benefit, he cared nothing about what Zhao's intense work on the exhibit cost her.  From August to November 2013, Zhao's work on the project was constant and consuming, at least 20 to 30 hours every week on top of her regular studies. This required having to work late into the night, but Xu often phoned her early in the morning about various details. Zhao slept fitfully, afraid that she would miss a call, or fail to promptly respond to him and anger him. Zhao's scholarship, the Tyler Fellowship, was a nonservice fellowship, meaning that she was meant to focus only on her own studies. For the intensive period of the exhibition, however, from November 26 to December 7, she worked 15 to 20 hours per *day*.  She had to go to China to do the work, forcing her to miss over a week of classes. Her work was all done without pay, except for one lump-sum payment of $1000 in cash, which Zhao took to be 'hush money' to silence her about several unsavory incidents involving Xu during the exhibition, described below.  To pay her the $1000 he withdrew $4000 from his wife's account and pocketed the remainder. Zhao knew she could not refuse to act as unpaid lackey: "I did not feel that I could refuse Xu; if I did, I had no doubt that Xu would punish me, and perhaps even remove me from the department and, by extension, the country, as he so often threatened to do."

ANSWER:

The Defendant denies the allegations of paragraph 122. The Defendant affirmatively states that Xing Zhao volunteered to work on the Sanya Show. Her work entailed contacting artists, purchasing flights for herself and for some of the international artists. She was onsite in Sanya to supervise the show installations during the Thanksgiving break in 2013. She was paid for her international flights from the US to Sanya. She was provided free lodging at the hotel where part of the show was held. She even invited her mother to stay with her during that period, enjoying the free vacation.

   *v. Xu assaults a young woman in Zhao's presence.*

123.    During the most intense period of work, when Zhao accompanied Xu to China for the exhibition, several disturbing occurrences happened that colored the rest of Zhao's interactions with him.

ANSWER:

The Defendant denies the allegations of paragraph 123.

124.    The first occurred several days before the exhibit opened, in December 2013. Xu's curatorship was chaotic. Many of the pieces for the display he was organizing were placed in a showroom reserved for another exhibit, curated by Du Huang. Despite numerous requests from Huang to place these items in the correct showroom, Xu did not. Finally, with just days to go until the opening, Huang could wait no longer. While Xu was out drinking with his friends, Huang gave the command to move the items, carefully, to the proper space so that he could set up his own exhibit. Huang, along with his 23-year-old curatorial assistant, Muqiao Sun, and other staff members, began gently moving items from the exhibit hall, taking care not to harm them and leaving them in a safe location. When Xu returned, drunk, and saw the items had been moved, he was enraged.

ANSWER:

The Defendant denies the allegations of paragraph 124.

125.    The person who bore brunt of his anger, Muqiao, recounts what happened next. "I heard a loud crash as he tore into the room, and turned to see a large figure barreling toward me from the entrance. Xu was clearly angry, yelling unintelligibly. I was terrified by his aggression and froze in place as he ran across the room. When he reached me moments later, he slapped me across the face with an open palm, using an incredible amount of force that caused my glasses to fall off. I hurt so very much from this battering." The slap left a handprint across her face that lasted through the next day, and mental anguish that continued for another six months or more.

ANSWER:

The Defendant denies the allegations of paragraph 125.

126. As Xu left her in a bewildered daze, other men present at the exhibit ran over to hold him back to keep him from beating her further. He was still fuming and gesturing, showing no remorse at all.  He acted as if it were his right to hit her.  Even afterwards, he gave Muqiao just a half-hearted apology, which was later undermined by his posting on social media that he "accidentally touched" her while pushing through a crowd.

ANSWER:

The Defendant denies the allegations of paragraph 126.

127.    Zhao was standing just feet from Muqiao during Xu's attack. She identified strongly with Muqiao, who was a year younger than she was. Zhao knew that she could just as easily have been Xu's target.  She knew now that the penalty for disobeying Xu could include not only losing her university place, funding and status in the U.S., but physical assault.

ANSWER:

The Defendant denies the allegations in Paragraph 127.

*vi. Xu attempts to kiss Zhao.*

128.     With Xu's slap still sounding like a warning shot in Zhao's ears, she was forced to continue working on the exhibition.  One or two days after the assault, Xu again went out drinking with his friends, while Zhao stayed in the exhibit hall working. He came back tipsy, following Zhao around the exhibition hall, bragging about all the work he had done, and casually belittling Zhao for being "stressed" about the huge amount of work remaining.

ANSWER:

The Defendant denies the allegations of paragraph 128.

129.     Ultimately, they ended up on a set of outside stairs, with Xu crowding her from behind. Xu reached around her back, caressing her shoulder and turning her to face him. As he did this, he leaned in, his breath hot on her lips. It was an overt, aggressive sexual move and his intentions were clear: he was going to kiss her. Zhao was terrified of him and did not want to anger him, but she also did not want to get sexually involved with him. She was physically in a precarious position, being positioned halfway up a flight of stairs. Zhao managed to extricate herself by blaming his fondling of her on the alcohol, saying that he had to grab onto her to keep from falling. In order to save face, Xu played along and went to his hotel room without further incident, although Zhao could see the anger in his eyes.

ANSWER:

The Defendant denies the allegations of paragraph 129.

*vii. Xu reasserts his dominance by belittling Zhao based on her looks.*

130.     Xu got his revenge. During a media preview and opening banquet for the exhibition, a Chinese artist commented on Zhao's role to Xu and a table of his colleagues who could potentially benefit her career down the line. The artist said, "A female student means a girlfriend; a girlfriend can be a student. There's no difference between a student and a girlfriend." Zhao was embarrassed and demeaned by the

characterization. She attempted to stand up for herself while Xu said nothing, just looked on, amused.

ANSWER:

The Defendant denies the allegations of paragraph 130.

131.     Xu then underscored the artist's point by recounting the story of a prospective Chinese student of his. He was not able to meet with her in person, so he asked his mother, still in China, to meet with her. His mother thought she was well-qualified, and the admission proceeded. When Xu came to China next, he agreed to meet with her. He told the table: "Once I saw her, I was shocked. How can a girl be this ugly! Her appearance disgusted me so much that I could not even finish my meal! You know, you have to be good-looking in order to be my student.  That's the bottom line." He told this story in front of Zhao, deprecating her intellectual capability by implying that she was only admitted because he found her sexually attractive.

ANSWER:

The Defendant denies the allegations of paragraph 131.

*viii. Xu attempts to involve Zhao in defrauding exhibit organizers*

132.     Xu made Zhao uncomfortable in other ways as well, as Zhao began to suspect that Xu was defrauding the organizers of the *Art Sanya* exhibit.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 132.

133.     Xu was promised 200,000 yuan for his work on the exhibit, or about $30,000. Generally, this is the only fee a curator would receive for his work on a group project, such as the one at *Art Sanya*. But Xu wanted more. He fraudulently made up a number of expenses, totaling 55,000 euros, including a nonexistent 10,000 euro "copyright fee" and other invented costs for an exhibit by artist Koen Vanmechelen. When the organizers asked for an itemized breakdown, it became clear that Xu had

drastically inflated the number.  The organizers ultimately agreed to pay 35,000 euros, but that was still much more than Xu had actually spent.

ANSWER:

The Defendant denies the allegations of paragraph 133.

134.    Xu evidently became nervous and wanted to cover his tracks. Rather than deposit the illicit funds directly into his own bank account, he lobbied Zhao to receive the money into her account, from which she could transfer it to his. Zhao refused several times, but Xu continued to threaten and intimidate her until she reluctantly acquiesced.  On the first attempt, the funds did not go through. Xu then pressed Zhao to open a new bank account in her own name to receive the funds. Xu showed up at her door, escorted her to his car, locked the doors, and drove her to the bank. He did not let her out of his sight, even accompanying her to the teller. With Xu at her shoulder, the teller told Zhao that she could not open the account and receive money on the same day. Xu decided he could not wait any longer and allowed the money to flow into his account.

ANSWER:

The Defendant denies the allegations of paragraph 134.

> ix. Coerced labor is a constant during Zhao's time at UIUC

135.    While Zhao's work for the *Art Sanya* exhibition was the most glaring example of Xu's exploitation of her labor, he required her to do work for him throughout her time at UIUC, ranging from translations to graphic design. For example, in February 2015, he required Zhao to make an exhibition poster for another commercial exhibition he was curating called *China Pop*. Xu likely placed a line item in the budget for marketing and graphic design, but rather than pay a professional to do it properly, he took Zhao's free labor and pocketed the money earmarked for design fees.

ANSWER:

The Defendant denies the allegations of paragraph 135.

136.    Zhao received no compensation or credit for any of this work, usually around 5 to 20 hours a week. This work had no benefit to Zhao or her education—it was outside her interests and desired skillsets.  She was forced to do it at the expense of her coursework.  But failure to obey Xu was not an option. He held too much power.

ANSWER:

The Defendant denies the allegations of paragraph 136.

137.    In contrast, Xu received substantial financial benefit from Zhao's work. All the work Zhao performed for him was for his own commercial gain.

ANSWER:

The Defendant denies the allegations of paragraph 137.

138.     Zhao's experience was not an isolated one.  Another student in the EALC department, Grace Chang, bore witness to professors' exploitation of students' labor at UIUC:

I saw and heard of many Chinese professors taking advantage of their Chinese international students' services because they were playing on these students' vulnerabilities. Usually, this took the form of free labor services—professors took advantage of these students' time and resources, using them to advance the professors' work/research for them, even as this made some students fall behind on their studies. This was a university-wide problem. I saw this in the EALC department, but I heard of a number of cases in the science and engineering departments, where research skills were more easily transferable to personal profit and gain for the professors.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 138.

*x. Xu creates a toxic atmosphere for his female students outside the classroom*

139.    Xu thrived on creating an atmosphere of unease among his female Chinese students, one where they were required to repeatedly prove their loyalty to him or risk excommunication.

ANSWER:

The Defendant denies the allegations of paragraph 139.

140.    One of his favorite methods for doing this was through a chat group for his Chinese students on the Chinese social media platform WeChat called "The Xu Gang." He used it repeatedly as a way to test and demand the loyalty of his Chinese students. If he wanted to humiliate a student, he would simply block him or her from the group, which all the others would see.

ANSWER:

The Defendant denies the allegations of paragraph 140.

141.    On one occasion, Xu posted, "If any of you ever badmouth me behind my back, please just quit [the program] immediately. Our master-apprentice relationship ends here. . . . Anyone who talks behind someone's back is not suitable for the academia." Students scrambled to pledge their loyalty to him and denounce whoever had been so misguided as to question Xu, and watched the feed to see who would be dropped. On this occasion, one of his advisees, Chen Ma, was dropped—as it turned out, because Xu suspected that she knew about his relationship with Sun. The expectation was that Ma would have to beg to get back in his favor. Displeasing Xu usually meant being shunned by his other students too, who did not know how to stand up to his bullying.

ANSWER:

The Defendant denies the allegations of paragraph 141.

142.    Students sometimes went to extreme measures to restore themselves to Xu's good graces.  One student knelt outside the front door of his house for hours until he forgave her for her perceived infraction.

ANSWER:

The Defendant denies the allegations of paragraph 142.

143.    Xu also asserted his superiority over students, and other professors, by speaking about them behind their backs. He said to Zhao that Ma was "useless" and "at best, she could become a librarian." Ma was a frequent target for attack, as she knew of his affair with Sun. In one incident, Xu excoriated Ma for having taken the side of a visiting professor, his former advisor, over Xu in an academic debate, which would be perfectly acceptable in a normal graduate program. He shut her in his office while berating her, telling her that she had humiliated him and threatening to expel her if she did not quit of her own volition. Ma, terrified, began to cry. Xu then held her close, licking her tears away, and calling his performance an act of "American-style passion."

ANSWER:

The Defendant denies the allegations of paragraph 143.

144.    Xu's treatment of Ma made Zhao deeply uncomfortable, both because Ma was one of her good friends and because she knew that it meant that Xu was likely talking about her behind her back as well.  In fact, he did talk about her.  Christian Potter recounts: "One day, I was smoking outside class. Sun came up to me and asked for a cigarette. She told me that Xu told her that I was a good student, unlike Zhao, whom he apparently described as 'absolutely terrible.' I found this to be totally out of line. Zhao was one of Xu's advisees – his treatment of her was cruel and unnecessary and she was anything but 'absolutely terrible.' It was clear to everyone that she was extraordinarily gifted, with huge talent in this intellectual discipline."

ANSWER:

The Defendant denies the allegations of paragraph 144 and, further, the Defendant lacks knowledge or information sufficient to form a belief about whether or not Christian Potter made the purported statement.

145.     Barricading students in his office was a favorite intimidation technique of Xu. It worked especially well on Zhao, who had developed a deep physical fear of him after seeing his attack on Muqiao Sun.  In one instance, he called Zhao angrily to his office.  Once she entered, he immediately shut the door and positioned himself in front of it.  He demanded that she explain her relationship to a male friend of hers named Yiqian Wang. Wang was also a friend of Sun, and knew about Sun's tumultuous relationship with Xu. Xu forcefully snatched Zhao's phone from her hands, then demanded that she never see or speak to Wang again. Zhao was dumbfounded, and asked for the opportunity to bring Wang to his office to discuss what was prompting this outburst. Zhao attempted to take the phone back, but Xu forcefully stopped her, knocking her hand hard in the process. Xu then seemed to catch himself, told Zhao she had not yet done anything wrong, and told her not to tell Wang anything about their meeting.  His behavior was erratic and alarming, leaving Zhao off-balance.  Although he only hit her hand, she felt that he was on the edge of greater violence.  When he stepped aside to let her leave his office, she was quaking with fear.

ANSWER:

The Defendant denies the allegations of paragraph 145.

146.     On other occasions, Xu insisted that his students delete the contact information of his other students from their phones.  He apparently sought to retain total control over the group's interactions, and to be able to ostracize anyone who displeased him.

ANSWER:

The Defendant denies the allegations of paragraph 146.

147.    Xu's behavior was intentional.  He got pleasure from seeing his students fight each other for his approval. He exulted in requiring elaborate proofs of their loyalty. He even enjoyed seeing them cry.  On two occasions, his former advisee, Josiah Case, witnessed Xu exacerbate two young female graduate students' emotional upset and tension, reducing them to tears.

ANSWER:

The Defendant denies the allegations of paragraph 147.

148.    All of Xu's behaviors created an atmosphere of distrust and paranoia among his female Chinese students, who bore the brunt of his abuse.

ANSWER:

The Defendant denies the allegations of paragraph 148.

### xi. Xu makes an example of a student who crosses him

149.    Xu's demands for loyalty became more pressing as his relationship with Sun became more intense and visible. In the early spring of 2014, Ma and Zhao ran into Xu with Sun at an off-campus coffee shop. Caught unexpectedly, Xu introduced Sun as the daughter of one of his friends. Ma, eager to get back into Xu's good graces after he berated her for debating him, took Sun under her wing. She saw Sun as an isolated, naïve young woman in need of a friend. Ma took her to church and tried to befriend her.

ANSWER:

The Defendant denies the allegations of paragraph 149.

150.    In the early morning hours of April 25, Sun called Ma in tears, begging for help in finding Xu, threatening suicide if she did not get in touch with him. Worried, Ma called Zhao, who advised her not to help.  Zhao suspected that Xu and Sun were having an affair and that getting entangled in their dispute would result in trouble for Ma, though she did not tell Ma she suspected an affair. Ma decided not to take Zhao's advice and gave Sun Xu's home address. Sun's appearance at Xu's house resulted—at

Xu's insistence—in the police filing a report against Sun for disorderly conduct, the event that later delayed Sun's return to the United States from China (see paragraph 76 above).

ANSWER:

The Defendant denies the allegations of paragraph 150.

151.    The next morning, Xu blamed Ma for the entire incident, absolving himself of any fault. He left voicemails on her phone swearing at her and threatening her. Ma had thought she was saving a young woman's life, a woman whom she did not at that time suspect of being sexually involved with Xu. Xu's tirade in response to another perfectly normal act convinced her that she could no longer remain at UIUC. She left the program at the end of the year with an M.A. instead of continuing to obtain a Ph.D. as she had planned, and left the United States.

ANSWER:

The Defendant denies the allegations of paragraph 151.

152.    Ma was seen as a cautionary tale for the Chinese students who remained: if you cross Xu, you, too, will be forced to stop your schooling and leave the country. Xu did nothing to dissuade his students from this interpretation and instead capitalized on it as Xu's students, including Zhao, redoubled their efforts to please him.

ANSWER:

The Defendant denies the allegations of paragraph 152.

*xii. Xu creates a toxic atmosphere for female students in the classroom*

153.    While the nearly universal experience of Xu's students was that Xu was a terrible professor, the young Chinese women in his classroom received the worst of him. Xu enjoyed using the classroom as a forum for asserting his own importance and authority and humiliating them.  Zhao was a frequent but not exclusive target.  Even women who were not the brunt of Xu's strange and domineering behavior were made to feel anxious and clammed up lest he erupt.  With the women in the class meek and quiet, Xu was able to concentrate on his preferred students—the men.

ANSWER:

The Defendant denies the allegations of paragraph 153.

154. One way Xu created a toxic environment was to talk inappropriately about sex, and the male's "dominance" in the act. He once proudly told a group of students, including Zhao, how he had "competed and defeated" his wife's suitors to become "the first man of her." Xu did not think it was odd to talk about his wife losing her virginity to him to his assembled students: He was proud of it, and of his "ownership" of her.

ANSWER:

The Defendant denies the allegations of paragraph 154.

155.    During one lecture, Xu connected his laptop to the HDMI cord and something along the lines of "hot girls in your area" popped up on the screen. Xu laughed the incident off, saying "Oh, you should not see that!" and minimized the window.

ANSWER:

The Defendant denies the allegations of paragraph 155 and affirmatively states that pop-up trash windows on the internet are frequent when one accesses some international websites, which were often necessary for the art and media classes he taught.

156.    His former advisee Christian Potter recounted that "Xu usually told us that our interpretations were totally incorrect—particularly if the individual giving the interpretation was a woman. The classes were not about the truth or learning. They were an opportunity for Xu to grandstand and make his students—particularly his female students—feel small." Another student, Mark Frank, "noticed how Xu was unprofessional and disrespectful in the way he spoke to . . . female students."

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 156.

157.     Xu seemed to enjoy singling out certain women to belittle—usually Zhao, but also others. After Xu knew that Ma was aware of his relationship with Sun, he denounced her as "stupid" in front of the class. Xu called another student "brainwashed," a term that holds severe connotations in China. He called this same student "weak," and pointed out that she had a medical condition to the entire class.

ANSWER:

The Defendant denies the allegations of paragraph 157.

158.     These incidents combined to make the classroom experience untenable for his female students generally, and for Zhao in particular.

ANSWER:

The Defendant denies the allegations of paragraph 158.

159.     It was widely thought at UIUC that Xu singled out Chinese women for negative treatment because he *could* – because they were culturally primed to obey him and because they had the most to lose. Dr. Michelle Yeh, who is friends with Xu's former advisor and is familiar with Xu, explained as follows:

When young Chinese students come to the United States for university, they generally have little knowledge of American law, sexual norms and sexual misconduct reporting procedures. They are taught to be reverential to their professors. In addition to this, they are often concerned about their visa status. It is easy for Chinese victims of misconduct to feel helpless, as they do not want to lose their foreign student status. It is clear that Xu knew about these vulnerabilities, and took advantage of them. He was able to use his female students' lack of knowledge and insecurity in order to benefit himself, at the great expense of these young women.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 159.

160.    Yeh's sentiments were echoed by numerous young Chinese women. As Xu's former Chinese student, Yueling Ji, stated, "In China, professors are revered and held on a high pedestal. From a young age, Chinese students are generally taught to obey their instructors, and to think of them as caring people who always do the right thing. In many ways, female Chinese students in the EALC department were more vulnerable to Xu's bad behavior than their American counterparts, at least in part because of cultural predispositions and practices." Another EALC student, Grace Chang, who is a U.S.-born Chinese woman, said, "The international students at UIUC, particularly the women, are incredibly vulnerable.  Part of Chinese culture is to revere your professors and do as they say.  When they come to the States, this cultural norm is further engrained because they are so dependent on their professors for grades, financial aid, and even the ability to stay in the country. This is particularly acute for the students who rely on financial aid." Because she was U.S.-born, she believed, "Xu left me alone because he had no leverage over me . . . he had nothing to gain from me." His former advisee, Christian Potter, stated: "I quickly noticed how he treated female Chinese students with contempt. He took advantage of female Chinese nationals and their cultural background, expecting them to be docile and overly respectful to him."

ANSWER:

The Defendant denies the allegations of paragraph 160.

*xiii. Xu's efforts to belittle and isolate Zhao intensify in the 2014-2015 school year*

161.    Zhao continued on at UIUC for her second academic year, 2014-15. During this school year, Zhao switched from pursuing a Ph.D. to pursuing a two-year master's degree. After being victimized by Xu, Zhao wanted to leave UIUC as soon as possible.

ANSWER:

The Defendant denies the allegations of paragraph 161. The Defendant affirmatively states that Zhao's academic record speaks for itself.

162.    She remained afraid of Xu and had actively lobbied him to take on more male students as advisees, hoping they would form a buffer between them. Xu agreed, perhaps hoping to deflect attention from his sexual relationship with Sun.

ANSWER:

The Defendant denies the allegations of paragraph 162.

163.    Nevertheless, Xu escalated his attacks and public humiliation of Zhao, who posed a threat because she knew he was sleeping with Sun. He needed to "put her in her place" so she would be less likely to report him, and to discredit her so she would not be believed if she did.

ANSWER:

The Defendant denies the allegations of paragraph 163.

164.    In fall 2014, Xu insisted that Zhao enroll in his graduate seminar on contemporary Chinese art. Xu announced to that class that Zhao did not have the skills or intellect to enter into a profession, so would need to rely on her good looks to get ahead. Zhao was mortified. In any other situation, she would have objected to this objectification and denigration. But she had been cowed by Xu and knew that if she spoke up he would retaliate. Zhao merely bowed her head and nodded, letting the moment pass.  This incident was so memorable that one of Xu's other advisees, Christian Potter, later mentioned it to his professor, Robert Tierney, when he reported his suspicions that Xu was having inappropriate sexual relationships with his students. Tierney did not make a report at this time or encourage Potter to do so. On other occasions, too, professors were notified about Xu's inappropriate relationships or emotional abuse of students, but did nothing. They were scared of him and the power he wielded.

ANSWER:

The Defendant denies the allegations of paragraph 164.

165.    Potter was not the only one to notice an odd dynamic between Xu and Zhao and wonder if they had more than a professor-student relationship. On one

occasion during this fall seminar, while Zhao sat defensively in her desk chair, Xu stood over her in a domineering posture and verbally berated her. "It was clear to everyone that Xu's behavior reflected a relationship between Xu and Zhao that went beyond the classroom."

ANSWER:

The Defendant denies the allegations of paragraph 165.

166.    Xu's spring 2015 class on Chinese cinema was even more uncomfortable. Open tograduate and undergraduate students, Zhao and Sun both enrolled. Xu took evident delight in pitting Sun and Zhao against each other. When Zhao spoke, he would encourage Sun to speak forcefully against whatever Zhao had just said. Contrary to what a professor should do, Xu made Zhao so uncomfortable that she was bullied into silence.

ANSWER:

The Defendant denies the allegations of paragraph 166.

167.    By the end of March 2015, Zhao felt like she was having a breakdown because of Xu's cruelty. Zhao determined that she would not continue at UIUC for her Ph.D., upending her career plans. However, Zhao still hoped to obtain her Master's degree, for which she needed Xu to review and comment on her thesis. Despite repeated requests over the course of months from Zhao for Xu to fulfill his most basic role as advisor of guiding her with her thesis, he ignored her. Zhao sent him a revised draft on March 20, 2015. He responded to it by saying, "I am afraid you won't be able to turn in a polished thesis in time.  You have stylistic and logical problems in almost every sentence and every statement." He offered no constructive feedback and no path forward. Zhao followed up with him politely, to which he responded, almost as an afterthought, "Also, I do not want to work with you anymore for your doctoral studies. Please consider switching to a different program."

ANSWER:

The Defendant admits the allegations that "He responded to it by saying, "I am afraid you won't be able to turn in a polished thesis in time. You have stylistic and logical problems in almost every sentence and every statement." The Defendant denies the remaining allegations of Paragraph 167.

168.    His refusal to assist with her thesis and repudiation of her ambitions for a Ph.D. were unprofessional and cruel, but also typical. He had done the same with Chen and with other students before her. With other students, imperious rejection often worked: they came back desperate to be readmitted to the fold. One had even knelt outside his house for hours abasing herself. (*See* para. 142 above.) In Zhao's case, however, she realized Xu would always seek a new way to abuse her, so she secured another advisor to complete her master's thesis, Robert Tierney. Of course, her thesis was not the pathetic failure, with "stylistic and logical problems in almost every sentence and every statement," that Xu had described. With normal assistance from Tierney, it was approved and she received her Master's degree. Nevertheless, she gave up her ambitions for a Ph.D.

ANSWER:

The Defendant admits the allegation that, "she received her Master's degree." The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations concerning the assistance that Robert Tierney gave to her. The Defendant denies the remaining allegations of paragraph 168.

169.    Prior to her graduation, at the end of March 2015, Zhao decided that to protect Xu's future and current students, she needed to report Xu's abuses of her and Sun. She told her new advisor, Robert Tierney, everything—Xu's sexual advances to her in China, how he had slapped the young curatorial assistant in her presence, his relationship with Sun, the mandatory labor she was forced to perform. Tierney recommended that Zhao drop Xu's seminar, which she did, despite having put in months of effort. He also put her in contact with a woman up the chain of command at

UIUC. Zhao told her story to this woman too, whose name she no longer recalls. The woman asked few, if any, follow-up questions and merely placated Zhao by telling her that she would be able to get her degree. The message was clear: the school did not want her making waves.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 169.

170.   Although Zhao has had no contact with Xu since graduating, her experience at UIUC continues to haunt her.  She stays up at night crying, wishing that she had not fallen prey to him. She feels manipulated and used. He took away her innocence and exposed her to violence, greed, and cruelty that she would not otherwise have had to experience and endure at a young age.

ANSWER:

The Defendant admits the allegations that "Zhao has had no contact with Xu since graduating" and denies the allegations that, "He took away her innocence and exposed her to violence, greed, and cruelty that she would not otherwise have had to experience and endure at a young age." The Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 170.

### C. Xu Is Called Out for His Abuse of Women

a. Xu continues to be paid by UIUC and hold himself out as a professor

171.   Xu left UIUC on a paid sabbatical when the news of his sexual relationship with Sun broke in 2015. For the 2016-17 and 2017-18 school years, UIUC continued to pay Xu his full $85,446.08 annual salary, plus benefits, per the terms of a separation agreement. Xu was also given a $10,000 separation bonus. His students, and others in the EALC department, were not told when, or if, Xu was coming back, causing them a great deal of anxiety and unease.

During these two years, Xu took visiting professor assignments, including at the Sichuan Fine Arts Institute and Stockholm University, where he held himself out as a professor at UIUC and/or EALC department head, along with all the credibility and gravitas that came with that position.

ANSWER:

The Defendant denies the allegations of paragraph 171. The Defendant affirmatively states that he was notified by officials at UIUC on October 23, 2015, that he would be placed on paid administrative leave from the University effective January 1, 2016, during which time he would receive his University pay and benefits. That paid administrative leave ended August 15, 2018. The Defendant further affirmatively states that under the terms of a non-disclosure agreement, he is prohibited from disclosing the existence of or the terms of any alleged separation agreement.

172.    The University did not tell the outside world that Xu's departure was forced because he had violated its sexual harassment rules. Presumably to avoid a scandal that would hurt its recruitment in China, Xu was allowed to leave quietly—with a gift from the University in his pocket—and to maintain his highly desirable title of UIUC professor.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 172.

173.    His former UIUC colleagues even joked in front of each other and students about the 'good deal' that Xu was getting. At a faculty meeting that included two student representatives, one professor asked the interim head of the EALC department, Jerome Packard, whether Xu was still affiliated with UIUC. Another professor asked whether Xu was still being paid. Packard answered affirmatively to both questions. As recounted by one of the student representatives there, Mei Wang, "this prompted a lot of jokes from the professors in the room about how he was collecting checks while not working. One said, 'I want to be in his position!' while

another responded, 'If you want to be in his position, then you just have to do what he did." At this point, each professor knew that Xu had beaten and raped an undergraduate student. Xu continued to be listed on UIUC's website as a faculty member through August 2018, and periodically returned to campus to participate in graduate student oral exams, supervise graduate students and have access to UIUC's women.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 173.

b. <u>Wang is concerned that Xu will harm additional students</u>

174.    Ao Wang knew Xu casually, and knew of him more deeply through the experience of his friend, whom Xu had tried to rape. In addition, Wang had heard on several occasions that Xu had been sexually involved with his students—in the 2015 social media post from Sun in which she describes her abusive relationship with Xu and his sexual relationships with other students, and from Michelle Yeh, in 2016. Ao Wang received further confirmation of Xu's predatory behaviors toward and sexual relationships with his young students through Xu's former advisor David Wang in late 2017. David Wang also told Ao Wang that Xu was allowed to continue to be affiliated with UIUC, despite his abuse of his students.  Ao Wang knew that the attempted rape of his friend was not an isolated incident, but the pattern of a serial rapist. He thought it unconscionable that Xu would be able to resume teaching duties as a visiting professor, or even a full professor at a Chinese university, fully cloaked in the authority of UIUC. He knew it was inevitable that he would prey on other young students.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 174.

175.    To try to stop Xu, Wang posted an article online—first on the Chinese site Douban.com and then on Zhihu.com—in early March 2018 outlining Xu's sexual

harassment and assault of his female students and colleagues over the past two decades.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 175 that "To try to stop Xu", the Defendant admits the allegations that, "Wang posted an article online—first on the Chinese site Douban.com and then on Zhihu.com—in early March 2018" and the Defendant denies the remaining allegations of Paragraph 175.

176.    In response, one woman using the name Survivor2018 told her harrowing story of sexual assault by Xu. She wrote:

> Although I was an adult at that time, I was an unsophisticated student and too credulous in, extremely respectful towards and utterly unwary of Gary Gang Xu, a professor much older than me. I had never thought that such a highly respected professor in the eyes of others would suddenly impose a nearly malformed desire for dominance over his students, and it was even more difficult for me to imagine that Gary Gang Xu dared to escalate his deformed control desire to actual sexual harassments and sexual assaults.[179]

ANSWER:

The Defendant admits that there was an online post by a user under the name of Survivor 2018, the Defendant states that the online post speaks for itself and further, the Defendant denies the remaining allegations in Paragraph 176.

177.    Survivor2018 saw parallels between Xu's assault of her and of Sun, who had also related her experience online. She wrote:

> After reading [about Sun's experience] carefully, I found that victim's experience was really similar to mine. The trick was exactly the same: Gary Gang Xu first built an image as a gentleman and then approached the target as a teacher. After a period of observation, he identified the

most suitable prey among the many young female students, and knew well about the weaknesses of the prey. Then, he waited for the opportunity to chase the student as a professor and sexually assault the student under the banner of love. Then, through "gaslight manipulation," he rationalized his evil behavior and repeatedly brainwashed the female student. If the student did not obediently submit to him, what was waiting for the female student would be threats, cajolery, insults, and violence; and the next would be prolonged spiritual control, cheating, enticing into unlawful sexual intercourse, and even sexual abuse. As UIUC was one of the US universities with the largest number of Chinese students, Gary Gang Xu had a steady source of prey.[180]

ANSWER:

The Defendant admits that there was an online post by a user under the name of Survivor 2018, the Defendant states that the online post speaks for itself and further, the Defendant denies the remaining allegations in Paragraph 177.


178.    Many others soon wrote in support of Survivor2018 and to recount their own experiences, even as Xu threatened his victims and former students to stay silent. Another individual, "Anonymous User," wrote: "Last night, I . . . recalled too many vicious details which were too sad to look back on. My emotions completely collapsed, and I was sleepless for almost the whole evening." She continued, "Gary Gang Xu used his family to reduce the alertness of the students. When brainwashing, he used his family as a shield. ("My wife is so virtuous, and my two children are good-looking and excellent. My family is so perfect. If others knew you were a third person, they would disdain and reject you, believing that you seduced me. How would you get married?").

ANSWER:

The Defendant admits that there were many online comments and posts and that there was a post by a user under the name Anonymous User, the Defendant states that the online posts speak for themselves and further, the Defendant denies the remaining allegations in Paragraph 178.

179.    Legal volunteers from Yale University volunteered to help the victims pursue claims against Xu, but Xu intimated that he had access to the legal volunteers' email address, meaning he could access the victims' identities, information, and experiences of abuse by him, which deterred them from speaking up. He further intimidated his victims by spying on their group chats and then spreading screenshots from them online. He posted photos of himself in different cities where the victims resided, implying he knew where they were. He directly contacted some of the victims to make sure they stayed quiet.

ANSWER:

The Defendant admits the allegation that "he posted photos of himself in different cities" but denies the remaining allegations of Paragraph 179. The Defendant affirmatively states that he traveled in early 2018 to various countries to prepare for the 2018 Shenzhen Biennale.

c. Xu learns of Wang's actions, and attempts to bully and threaten him into silence

180.    Xu caught wind of the growing tide against him.  He was furious with Wang for his post.  On March 10, Xu wrote a strongly worded message to Wang, copying his American attorney, Rachel Funderburg, in which he denied the allegations in the post and demanded its withdrawal.

ANSWER:

The Defendant denies the allegations of paragraph 180. The Defendant affirmatively states that his American attorney, Rochelle Funderberg, wrote a letter to

AO Wang in which she reiterated that the Defendant denied all allegations in the online posts and in which she demanded that it be taken down.

181.    Later that day, Xu changed tactics, writing a careful letter to Wang, sent by email, dated March 10, 2018.  In this letter, he denied ever having sex with a student, or even being behind closed doors with one.  He urged Wang to respect professional courtesy and take down the post.

ANSWER:

The Defendant denies the allegation that "Xu changed tactics" and the Defendant admits the remaining allegations of Paragraph 181 and further states the email speaks for itself.

182.    When Wang did not do so, Xu stepped up his campaign. He began to spread false rumors about Wang on WeChat, the Chinese messaging service, saying that Wang's post was nothing but a smear campaign because Xu had denied him admission to the UIUC graduate program about 20 years ago. This was invented; Xu would have had little say over admission decisions at that early stage in his career. Even if he had, Wang bore no grudge towards UIUC— he had been accepted to and attended a much higher-ranking graduate program, and would not have accepted an offer from UIUC. Nonetheless, Xu was trying to embarrass Wang and hurt his reputation.

ANSWER:

The Defendant admits the allegation that he engaged in a conversation about AO Wang on WeChat. The Defendant states that the online conversation on WeChat speaks for itself. The Defendant denies the remaining allegations of paragraph 182.

183.    In addition to spreading false rumors, Xu and his friend Feng Wang, a gallery owner, attempted to bully Wang into removing the post by soliciting Wang's friends and business acquaintances in a torrent of harassing chats and voicemails.

ANSWER:

The Defendant admits that Feng Wang engaged in online chats with Wang. The Defendant states that the online chats and voicemails speak for themselves and the Defendant denies the remaining allegations of Paragraph 183.

184.    In particular, Feng Wang showed Er Zhang, Ao Wang's friend and fellow poet, a screenshot of a text exchange she had with Xu. In this text conversation, Xu directly threatened Wang's life, writing that he would "kill [Ao Wang] in one blow." Feng Wang had replied to Xu, "Please hold on. I really mean it. Don't turn yourself into an 'executioner' or you will regret it one day."

ANSWER:

The Defendant states that the online posts and screenshots and text exchanges speak for themselves and further, the Defendant denies the allegations of Paragraph 184.

185.    Zhang told Ao Wang about these exchanges shown to him by Feng Wang. Ao Wang took Xu's threat to "kill" him "in one blow" to be a death threat, as did Zhang. Ao Wang was aware of the extreme violence of which Xu was capable. He had seen photos of the vicious beating that Sun sustained and knew how Xu had slapped in public the young curatorial assistant, Muqiao Sun, so hard he knocked her glasses off and left a bruise. He feared for the safety of his family. He is still afraid.

ANSWER:

The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 185.

186.    In case the death threat did not work, Feng Wang attempted to use "logic" to "prove" that Xu could not be a sexual predator. In her chat with Zhang, Feng Wang wrote that Xu must be guiltless, stating: "There will be absolutely no evidence of the so-called 'sexual assaults' because there isn't any. Xu is a Blood Type-A, discrete and restrained. Except for some resentment toward a female Ph.D. who had rejected him several times a long time ago, or an affair with a senior female classmate a long time ago, or an accidental striking of a bespectacled young woman [at an art exhibition]

after he had some drinks in 2013—I don't think you can find any dirt." Feng Wang pressured Zhang intensely on Xu's behalf. From March 12 to March 14, 2018, she sent him dozens of messages and left several voicemails—one over 20 minutes long, another almost 18 minutes.

ANSWER:

The Defendant denies allegations of Paragraph 186. Further, the Defendant states the online chats or posts or voicemails speak for themselves.

187.    When Zhang turned out to be a dead end in terms of getting Ao Wang to repudiate his post about Xu, Xu himself cornered Zhang Er's coworker, Jiabin Song, and others attending a business meeting in advance of the 2018 Shenzhen Biennale Art Exhibition, an art festival Xu was meant to curate, again urging the removal of the post.

ANSWER:

The Defendant denies the allegations of paragraph 187.

188.    With Ao Wang still undeterred, Xu grew increasingly desperate. He once again used his intermediary, Feng Wang, to contact Ao Wang directly via WeChat. She said Xu now wanted Ao Wang to tell the world that his posts about Xu's sexual abuse of women had just been an elaborate act of "performance art," fabricated with Xu's consent to demonstrate the power of the internet to damage a "blameless" man's reputation overnight. If Wang agreed, Xu would promote the "performance art" as part of the Shenzhen Biennale. Feng Wang even prepared a flyer describing the project, with "Special Guest" Gary Xu and Ao Wang. The clear expectation was that Ao Wang would be compensated for his part in creating this "art." Ao Wang refused to accept the bribe, expressing outrage at even the idea of it, particularly given that Xu had been making threats on his life. Feng Wang responded: "He is not threatening you, but he is going to do so. I have been trying my best to stop him . . . . Do you understand? Once the arrow [is] sent out it can never return."

ANSWER:

The Defendant denies the allegations of Paragraph 188. The Defendant states that any online chats or other documents speak for themselves and the Defendant affirmatively states that he did not authorize any such online chats or discussions between Feng Wang and Ao Wang.

189.    When all of Xu's efforts to silence Ao Wang failed, Xu sued him for defamation in Shenzhen, China. That case is ongoing, costing Ao Wang legal fees and mental stress. Xu also threatened legal action in the United States, but none has materialized.

ANSWER:

The Defendant admits the allegations that "Xu sued him for defamation in Shenzhen, China" and denies the remaining allegations in Paragraph 189. The Defendant affirmatively states that the case was decided in his favor on October 23, 2019, in which the judge ordered Ao Wang to remove the defamatory posts, apologize to Xu and pay Xu for his mental damage.

190.    Around the time Xu sued Ao Wang in China, an anonymous defamatory email was sent to Ao Wang's employer, Wesleyan University in Connecticut, copying the President, Provost and Dean. The anonymous email, purportedly from a group of Chinese students at the school, claimed that Ao Wang's work to support survivors of sexual violence and the #MeToo movement had detracted from his teaching and demanded the university investigate him. The claims were bogus; nearly 70 Chinese students at Wesleyan signed a letter refuting them. The timing of this email was highly suspicious, causing Ao Wang to believe Xu might have been behind it.

ANSWER:

The Defendant denies that he sent or posted any email to Ao Wang's employer. The Defendant affirmatively states that Ao Wang posted the anonymous email online and the Defendant thus became aware of it.

191.    Xu's relentless threats and attacks against Ao Wang have caused him substantial reputational harm. Ao Wang is a well-known and deeply respected poet in China, with a sterling reputation as a scholar and moral individual. His publishing income is dependent in large part on the way that the public sees him. It was embarrassing for him to be portrayed as vindictive and petty by Xu and his minions.

ANSWER:

The Defendant denies the allegations that "Xu's relentless threats and attacks against Ao Wang have caused him substantial reputational harm. "and further states the Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 127. The Defendant further affirmatively states that in a series of lengthy online posts, by a female graduate student on a Chinese social media website called "Douban", she discloses how Wang Ao had intimidated her physically and verbally, and how Sun Xianjian had threatened to kill her.

192.    Xu's threats and attacks have also resulted in serious harm to Ao Wang's health. As a direct result of Xu's threats against Ao Wang's life, incessant attempts to turn his friends and colleagues against him, and baseless attacks on his reputation, he suffered from intense anxiety and was unable to sleep.  The anxiety manifested itself so acutely that he began having chest pains in late April 2018, and was treated for heart palpitations at the emergency room at Middlesex Hospital. He was advised that the cardiac issues were due to anxiety. Ao Wang had not suffered from anxiety or any cardiac issues prior to Xu's threats.

ANSWER:

The Defendant denies the allegations that, "Xu's threats and attacks have also resulted in serious harm to Ao Wang's health. As a direct result of Xu's threats against Ao Wang's life, incessant attempts to turn his friends and colleagues against him, and baseless attacks on his reputation". The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 192.

**CLAIMS FOR RELIEF**

<u>COUNT I</u>

<u>SEX TRAFFICKING, 18 U.S.C. §§ 1591, 1595</u>

**(Plaintiff Sun)**

193.    Plaintiffs reallege and incorporate, as though fully stated herein, the allegations contained in the above paragraphs.

ANSWER:

The Defendant restates his Answers to the allegations in the above paragraphs.

194.    The sex trafficking provisions of the TVPA, 18 U.S.C. § 1591(a), provide: "Whoever knowingly—(1) in or affecting interstate commerce. . . recruits entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or, . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act . . . shall be punished . . . ."

ANSWER:

The Defendant admits that the statute states as selectively quoted in Paragraph 194, but denies that any of its provisions involve or relate to him or that he violated the statute.

195.    "Commercial sex act" is defined in the TVPA as "any sex act, on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 195, but denies that any of its provisions involve or relate to him or that he violated the statute.

196.    Defendant engaged in a commercial sex act with Plaintiff Sun.  He pressured her to have sex with him in exchange for rent, good grades, and connections to esteemed professionals in the art and film world. He was instrumental in causing Sun to come to the United States to continue her education at UIUC when her visa status was in jeopardy, with the expectation that she continue to have sex with Xu upon

his demand.  Sun knew that Xu's acts were tied directly to her sexual relationship with Xu.  Her refusal to engage in sex with him would have hurt her grades, future prospects, and ability to remain in the United States.

ANSWER:

The Defendant denies the allegations of paragraph 196.

197.     Defendant actively engaged in interstate commerce with Plaintiff Sun for the purpose of engaging in commercial sex. Xu made numerous payments to her through WeChat, shortly after engaging in commercial sex with her. Xu offered to pay her rent so that he could continue to engage in commercial sex with her. Defendant paid for trips to Indiana and Chicago, including the cost of gas.  He brought Sun to China for the purpose of engaging in commercial sex with her.  Through his maneuvering, he allowed her to come back to the United States from China, where she paid tuition to UIUC.  His purpose in performing these acts was to engage in commercial sex acts with Sun.

ANSWER:

The Defendant denies the allegations of paragraph 197.

198.     Xu attempted to cause Sun to engage in commercial sex with a third woman, Yibing Pu. In exchange for having a threesome, Xu offered to pay for Pu's legal fees in an unrelated car accident, and offered to give Sun and her friend a good grade in his class, as well as connections to individuals in the art and film world.

ANSWER:

The Defendant denies the allegations of paragraph 198.

199.     Xu attempted to cause Sun to engage in commercial sex with several of his artist friends in Shanghai.  He offered Sun's body, without her consent, to these men in order to achieve greater prominence in the art world and commercial gain in the form of art and opportunities.

ANSWER:

The Defendant denies the allegations of paragraph 199.

200.    Defendant employed force in causing Plaintiff Sun to engage in commercial sex acts with him. On several occasions, he violently raped her. On other occasions, he physically beat her.  While badly beaten, he raped her again.  This caused Sun serious physical and emotional harm, including ongoing post-traumatic stress disorder.

ANSWER:

The Defendant denies the allegations of paragraph 200.

201.    Defendant employed coercion in causing Plaintiff Sun to engage in commercial sex acts with him. Through his words and deeds, and against the backdrop of his previous physical and sexual abuse of her, he caused Sun to believe that he could end her schooling prospects, her future in the film industry, and her ability to remain in the United States if she did not consent to all he required of her, including sexual services. Xu also threatened abuse of law in coercing Sun into engaging in commercial sex acts. He told Sun that if she did not return from China to the United States to continue to engage in sexual acts with him, he would reinstate proceedings against her stemming from the disorderly conduct charge she received in 2014. He made clear that if he followed through on this threat, she would never be permitted to return to the country again.  This caused Sun serious psychological harm.

ANSWER:

The Defendant denies the allegations of paragraph 201.

202.    Defendant also caused serious harm to Sun by causing her reputational harm, including by posting to social media allegations that she was unstable, admitted to an asylum, and otherwise untrustworthy. This behavior also caused serious harm to Sun's family, in particular her father, who was ashamed by what Xu had posted.

ANSWER:

The Defendant denies the allegations of paragraph 202.

203.     Pursuant to 18 U.S.C. § 1595(a), which provides for the recovery of civil damages for violations of 18 U.S.C. § 1591, Plaintiff Sun is entitled to recover damages, including punitive damages, and reasonable attorney's fees for Defendant's wrongful conduct.

ANSWER:

The Defendant admits that the statute provides for such recovery of civil damages, but denies that Sun is entitled to recover any damages and the Defendant denies any wrongful conduct.

<u>COUNT II</u>

<u>FORCED LABOR, 18 U.S.C. §§ 1589, 1595</u>

**(Plaintiff Zhao)**

204.     Plaintiffs reallege and incorporate, as though fully stated herein, the allegations contained in the above paragraphs.

ANSWER:

The Defendant restates his Answers to the allegations in the above paragraphs.

205.     The forced labor provisions of TVPA, 18 U.S.C. § 1589, provide "(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint shall be punished as provided under subsection (d)."

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 205, but denies that any of its provisions involve or relate to him or that he violated the statute.

206.    Defendant Xu knowingly obtained Plaintiff Zhao's labor and services by requiring her to perform work for his personal benefit for little or no compensation or other recognition.  He threatened serious harm and caused Zhao to believe that he intended to cause serious harm to her if she refused to comply, including the threat of withholding admission and financial aid to the EALC department at UIUC, and later the threat of expulsion from the program, in order to require her to continue to perform this labor. Xu knew that expulsion from the program could result in Zhao losing her F1 student visa status and being forced to leave the country.

ANSWER:

The Defendant denies the allegations of paragraph 206.

207.    Xu further used the threat of physical force and actual physical confinement to require her to do his bidding. By use of threats and intimidation, Zhao was compelled to perform services for Xu without the compensation required by law, while Xu benefitted financially.

ANSWER:

The Defendant denies the allegations of paragraph 207.

208.    As a result of Defendant's conduct, Zhao has suffered damages in an amount to be determined at trial.

ANSWER:

The Defendant denies the allegations of paragraph 208.

209.    Pursuant to 18 U.S.C. § 1595(a), which provides for the recovery of civil damages for violations of 18 U.S.C. § 1589, Zhao is entitled to recover damages, including punitive damages, and reasonable attorney's fees for Defendant's wrongful conduct.

ANSWER:

The Defendant admits that the statute provides for such recovery of civil damages, but the Defendant denies that Zhao is entitled to any damages and the Defendant denies any wrongful conduct.

<u>COUNT III</u>

<u>FORCED LABOR, 18 U.S.C. §§ 1589, 1595</u>

**<u>(Plaintiff Sun)</u>**

210.     Plaintiffs reallege and incorporate, as though fully stated herein, the allegations contained in the above paragraphs.

ANSWER:

The Defendant restates his Answers to the allegations in the above paragraphs.

211.     The forced labor provisions of the TVPA, 18 U.S.C. § 1589, provide "(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint shall be punished as provided under subsection (d)."

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 211, but denies that any of its provisions involve or relate to him or that he violated the statute.

212.     Defendant Xu knowingly obtained Plaintiff Sun's sexual services by means of force, threats of force, physical restraint, or threats of physical restraint. On several occasions, he violently raped her.  On other occasions, he physically beat her. While badly beaten, he raped her again. His pattern of abuse caused Sun to fear that withholding sex from him would anger him, causing him to rape or beat her again.

ANSWER:

The Defendant denies the allegations of paragraph 212.

213.    Defendant Xu obtained Sun's sexual services through the threat of serious harm to Sun and her family. He told her that if she did not do as he said, he would lambast her name to other professors at UIUC, and spread rumors about her online—causing reputational harm to her and her family. He told her, by word and deed, that if she did not engage in sexual services with him, he would kick her out of the school and the country. When Sun fought back, he followed through on many of these threats, causing her and her family reputational harm, including by posting allegations to social media that she was unstable, admitted to an asylum, and otherwise untrustworthy.

ANSWER:

The Defendant denies the allegations of paragraph 213.

214.    Defendant Xu obtained Sun's sexual services by means of the abuse or threatened abuse of law or legal process. He told Sun that if she did not return from China to the United States to continue to engage in sexual acts with him, he would reinstate proceedings against her stemming from the disorderly conduct charge she received in 2014. He made clear that if he followed through on this threat, she would never be permitted to return to the country again.

ANSWER:

The Defendant denies the allegations of paragraph 214.

215.    Defendant Xu obtained Sun's sexual services by means of a scheme, plan, or pattern intended to cause Sun to believe that if she did not perform sexual services, she would suffer serious harm. Through his words and deeds, and against the backdrop of his previous physical and sexual abuse of her, he caused Sun to believe that he could end her schooling prospects, her future in the film industry, her reputation as a budding filmmaker, her father's status and job security in China, and her immigration status if she did not consent to all he required of her, including sexual services.

ANSWER:

The Defendant denies the allegations of paragraph 215.

216.    Pursuant to 18 U.S.C. § 1595(a), which provides for the recovery of civil damages for violations of 18 U.S.C. § 1591, Plaintiff Sun is entitled to recover damages, including punitive damages, and reasonable attorney's fees for Defendant's wrongful conduct.

ANSWER:

The Defendant admits that the statute provides for such recovery of civil damages, but denies that Sun is entitled to recover any damages and the Defendant denies any wrongful conduct.

COUNT IV

TRAFFICKING INTO SERVITUDE, 18 U.S.C. §§ 1590, 1595

**(Plaintiffs Zhao and Sun)**

217.    Plaintiffs reallege and incorporate, as though fully stated herein, the allegations contained in the above paragraphs.

ANSWER:

The Defendant restates his Answers to the allegations in the above paragraphs.

218.    The trafficking into servitude provision of the TVPA, 18 U.S.C. § 1590, provides that recruiting, harboring, transporting, providing, or obtaining by any means any person for labor or services in violation of laws prohibiting, inter alia, forced labor shall subject the Defendant to punishment.

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 218, but denies that any of its provisions involve or relate to him or that he violated the statute.

219.    As set forth above, Defendant knowingly recruited and transported Zhao from Kansas to Illinois to provide labor and services to him in violation of laws prohibiting these actions. Xu also knowingly  transported Sun across state and international lines for the purpose of commercial sex and sexual services.

ANSWER:

The Defendant denies the allegations of paragraph 219.

220.    As a result of Defendant's conduct, Zhao and Sun have suffered damages in an amount to be determined at trial.

ANSWER:

The Defendant denies the allegations of Paragraph 220.

221.    The trafficking into servitude provisions of the TVPRA further provide that "if the violation includes . . . aggravated sexual abuse, or the attempt to commit aggravated sexual abuse," additional punishments are warranted.

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 221, but denies that any of its provisions involve or relate to him or that he violated the statute.

222.    Aggravated sexual abuse includes using force against another person to cause another person to engage in a sexual act. 18 U.S.C. § 2241.

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 222, but denies that any of its provisions involve or relate to him or that he violated the statute.

223.    Defendant facilitated Plaintiff Sun's trip to China in the summer of 2014 for the purpose of obtaining her sexual services.  While there, Defendant used force to cause Sun to engage in a sexual act against her will.

ANSWER:

The Defendant denies the allegations of paragraph 223.

224.    Pursuant to 18 U.S.C. § 1595(a), which provides for the recovery of civil damages for violations of 18 U.S.C. § 1590, Plaintiffs Zhao and Sun are entitled to recover damages, including punitive damages, and reasonable attorney's fees for Defendant's wrongful conduct.

ANSWER:

The Defendant admits that the statute provides for such recovery of civil damages, but denies that Sun is entitled to recover any damages and the Defendant denies any wrongful conduct.

COUNT V

GENDER VIOLENCE ACT, 740 ILCS § 82/5

**(Plaintiffs Sun and Zhao)**

225.    Plaintiffs reallege and incorporate, as though fully stated herein, the allegations contained in the above paragraphs.

ANSWER:

The Defendant restates his Answers to the allegations in the above paragraphs.

226.    The Gender Violence Act (GVA), 740 ILCS § 82/10, provides that "any person who has been subjected to gender-related violence as defined in Section 5 may bring a civil action for damages, injunctive relief, or other appropriate relief against a person or persons perpetrating that gender-related violence."

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 226, but denies that any of its provisions involve or relate to him or that he violated the statute.

227.    Gender-related violence is defined in section 5 to include: an act or threat of violence or physical aggression at least in part on the basis of a person's sex; or an act or threat of physical intrusion or invasion of a sexual nature under coercive conditions. 740 ILCS § 82/5.

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 227, but denies that any of its provisions involve or relate to him or that he violated the statute.

228.    "Perpetrating" an act of gender-related violence means either personally committing the violence, or "personally encouraging or assisting the act or acts of gender-related violence." 740 ILCS § 82/10.

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 228, but denies that any of its provisions involve or relate to him or that he violated the statute.

229.    Defendant engaged in several acts of gender-related violence against Plaintiff Sun. He brutally beat her on several occasions, including by pushing her down the stairs, shoving her into walls, and beating her until bruised while she was unconscious from an attempted suicide.  He raped her on several occasions, including when she was unable to move or see due to his previous beating of her, while she was stranded in China due to her impaired visa status. These actions were based at least in part on Sun's sex. These were acts of aggression to show his superior strength over Sun, a woman, and his male dominance over her.

ANSWER:

The Defendant denies the allegations of paragraph 229.

230.    Defendant engaged in acts of gender-related violence against Plaintiff Zhao. He punched another young curatorial assistant, Muqiao Sun, in Zhao's direct presence. Zhao and the assistant were the only two young women there in a room otherwise filled with men.  This physical beating served as a backdrop for all future interactions between Zhao and her professor.  Just days later, Xu cornered Zhao on a dark stairwell, moving in to kiss her against her will.  It was only due to Zhao's position on the stairwell and Xu's intoxicated state that she was able to escape.  Xu knew that Zhao was frightened of him after she witnessed him punching Muqiao Sun, but still repeatedly confined her behind closed doors in his office, against school policy; confined her in his car against her will; and otherwise physically cowed or constrained her.  These actions were based on Zhao's sex, as is further seen in his concentrated debasement of Zhao and other women on the basis of gender in and out of the classroom. These were acts of aggression to show his superior strength over Zhao, a woman, and his male dominance over her.

ANSWER:

The Defendant denies the allegations of paragraph 230.

231.    As a result of Defendant's gender-related violence, Plaintiffs Sun and Zhao are entitled to damages and other appropriate relief, including emotional distress, punitive damages, and attorney's fees and costs. 740 ILCS § 82/15.

ANSWER:

The Defendant denies the allegations of paragraph 231.

<u>COUNT VI</u>

<u>I NVOLUNTARY SERVITUDE, 720 ILCS § 5/10-9(b); 735 ILCS § 5/13-225; 740 ILCS §128/15</u>

**(Plaintiff Sun)**

232.    Plaintiffs reallege and incorporate, as though fully stated herein, the allegations contained in the above paragraphs.

ANSWER:

The Defendant restates his Answers to the allegations in the above paragraphs.

233.    720 ILCS § 5/10-9(b) provides that "A person commits involuntary servitude when he or she knowingly subjects, attempts to subject, or engages in a conspiracy to subject another person to labor or services obtained or maintained through any of the following means, or a combination of these means: (1) causes or threatens to cause physical harm to any person; (2) physically restrains or threatens to physically restrain another person; (3) abuses or threatens to abuse the law or legal process; (4) knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person; (5) uses intimidation, or exerts financial control over any person; or (6) uses any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform the labor or services, that person or another person would suffer serious harm or physical restraint."

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 233, but denies that any of its provisions involve or relate to him or that he violated the statute.

234.    "Services" is specifically defined to include commercial sexual activity, which is defined as "any sex act on account of which anything of value is given, promised to, or received by any person."  720 ILCS §§ 5/10-9(a)(8), (2).

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 233, but denies that any of its provisions involve or relate to him or that he violated the statute.

235.    Defendant subjected and attempted to subject Plaintiff Sun to commercial sexual activity against her will. He pressured her to have sex with him in exchange for cash, rent, good grades, and connections to esteemed professionals in the art and film world. He assisted her in coming back to the United States from China, allowing her to continue her education at UIUC, when her visa status was in jeopardy, with the expectation that she continue to have sex with Xu upon his demand. Sun knew that Xu's acts were tied directly to her sexual relationship with him. Her refusal to engage in sex with him would have negatively affected her grades, her future prospects, and her ability to remain in the United States on her student visa. His ability to control her student status was seen in his maneuvering to keep her in China, and then to bring her back to the United States from China. His purpose in performing these acts was to engage in sex with Sun, and Sun felt compelled to do so.

ANSWER:

The Defendant denies the allegations of paragraph 235.

236.    Xu attempted to cause Sun to engage in commercial sex with a third woman, Yibing Pu. In exchange for having a threesome, Xu offered to pay for Pu's legal fees in an unrelated car accident, and offered to give Sun and her friend a good grade in his class, as well as connections to individuals in the art and film world.

ANSWER:

The Defendant denies the allegations of paragraph 236.

237.    Defendant physically harmed Plaintiff Sun. On several occasions, he violently raped her. On other occasions, he physically beat her. When badly beaten, he raped her again. Knowing his violent tendencies, she was afraid to say no to him when he demanded commercial sex. She believed that her refusal would result in more physical harm to her. His rapes and physical beatings caused Sun serious physical and emotional harm, including in the form of ongoing post-traumatic stress disorder.

ANSWER:

The Defendant denies the allegations of paragraph 237.

238.    Defendant Xu obtained commercial sex from Sun by means of the abuse or threatened abuse of law or legal process. He told Sun that if she did not return from China to the United States to continue to engage in commercial sex acts with him, he would reinstate proceedings against her stemming from the disorderly conduct charge she received in 2014. He made clear that if he followed through on this threat, she would never be permitted to return to the country again.

ANSWER:

The Defendant denies the allegations of paragraph 238.

239.    Defendant employed intimidation and coercion in causing Plaintiff Sun to engage in commercial sex acts with him. Through his words and deeds, he caused Sun to believe that she would suffer serious harm because he could end her schooling prospects, her future in the film industry, and her immigration status if she did not consent to all he required of her, including commercial sexual activity. This caused Sun serious psychological harm.

ANSWER:

The Defendant denies the allegations of paragraph 239.

240.    Defendant also caused serious harm to Sun by causing her reputational harm, including by posting to social media allegations that she was unstable, admitted to an asylum, and otherwise untrustworthy. This behavior also

caused serious harm to Sun's family, in particular her father, who was ashamed by what Xu had posted.

ANSWER:

The Defendant denies the allegations of paragraph 240.

241. Pursuant to 740 ILCS §§ 128/15 and 128/20, which provides for the recovery of civil damages for violations of 720 ILCS § 5/10-9, Zhao is entitled to recover damages, including punitive damages, and reasonable attorney's fees for Defendant's wrongful conduct.

ANSWER:

The Defendant admits that the statute provides for such recovery of civil damages, but denies that Zhao is entitled to recover any damages and the Defendant denies any wrongful conduct.

<u>COUNT VII</u>

<u>INVOLUNTARY SERVITUDE, 720 ILCS § 5/10-9(b); 735 ILCS § 5/13-225; 740 ILCS §128/15</u>

**(Plaintiff Zhao)**

242. Plaintiffs reallege and incorporate, as though fully stated herein, the allegations contained in the above paragraphs.

ANSWER:

The Defendant restates his Answers to the allegations in the above paragraphs.

243. 720 ILCS § 5/10-9(b) provides that "A person commits involuntary servitude when he or she knowingly subjects, attempts to subject, or engages in a conspiracy to subject another person to labor or services obtained or maintained through any of the following means, or a combination of these means: (1) causes or threatens to cause physical harm to any person; (2) physically restrains or threatens to physically restrain another person; (3) abuses or threatens to abuse the law or legal process; (4) knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or

purported government identification document, of another person; (5) uses intimidation, or exerts financial control over any person; or (6) uses any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform the labor or services, that person or another person would suffer serious harm or physical restraint."

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 243, but denies that any of its provisions involve or relate to him or that he violated the statute.

244.    From at least August 2012 through March 2015, plaintiff Zhao was required to perform labor or services for Defendant. Xu knowingly obtained Zhao's labor and services by requiring her to perform work for his personal benefit for little or no compensation or other recognition, while he benefitted commercially. He intimidated her by using the threat of withholding admission and financial aid to the EALC department at UIUC, and later the threat of expulsion from the program, in order to require her to continue to perform this labor. Xu knew that expulsion from the program could result in Zhao suffering serious harm, including losing her F1 student visa status and being forced to leave the country.  He further used the threat of physical force to require her to do his bidding. By use of threats and intimidation, Zhao was compelled to perform services for Xu without the compensation required by law.

ANSWER:

The Defendant denies the allegations of paragraph 244.

245.    As a result of Defendant's conduct, Zhao has suffered damages in an amount to be determined at trial.

ANSWER:

The Defendant denies the allegations of paragraph 245.

246.    Pursuant to 740 ILCS §§ 128/15 and 128/20, which provides for the recovery of civil damages for violations of 720 ILCS § 5/10-9, Zhao is entitled to recover

damages, including punitive damages, and reasonable attorney's fees for Defendant's wrongful conduct.

ANSWER:

The Defendant admits that the statute provides for such recovery of civil damages, but denies that Zhao is entitled to recover any damages and the Defendant denies any wrongful conduct.

<u>COUNT VIII</u>

<u>TRAFFICKING IN PERSONS, 720 ILCS § 5/10-9(d) and 740 ILCS § 128/15</u>

**(Plaintiffs Zhao and Sun)**

247.    Plaintiffs reallege and incorporate, as though fully stated herein, the allegations contained in the above paragraphs.

ANSWER:

The Defendant restates his Answers to the allegations in the above paragraphs.

248.    720 ILCS §5/10-9(d) provides: "A person commits trafficking in persons when he or she knowingly: (1) recruits, harbors, transports, provides, or obtains by any means, or attempts to recruit, entice, harbor, transport, provide, or obtain by any means, another person, intending or knowing that the person will be subjected to involuntary servitude; or (2) benefits, financially or by receiving anything of value, from participation in a venture that has engaged in an act of involuntary servitude or involuntary sexual servitude of a minor."

ANSWER:

The Defendant admits that the statute states as quoted in Paragraph 248, but denies that any of its provisions involve or relate to him or that he violated the statute.

249.    As set forth above, Defendant knowingly recruited and transported Zhao from Kansas to Illinois to provide labor and services to him in violation of laws prohibiting these actions. Xu also knowingly  transported Sun across state and international lines for the purpose of commercial sex.

ANSWER:

The Defendant denies the allegations of paragraph 249.

250.    Pursuant to 740 ILCS §§ 128/15 and 128/20, which provides for the recovery of civil damages for violations of 720 ILCS § 5/10-9, Zhao is entitled to recover damages, including punitive damages, and reasonable attorney's fees for Defendant's wrongful conduct, at an amount to be determined at trial.

ANSWER:

The Defendant admits that the statute provides for such recovery of civil damages, but denies that Zhao is entitled to recover any damages and the Defendant denies any wrongful conduct.

<u>COUNT IX</u>

<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

**(Plaintiff Wang)**

251.    Plaintiffs reallege and incorporate, as though fully stated herein, the allegations contained in the above paragraphs.

ANSWER:

The Defendant restates his Answers to the allegations in the above paragraphs.

252.    The elements of intentional infliction of emotional distress are that: (1) the Defendant engaged in "extreme and outrageous" conduct toward the plaintiff; (2) the Defendant intended or recklessly disregarded the probability that the conduct would cause the plaintiff to suffer emotional distress; (3) the plaintiff endured "severe or extreme" emotional distress; and (4) the Defendant's conduct actually and proximately caused the plaintiff's distress.

ANSWER:

The Defendant admits that in Paragraph 252 the plaintiffs have accurately set out the elements for a cause of action alleging the intentional infliction of emotional distress, but denies that any of such elements involve or relate to him or that he engaged in any such acts or conduct.

253.    Xu engaged in extreme and outrageous conduct toward Wang with his systematic campaign of threatening and bullying him into dropping his truthful claims against Xu. He, individually and through his agents, issued a death threat against Wang.  Wang, well aware of Xu's violent tendencies, was terrified for the safety of his family. Xu tarnished Wang's reputation by undermining his academic accomplishments and harassing his colleagues and contemporaries.  He attempted to bribe him into dropping his allegations in exchange for lucrative compensation at an upcoming art festival. When Wang still refused, he instituted a baseless and extended lawsuit against him, at great personal and emotional cost to Wang and his family.

ANSWER:

The Defendant denies the allegations of paragraph 253.

254.    Xu engaged in this behavior knowingly, with the clear intent of causing Wang great emotional distress so that he would retract his true claims regarding Xu's sexual assaults of young women.

ANSWER:

The Defendant denies the allegations of paragraph 254.

255.    As the direct and proximate result of Xu's behavior, Wang endured severe emotional distress. The stress he experienced was so great that it manifested itself in physical symptoms, with Wang admitting himself to the hospital with chest pain, out of fear he was having a heart attack.

ANSWER:

The Defendant denies the allegations of paragraph 255.

256.    As a result of Xu's tortious conduct, Wang is entitled to damages in an amount to be determined at trial.

ANSWER:

The Defendant denies the allegations of paragraph 256.

## COUNT X

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**(Plaintiff Wang)**

257.     Plaintiffs reallege and incorporate, as though fully stated herein, the allegations contained in the above paragraphs.

ANSWER:

The Defendant restates his Answers to the allegations in the above paragraphs.

258.     The elements of negligent infliction of emotional distress are that: (1) the Defendant owed a duty to the plaintiff; (2) Defendant breached that duty; and (3) that breach caused damages to the plaintiff.

ANSWER:

The Defendant admits that in Paragraph 258 the plaintiffs have accurately set out the elements for a cause of action alleging the negligent infliction of emotional distress, but denies that any of such elements involve or relate to him or that he engaged in any such acts or conduct.

259.     Xu owed Wang an ordinary duty of care to guard against injuries which flow as a reasonably probable and foreseeable consequence of an act.

ANSWER:

The Defendant admits that in Paragraph 259 the plaintiffs have accurately set out the duty that one person owes to another, but denies that he violated any such duty.

260.     Xu breached this duty with his extreme and outrageous behavior as outlined above, including by issuing death threats, attempting to bribe him, bringing a baseless lawsuit, and threatening his reputation and standing in the community.

ANSWER:

The Defendant denies the allegations of paragraph 260.

261.     This breach caused damages to Wang, including in the form of physical and emotional harm, medical bills and reputational harm.

ANSWER:

The Defendant denies the allegations of paragraph 261.

262.     As a result of Xu's tortious conduct, Wang is entitled to damages in an amount to be determined at trial.

ANSWER:

The Defendant denies the allegations of paragraph 262.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendant, awarding Plaintiffs relief as follows:

1. General, compensatory and special damages in an amount to be proven at trial;

2. Unpaid wages in an amount to be proven at trial;

3. Punitive and exemplary damages;

4. Pre- and post-judgment interest;

5. Reasonable attorney's fees and costs; and

6. Such other and further relief as the Court deems just and proper.

WHEREFORE, the Defendant prays that the plaintiffs take nothing by their complaint, that judgment be entered in his favor and against the plaintiffs, that the plaintiff's claims be dismissed, and that the Defendant recover costs of suit.

COUNTER-CLAIM

The Defendant/Counter-plaintiff, GARY GANG XU, states the following for his Counter-claim against the Plaintiffs, XINGJIAN SUN, XING ZHAO, and AO WANG:

JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the value of this case exceeds $75,000 and there is diversity between the parties, with the Plaintiffs/Counter-defendants residing in California, New York, and New Hampshire.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this district.

PARTIES

3. The Defendant/Counter-plaintiff, GARY GANG XU (hereafter "Xu") is an independent art curator and was previously an Associate Professor at the University of Illinois at Urbana-Champaign and department head of the Department of East Asian Languages and Culture ("EALC") until 2015.

4. The Plaintiff/Counter-Defendant, XINGJIAN SUN, (hereafter "Sun") is a Chinese citizen currently residing in New York under an F1 student visa.

5. The Plaintiff/Counter-Defendant, XING ZHAO, (hereafter "Zhao") is a Chinese citizen currently residing in California under an F1 student visa.

6. The Plaintiff/Counter-Defendant, AO WANG, (hereafter "Wang") is an Associate Professor of East Asian Studies at Wesleyan University in Middletown, Connecticut, and he resides in New Hampshire.

STATEMENT OF FACTS

7. Sun participated in a CBS Morning News filmed interview that was published on September 16, 2019, in which she says that Xu beat her and raped her countless times and that Xu tried to kill her by running her down with his car. The filmed interview and article can be viewed online at https://www.cbsnews.com/news/gary-xu-former-university-of-illinois-professor-accused-of-sexual-abuse/

The headline of the article is: "He tried to kill me!"

8. On April 24, 2014, Sun sent a series of text messages to Xu via his mobile phone, threatening to kill his entire family. The original text message is in Chinese. The English translation is:

> "Are you psycho? Pick up the phone! If you don't pick up the phone, today I am going to drive there and knife your entire family to death! (phone cancelled) (phone cancelled) Pick up the phone you mother-fucker! Fuck you, you mother fucker, pick up the phone, fuck you! (phone call for 8 minutes and 4 seconds)

9.  Zhao participated in an interview with China's English language media "Sixth Tone" published on March 21, 2018, in which she was quoted as saying about Xu that, "Over a year after she met the professor, he harassed her for the first time, catching her completely off guard. "I hadn't thought to be vigilant around him."

10. Zhao was further quoted in her interview that, "After the first instance, the woman said, Xu forced her into unwanted sexual behavior that she described as "horrifying," alternately using affectionate words and menacing threats to coerce her into obeying. For fear of being recognized, she did not specify when this occurred.

11. Zhao was further quoted in her interview that, "My life was ruined during that period," the former student recalled. "My self-esteem was really low — I felt physically dirty." The article continued that, "She said she suffered both physical and psychological damage, and added that she was aware of other UIUC students who had had sexual relationships with Xu, including an undergraduate who reported him to the school in 2015." The article is available online at https://www.sixthtone.com/news/1001927/professor-accused-of-sexual-abuse-to-resign%2C-says-university

12. Zhao was further quoted in her interview that Xu only "attempted to kiss her" but his attempt fell short.

13. Zhao published statements in the We-chat group North American Chinese Law PhDs Volunteer Group that Xu had slept with his assistant at Venice Biennale and that the assistant had later become the associate director of Today Museum in Beijing. Zhao also claims that Xu has committed tax evasion and encouraged others to report Xu to the IRS.

14. On March 12, 2018, Wang published an online post on the social media platform called Zhihu in which he cited to posts he made to another online social medial platform called Douban that was titled, "About school campus sexual assault offenders, what I saw, what I thought, what I can do." Wang posted that, "This person has a history of bad behaviors, has been sexually assaulting students for nearly 20 years, and has finally been forced to change schools." The post continues that, "This person is Xu Gang." The post continued to identify Xu by saying, "His English name is Gary Xu, Associate Professor of the East Asian Institute of the University of Illinois, Urbana-Champaign." The post continued that Wang had published the accusations to, "expose [Xu's] sexual harassment and threat, and use of violent measures against students for nearly 20 years."

15. The post continued that "Friends who have suffered Xu Gang's sexual assault/sexual harassment, or anyone with information, may contact me on a voluntary basis. Let's handle this thing right." Wang's announcement further stated that he had made posts on social media platforms including Douban and Zhihu to "expose [Xu's] sexual harassment and threat, and use of violent measures against students for nearly 20 years." As of March 16, 2018, the article had been viewed over 800,000 times.

16. From March 11, 2018 through March 19, 2018, Wang published posts, broadcasts, referrals, and retransmissions, mentioning repeatedly that Xu had committed "sexual assault" and "sexual harassment" of women. The posts includes statements such as, "I have known about his history of sexual assault/sexual harassment of female students for nearly 20 years, including targeting female teachers" and statements such as, "Xu Gang, why is it that you have a habit of beating people?"

17. During the same period of time, Wang retransmitted a question on the platform Zhihu, "What do you think of Profesor Wang Ao of Wesleyan University issuing a warning that Xu Gang of UIUC is a repeat sexual assault offender?" and answered it by reposting his statements made above.

18. From March 11, 2018 through March 19, 2018, Wang reposted on the social medial platform Zhihu, the statement, "Announcement of Collecting Information regarding Xu Gang's Misconduct".

19. During the same period of time, Wang published several posts on the social medial platform Weibo which mention that Xu had committed sexual assault and sexual harassment of women. Wang further reposted his Answer stated on Zhihu and his "Announcement".

20. Wang posted that he was trained in Thai boxing and that he was ready and able to "beat him up" meaning Xu.

21. The posts remained online until after a civil judgment was entered against Wang by the Luohu District People's Court, Shenzhen, Guangdong, China on October 23, 2019, which found that Wang was found guilty of violating Xu reputation, and ordered him to stop, ordered that an apology should be posted on the Zhihu, Douban and Weibo sites, ordered compensation to Xu, and assessed court costs against Wang.

## Count I - Sun - Intentional Infliction of Emotional Distress

1. Xu realleges and incorporates Paragraphs 1-21 as though fully stated herein.

2. Sun engaged in extreme and outrageous conduct toward Xu with her statements during the interview with CBS Morning News.

3. Sun engaged in this behavior knowingly, with the clear intent of causing Xu to suffer great emotional distress.

4. As the direct and proximate result of Sun's behavior, Xu endured severe emotional distress. The stress he experienced was so great that it manifested itself in physical symptoms, in that he has suffered from anxiety attacks, and he has developed a heart condition that required invasive treatment.

5.  As a result of Sun's tortious conduct, Xu is entitled to damages in an amount to be determined at trial.

## Count II - Sun - Defamation

1.  Xu realleges and incorporates Paragraphs 1-21 as though fully stated herein.

2.  Sun engaged in extreme and outrageous conduct toward Xu with her statements during the interview with CBS Morning News.

3.  Sun's statements during the interview about Xu were false and dafamatory.

4.  Sun's statements during the interview were an unprivileged publication of the defamatory statement to a third party

5.  Sun's statements during the interview were defamatory *per se* because the words used are so obviously and materially harmful to Xu that injury to his reputation may be presumed or when its defamatory character is apparent on its face as Sun's statements imputed the commission of one or more criminal offenses.

6.  As a direct and proximate result of the statements and actions of Sun, the reputation and good name of Xu has been damaged.

7.  As a result of Sun's tortious conduct, Xu is entitled to damages in an amount to be determined at trial.

## Count III - Zhao- Intentional Infliction of Emotional Distress

1.  Xu realleges and incorporates Paragraphs 1-21 as though fully stated herein.

2.  Zhao engaged in extreme and outrageous conduct toward Xu with the statements she made during the interview.

3.  Zhao engaged in this behavior knowingly, with the clear intent of causing Xu to suffer great emotional distress.

4.  As the direct and proximate result of Zhao's behavior, Xu endured severe emotional distress. The stress he experienced was so great that it manifested itself in physical symptoms, in that he has suffered from anxiety attacks, and he has developed a heart condition that required invasive treatment.

5.  As a result of Zhao's tortious conduct, Xu is entitled to damages in an amount to be determined at trial.

#### Count IV - Wang- Intentional Infliction of Emotional Distress

6.  Xu realleges and incorporates Paragraphs 1-21 as though fully stated herein.

7.  Wang engaged in extreme and outrageous conduct toward Xu with his online statements and posts.

8.  Wang engaged in this behavior knowingly, with the clear intent of causing Xu to suffer great emotional distress.

9.  As the direct and proximate result of Wang's behavior, Xu endured severe emotional distress. The stress he experienced was so great that it manifested itself in physical symptoms, in that he has suffered from anxiety attacks, and he has developed a heart condition that required invasive treatment.

10. As a result of Wang's tortious conduct, Xu is entitled to damages in an amount to be determined at trial.

WHEREFORE, the Defendant/Counter-plaintiff, Gary Xu, prays that this Court enter judgment against the Plaintiff/Counter-Defendants, awarding relief as follows:

1. General, compensatory and special damages in an amount to be proven at trial; and,

2. Such other and further relief as the Court deems just and proper.

BY: s/James A. Martinkus
James A. Martinkus Bar Number: 21116 IL
Attorney for Plaintiff
Erwin, Martinkus & Cole, Ltd.
411 West University Avenue
P.O. Box 1098
Champaign IL 61824-1098
(217) 351-4040
FAX 217-351-4314
E-mail: jim.martinkus@erwinlaw.com

CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Dr. Ann Olivarius                                  Jonathan Little

Dr. J. F.O. McAllister                             Jessica Wegg

Alison Wilkinson                                   SAEED AND LITTLE, LLP

McALLISTER OLIVARIUS                               jon@sllawfirm.com

aolivarius@mcolaw.com                              jessica@sllawfirm.com

jmcallister@mcolaw.com

awilkinson@mcolaw.com


and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:       None


BY: s/James A. Martinkus
James A. Martinkus Bar Number: 21116 IL
Attorney for Plaintiff
Erwin, Martinkus & Cole, Ltd.
411 West University Avenue
P.O. Box 1098
Champaign, IL 61824-1098
(217) 351-4040
FAX 217-351-4314
E-mails: jim.martinkus@erwinlaw.com