E-FILED
Monday, 21 November, 2022 01:42:08 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

XINGJIAN SUN, et al.,

      Plaintiffs,

v.                                                            Case No. 19-2242

GARY GANG XU,

      Defendant.

## ORDER

This case is before the Court on several pretrial motions filed by the parties. Defendant Gary Gang Xu filed a Motion for Summary Judgment (#80). Plaintiffs Xingjian Sun, Xing Zhao, and Ao Wang filed a Motion for Partial Summary Judgment (#81). Additionally, Plaintiffs filed a Motion for Leave to File an Amended Answer to Defendant's Counter-Claim (#87). Finally, Plaintiffs filed a Motion to Strike Portions of Defendant's Reply to Motion for Summary Judgment and For Costs (#90). For the reasons discussed below, Defendant's Motion for Summary Judgment (#80) is granted in part and denied in part, Plaintiffs' Motion for Partial Summary Judgment (#81) is granted in part and denied in part, Plaintiffs' Motion for Leave to File an Amended Answer to Defendant's Counter-Claim (#87) is granted, and Plaintiffs' Motion to Strike Portions of Defendant's Reply to Motion for Summary Judgment and For Costs (#90) is granted in part and denied in part.

### I.    Background

The following background facts are taken from the undisputed material facts contained in the parties' various motions and responses. Defendant Xu denies and disputes many of the agreed facts, but includes them as undisputed and maintains that even if all facts alleged by Plaintiffs are true, Plaintiffs have failed to support their causes of action.

### A.  Facts Relating to Sun

Plaintiff Xingjian Sun ("Sun") was a student at the University of Illinois at Urbana-Champaign ("UIUC") in the spring of 2013. Defendant Gary Gang Xu ("Xu") was a professor at UIUC in the Department of East Asian Language and Culture during that time. Sun reached out to Xu by email asking him to serve as her advisor for an independent studies project on Chinese film or Chinese language film. Sun visited Xu's office in the spring of 2013. Sun and Xu later engaged in sexual encounters on several occasions. Sun considered herself to be in a romantic relationship with Xu. Xu denies having sex with Sun.[1] (Xu Dep. at 30.)

In August 2014, Sun and Xu went to an art exhibition in Shanghai, China. Sun and Xu traveled separately to Shanghai but stayed in the same hotel room during the trip. Sun alleges that Xu asked Sun to have sex with two artists at the exhibition. Sun does not recall her response to Xu's alleged request, but she did not have sex with the artists.  Xu denies that he had any interaction with Sun in Shanghai in August 2014. (Xu Dep. at 211.)

On September 16, 2018, *CBS This Morning* aired a recorded interview with Sun in which she reported that Xu tried to kill her with his car and subjected her to physical, sexual, and emotional abuse.

### B.  Facts Relating to Zhao

Plaintiff Xing Zhao ("Zhao") began a master's degree program at the University of Kansas ("Kansas) in the fall of 2012. She did not receive any financial aid from Kansas, instead she received family support to pay for her education.

Zhao was aware of Xu's presence on social media in the summer of 2012 but had never met him. Shortly after Zhao began her graduate program at Kansas, Zhao reached out to Xu to ask about transferring to UIUC. Zhao testified that she was interested in transferring to UIUC because she was seeking financial aid, Asian study sounded

---

[1] While Xu denies having sex with Sun, for purposes of his Motion, he argues that Sun's testimony, even if undisputed, does not support her causes of action.

broader than art history, and she wanted to return to the Midwest. Zhao contacted Xu initially by telephone and then followed up with emails.

In April 2013, UIUC informed Zhao that she had received a Tyler Fellowship, a non-service, merit-based fellowship for new students worth $16,000 for the academic year. Zhao accepted the fellowship, under which she had no obligation to work for an individual, the department, or the university.

During that time, Xu was co-authoring a book on an artist. Zhao accepted an assignment to translate the artist's letters from Chinese to English for Xu. Zhao spent time translating letters from August 2012 through March 2013. Zhao did not keep track of her time spent on the translations. Zhao was expecting payment for her translation work, but she never discussed that with Xu or anyone else. Zhao was aware that her student visa limited the amount of time she could spend on work.

Zhao also assisted Xu with an art exhibit in Sanya, China ("Sanya Exhibit"). She helped Xu with various tasks, including budgeting, organizing travel, and contact with artists. Zhao allocated $2,500 to herself for her work on the Sanya Exhibit. All of Zhao's expenses for attending the Sanya Exhibit were paid by the company running the exhibit.

While at the Sanya Exhibit, Zhao saw Xu slap another assistant's face prior to the opening. Zhao also reported that Xu was "tipsy". Zhao testified that Xu grabbed her shoulder while they were in a stairwell and apparently attempted to kiss her.[2] Xu acknowledges that Zhao was his assistant for the Sanya Exhibit. (Xu Dep. 299-302.)

Zhao reported being distressed about comments Xu directed to other students, but she never told Xu that she wanted to discontinue working with him as her advisor.

### C. Facts Relating to Wang

Plaintiff Ao Wang ("Wang") is a professor at Wesleyan University in Middletown, Connecticut. Wang and Xu met once when Xu was visiting Washington

---

[2] While Xu presumably denies that he grabbed Zhao's shoulder and attempted to kiss her, this topic did not come up in his deposition, and Xu includes these as undisputed facts. Because Xu argues that Zhao's testimony, even if undisputed, does not support her causes of action, the Court will consider this an undisputed fact for purposes of Xu's Motion.

University in St. Louis while Wang was a graduate student. On March 10, 2018, Wang made an online social media post claiming Xu had sexually harassed people and had assaulted female colleagues for the past two decades. Wang's post was titled, "U.S. professor sexually assaulting his students for more than 20 years." Wang's post further claimed that Xu had worked at a different university that forced him to resign. Wang stated in his post that Xu had improper relationships with many students and that the university had stopped scheduling classes for Xu to teach.

In his post, Wang directed comments to Xu, stating "I welcome your retaliation after you read my posts, no matter whether you accuse me of spreading slanders or rumors or you retaliate against me in other ways. Come on. If you choose to take legal action, I will keep you company to the end." Wang published this post on several websites: Douban.com, Zhihu.com, Transparent Earth, Weibo, and Ao Academy.

In response, Xu sent two emails to Wang. Wang testified that he felt threatened by these emails. Xu's first email asked Wang to take the post down. Xu copied a list of his former students on this first email, which Wang perceived as a threat. Xu's second email stated that Xu's lawyer would contact Wang about the post. Wang reported feeling threatened when Xu posted to WeChat about the post.[3] Xu's responsive post said that Wang was bitter because Wang was rejected by Xu when Wang applied to UIUC for a Ph.D. program. Xu stated to his own friends on WeChat that Wang was a "petty hater."

One of Xu's friends contacted Wang to tell Wang that the allegations against Xu were not true and not supported by evidence. Someone sent anonymous emails to Wang's superiors at Wesleyan University that included defamatory statements about Wang. Wang claims that his reputation was damaged because some of Wang's colleagues de-friended him on social media. Wang also experienced fear that Xu would

---

[3] WeChat is a free messaging and calling app widely used in China.

hurt Wang's family based on what other people said about assaults Xu had allegedly committed.[4]

## II.     Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009) (citations omitted).

When ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences that are only supported by speculation or conjecture. *See Singer*, 593 F.3d at 533. In addition, the court "need not accept as true a plaintiff's characterization of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d

---

[4] Xu sued Wang for defamation in a Chinese court for publishing fake accusations on social media. Xu initially won the case, but the case was sent for retrial on appeal. Upon retrial, the People's Court entered a civil judgment for Wang.

1104, 1111 (7th Cir. 2004) (*quoting Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)).

Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), (*citing Celotex Corp.*, 477 U.S. at 322-323)). If the nonmovant does not come forward with evidence that would reasonably permit the finder of fact to find in his favor on a material question, then the court must enter summary judgment against him. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

## III.   Analysis

The parties filed cross motions for summary judgment. Defendant asks the Court to enter judgment in his favor on the following claims:

- Sun's Claims:
  - Count I: Sex Trafficking
  - Count III: Forced Labor
  - Count IV: Trafficking into Servitude
  - Count V: Illinois Gender Violence
  - Count VI: Illinois Involuntary Servitude
  - Count VIII: Illinois Trafficking in Persons

- Zhao's Claims:
  - Count II: Forced Labor
  - Count IV: Trafficking Into Servitude
  - Count V: Illinois Gender Violence
  - Count VII: Illinois Involuntary Servitude
  - Count VIII: Illinois Trafficking in Persons

- Wang's Claims:
  - Count IX: Intentional Infliction of Emotional Distress
  - Count X: Negligent Infliction of Emotional Distress

Plaintiffs move for partial summary judgment on Defendant's counterclaim of intentional infliction of emotional distress. Defendant's counterclaim alleges intentional infliction of emotional distress against Plaintiff Sun (Count I), Plaintiff Zhao (Count III) and Plaintiff Wang (Count IV).

The Court will consider each count in turn.

### a. Defendant Xu's Motion for Summary Judgment

Defendant Xu moves for summary judgment as to several counts of Plaintiffs' Complaint.

### i. Plaintiff Sun's Claims

### 1. Count I: Sex Trafficking

Plaintiffs' Complaint alleges that Xu violated the Trafficking Victims Protection Reauthorization Act ("TVPA"), 18 U.S.C. § 1591, as to Plaintiff Sun. "The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591, prohibits the sex trafficking of children or adults by force, fraud, or coercion." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021). "The statute focuses on those (usually men) who make money out of selling the sexual services of human beings (usually women) they control and treat as their profit-producing property." *U.S. v. Todd*, 627 F.3d 329, 330-31 (9th Cir. 2010).

The TVPA provides for civil remedies for victims of sex trafficking, and § 1595 allows victims of trafficking to sue for damages. 18 U.S.C. 1591, 18 U.S.C. 1595. Specifically, "§ 1595 allows victims of sex trafficking violations under § 1591 to 'bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [§ 1591].'" *G.G. v. Salesforce.com, Inc.*, 2022 WL 1541408, at *3 (N.D. Ill. May 16, 2022) (citing 18 U.S.C. § 1595). So, to receive damages under the TVPA, Sun must first show that Xu violated § 1591 and then that Xu is liable under § 1595.

Section 1591 makes it a federal crime to knowingly:

recruit[ ], entice[ ], harbor[ ], transport[ ], provide[ ], obtain[ ] or maintain[ ] by any means a person ... knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion ... or any combination

of such means will be used to cause the person to engage in a commercial sex act.

18 U.S.C. § 1591.[5]

Xu argues that Sun's claim under § 1591 fails because Sun and Xu's sexual relationship was consensual and does not constitute "sex trafficking" under the statute. Xu does not challenge any specific element of § 1591, but only notes that § 1591 does not define the term "sex trafficking." In making this argument, Xu considers only the stereotypical claim of sex trafficking, such as prostitution or sexual slavery.

Section 1591 is not limited to this stereotypical definition and does not even use the term "sex trafficking" beyond the title. Rather, the entirety of § 1591(a) defines what is necessary for an act to qualify as sex trafficking under the statute. Courts, considering the plain language of the statute, have "applied the TVPA to cases where a victim claims to have been forced or defrauded into sexual activity with the promise of career advancement." *Eckhart v. Fox News Network, LLC*, 2021 WL 4124616, at *7 (S.D. N.Y. Sept. 9, 2021); *see also Huett v. Weinstein Company LLC*, 2018 WL 6314159 (C.D. Cal. Nov. 5, 2018) (finding that nonmonetary career promises were sufficient to make a claim under § 1591).

There are three elements of § 1591 that must be met. First, the plaintiff must show that the defendant recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited a person. In this case, the operative verbs at play are "entice" and "patronize" which are not defined by the statute. Merriam-Webster defines "entice" as "to attract artfully or adroitly or by arousing hope or desire" and "patronize" as "to adopt an air of condescension toward**:** treat haughtily or coolly." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/entice (last visited October 26, 2022); https://www.merriam-webster.com/dictionary/patronize (last visited October 26, 2022).

Looking at the facts in the light most favorable to Sun, there is sufficient evidence for a reasonable jury to find that Xu enticed and patronized Sun. Sun does not dispute

---

[5] Section 1595 allows a victim of § 1591 to bring a civil action against the perpetrator.

that she believed her relationship with Xu to be consensual and that she considered herself to be in a romantic relationship with Xu. However, Sun testified that at times, the sexual relationship was not consensual[6] and even consensual sex acts can still violate § 1591 if all required elements are met. *See Noble v. Weinstein*, 335 F.Supp.3d 504, 523 (S.D. N.Y. 2018).

Xu does not dispute that he was Sun's advisor for the East Asian Language and Culture independent studies class ("EALC 199") Sun took during the Fall 2013 semester. Sun testified that she met with Xu a couple of times relating to the class before Xu "confessed his love to [her] and took [her] to his house and raped [her]." (Defendant's Exhibit 1, Sun Dep. at 72, #80-1.) According to Sun, when this happened, Xu did not tell Sun where he was taking her, but just said that he was driving to "a place." (Sun Dep. at 81.) Sun further testified that Xu warned her that if she called the police, she would lose her grade in the EALC 199 class. (Sun Dep. at 85.) Sun testified that Xu "especially" said to not report the incident to the school because they can report the incident to the police. (Sun Dep. at 85.)

After taking Sun home, Sun testified that Xu reminded her that her status was "very fragile" as an international student and that if she reported Xu, the school could choose to deport Sun or remove her student visa. (Sun Dep. at 87.) According to Sun, she allowed Xu to come to her apartment for sex because she "was hysterical and totally terrified that if [she] didn't comply he would have [her] deported." (Sun Dep. at 90.) After several sexual encounters, Sun asked Xu about their relationship status and Xu told her they "were lovers." (Sun Dep. at 92.)

Sun received a grade of A from Xu in the EALC 199 class. She testified that she felt a "huge imbalance of power" and that Xu told her that a love relationship is about an imbalance of power. (Sun Dep. at 95.) Sun reports that Xu was physically violent toward her, at times pounding her head against the wall, throwing her on the bed, and slapping her face until her teeth bled. (Sun Dep. at 96.) Sun further explained that he

---

[6] While Sun agreed her relationship with Xu was "consensual," she testified that she said no and tried to resist when Xu used violence against her as a part of the sexual relationship.

was verbally abusive, calling her a slut, shaming her family, and causing her to attempt suicide. (Sun Dep. at 98-99; 102.) According to Sun, Xu told Sun that violence was a normal part of the excitement in a sexual relationship. (Sun Dep. at 96.) Xu denies having sex with Sun and denies ever being violent during sex. (Xu Dep. at 30, 34.)

Sun explained that Xu visited her in the hospital, gave her a ride home and then violently had sex with her, against her will. (Sun Dep. at 104-05.)

Sun's testimony, which can be used to oppose Xu's Motion for Summary Judgment, creates a genuine dispute as to whether Xu used his position of power as Sun's advisor to entice Sun to consent to violent sexual encounters. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 554 (7th Cir. 2014) ("Evidence supporting or opposing summary judgment must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony.").

According to Sun, Xu also enticed her to agree to have sex with him by threatening her status as a foreign student. He warned her not to tell the police, the university, or her friends about the sexual encounters and told her that she may be deported if she reported the incident. Xu's statements aroused hope in Sun that her student status and grade would remain safe if she did as Xu said. Xu further used an air of condescension toward Sun when he allegedly told her that his violent sexual actions were normal excitement in a loving relationship.

Looking at the facts in the light most favorable to Sun, there is sufficient evidence for a reasonable jury to find that Xu enticed and patronized Sun, thereby satisfying the first element of the offense.

Second, Sun must show that Xu knew, or was in reckless disregard of the fact, that means of force, fraud or coercion would be used. This element requires Sun to show that Xu was aware, at the initial enticement stage, that certain prohibited means would be used to achieve the end goal of a commercial sex act. *Noble v. Weinstein*, 335 F.Supp.3d 504 at 518; *See also U.S. v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010) ("The knowledge required of the defendant is such that if things go as he has planned, force, fraud or coercion will be employed to cause his victim to engage in a commercial sex

transaction. That required knowledge brings the predictable use of force, fraud, or coercion into the definition of the defendant's crime.").

Xu's pattern of behavior shows that from early in the relationship, Xu knew or understood that he would use force and fraudulent means to entice Sun to engage in sex with him. Sun testified that after discussing her studies a couple of times, he confessed his love for her and took her to his house and raped her. (Sun Dep. 72.) Immediately after, Xu warned Sun that her status as a foreign student and her grade in his class were at risk if she reported the sexual encounter. (Sun Dep. 85.) Xu also allegedly repeatedly used violence in his sexual encounters with Sun.  If the jury believes Sun's testimony, they could reasonably find that Xu knew and even intended to use these fraudulent and forceful means to achieve his goal of having sex with Sun. *See Noble*, 335 F.Supp.3d at 518 ("Here, the pattern of behavior included in the Amended Complaint plausibly alleges a knowledge and understanding that, from the start of their professional relationship in February 2014, Harvey would use fraudulent means to entice Noble to engage in a sex act with him. The promise of a film role, the interview with Ford for the film role, and the assurances that 'everything will be taken care of for you if you relax,' including as he forced her to masturbate him, support this.").

Finally, Sun must establish that the prohibited means of force or fraud were used to cause Sun to engage in a commercial sex act.  "In other words, Defendant must have intended, or been aware, that the fraud and force *would cause* a sex act to take place." *Noble*, 335 F. Supp.3d at 519 (emphasis in original).

As Sun's advisor, Xu held a position of power. A reasonable jury could conclude that Xu's threats as to Sun's student status and her grade caused Sun to agree to have sex with Xu.

As to the "commercial" nature of the sex act itself, § 1591(e)(3) defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." Courts, considering the expansive language in the act, including "any sex act," "anything of value," and "any person," have found that the Act

covers more than just monetary gain. *Noble*, 335 F.Supp.3d at 521 (finding that the promise of a film role to qualify as value under § 1591(a)); *U.S. v. Rivera*, No. 12-cr-121, 2012 WL 6589526, at *5 (M.D. Fla. Dec. 18, 2012) (finding, in the context of § 1591, that the term "anything of value" encompassed the victim's ordination as a prophet, which was considered an honor).  Xu argues that in any consensual sex relationship there is always an exchange of value of some sort between the two individuals involved, and there was nothing about his relationship with Sun that would have made it commercial in nature.

Nevertheless, a reasonable juror could conclude that Sun received a high grade in Xu's class and Xu's reassurance as to her student status in the United States in exchange for her sexual activities with Xu.  It is enough that Sun held a reasonable belief that having a sexual relationship with Xu would positively impact her grade and career advancement. Both the potential academic advancement and career growth were things of value sufficient to satisfy a "commercial sex act." *See Noble*, 335 F.Supp.3d at 521 ("Even if the prospect of a film role, of a modeling meeting, and of a continued professional relationship with TWC were not "things of value" sufficient to satisfy commercial aspect of the sex act definition, [the plaintiff's] reasonable expectation of receiving those things in the future, based on [the defendant's] repeated representations that she would, is sufficient.).

In fact, § 1591 does not require that an actual commercial sex act occurred. *United States v. Corley*, 679 Fed. Appx. 1, 7 (2d. Cir. 2017) (noting that § 1591 "requires only that the defendant 'know' that the victim 'will be caused' to engage in a commercial sex act; the statute does not require that an actual commercial sex act have occurred."). Here, under the facts to which Sun testified, Xu knew that his promise of a good grade in his class and the stability of Sun's student status would cause Sun to continue to have sex with him.[7]

---

[7] Xu's Reply argues that Sun fails to allege a specific promise Xu made to Sun in exchange for the sex. Under the broad language of the statute, Sun must show that Xu enticed her to have sex and that she received "anything of value" in exchange. If the jury believes Sun, it can reasonably conclude that a good

Considering the facts in the light most favorable to Sun, a reasonable juror could find that Xu knowingly enticed Sun knowing that means of force, fraud, or a combination of the two, would be employed to cause her to engage in a commercial sex act. Xu's Motion for Summary Judgment as to Count I is denied.

### 2. Count III: Forced Labor

Count III alleges that Xu violated the forced labor provision of the TVPA, 18 U.S.C. § 1589.[8] Section 1589 provides:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
>
> > (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> >
> > (2) by means of serious harm or threats of serious harm to that person or another person;
> >
> > (3) by means of the abuse or threatened abuse of law or legal process; or
> >
> > (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
>
> shall be punished as provided under subsection (d).

Sun alleges that Xu knowingly obtained Sun's sexual services by means of force, threats of force, physical restraint, or threats of physical restraint. Xu's Motion for Summary Judgment simply argues "[t]o the extent that Sun claims that she provided sexual services to Xu in violation of this statute Xu reasserts the arguments set forth in Count I."

Sun's deposition testimony, detailed above, alleges that Xu knowingly obtained sex with Sun by means of force and physical restraint. Sun testified that Xu was physically violent toward her, at times pounding her head on the wall, throwing her on

---

grade and the security of her student status were things of value that she received in exchange for the alleged continued violent sex with Xu.

[8] As with § 1591, § 1595 allows for civil remedies for violations of § 1589.

the bed, and slapping her face until her teeth bled. (Sun Dep. at 96.) Sun further explained that he was verbally abusive, calling her a slut, shaming her family, and causing her to attempt suicide. (Sun Dep. at 98-99; 102.) As detailed in Section III(a)(i)(1), a reasonable juror could conclude that Xu used this physical force to obtain sex from Sun.

Given this, the question is whether the sex between Xu and Sun constitutes "labor or services" under the forced labor provision.

The Seventh Circuit has not considered whether sexual activities constitute labor or services under § 1589. The Tenth Circuit considered the issue in *United States v. Kaufman*, 546 F.3d 1242 (10th Cir. 2008). *Kaufman* was a criminal case where prosecutors charged a married couple who ran an unlicensed group home for the mentally ill and forced the residents to perform a variety of bizarre sex acts. Prosecutors pursued the case under § 1589. At trial the Court gave jury instructions that defined "labor" as "the expenditure of physical or mental effort" and "services" as "conduct or performance that assists or benefits someone or something." *Id.* at 1260. The defendants appealed, objecting to the instructions, arguing that § 1589 applied only to "labor or services" that constitute "work in an economic sense." The Tenth Circuit rejected the defendant's argument. The Court considered a Fourth Circuit case stating that sexual abuse was "a badge and incident of servitude which is distressingly common, not just historically, but for young women who find themselves in coercive circumstances today." *U.S. v. Udeozor*, 515 F.3d 260, 266 (4th Cir. 2008). The Tenth Circuit found "[t]hat statement suggests that sexual acts that have been coerced by other means are covered by the involuntary servitude statute."

In *Kaufman*, the Court further considered a New York district court case where the court relied on the ordinary meaning of the terms "labor" and "services" to find that they covered commercial sex acts. *U.S. v. Marcus*, 478 F.Supp.2d 289, 303 (E.D. N.Y. 2007) (reversed on other grounds) ("The ordinary meaning of the term 'labor' is an expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory."). The *Kaufman* Court concluded, "we are persuaded that the involuntary

servitude and forced labor statutes apply to coerced acts other than 'work in an economic sense.'" *Kaufman*, 546 F.3d at 1262.

Xu attempts to distinguish the instant case from *Kaufman* because the victims in *Kaufman* did manual labor in addition to their sex acts. While the facts of *Kaufman* differ, the conclusion that the forced labor provision applies to coerced acts other than work in an economic sense remains. The *Kaufman* Court reached this conclusion by considering other cases where the forced labor was a commercial sex act. Considering that court's reasoning in full, the Court concludes that the forced labor statute encompasses sex acts within the definition of "labor or services." It is up to the jury to determine whether Xu's actions toward Sun violated the forced labor provision. Xu's Motion for Summary Judgment as to Count III is denied.

### 3. Count IV: Trafficking into Servitude

Count IV alleges that Xu violated the trafficking into servitude provision of the TVPA, 18 U.S.C. § 1590. The Complaint alleges that Xu knowingly recruited and transported Sun across state and international lines for the purpose of commercial sex and sexual services when they traveled to Shanghai. Section 1590 applies to:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse, or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.

18 U.S.C. § 1590.

Defendant Xu again repeats his arguments as to Count I, arguing that because the relationship was consensual, the facts do not support Sun's claim under the trafficking into servitude provision. Whether or not Sun consented to sex with Xu is irrelevant as to Sun's claim that Xu trafficked her to Shanghai to have sex with his colleagues. Xu's argument on this point is therefore rejected.

Xu also argues that Sun "has not shown that Xu had any intent to recruit and transport her to China for sex."   As with other sections of the TVPA, § 1590 "has a knowledge requirement." *Martinez-Rodriguez v. Giles*, 2017 WL 4076095, at *3 (D. Idaho, Sept. 14, 2017). Section 1590 "imposes liability for [human] trafficking, which is separate and distinct from liability for forced labor or services." *Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d 1112, 1133 (D. Colo. 2019). Additionally, "[a] Section 1590 claim is derivative—*i.e.*, it 'depends on a predicate TVPRA offense—such as forced labor.'" *Mallela v. Cogent Infotech Corp.*, 2020 WL 2541860, at *3 (W.D. Pa. May 19, 2020).

The Complaint alleges that Xu "facilitated" Sun's trip to Shanghai for the purpose of obtaining her sexual services. In her deposition, Sun testified that she "agreed to go to Shanghai with him" but that she did not travel on the same plane as Xu to Shanghai and that she does not remember whether Xu asked her to come. (Sun Dep. 136-38). She further testified that they stayed in the same room at the hotel and that Xu left the hotel and then returned wanting Sun to have sex with his colleagues. (Sun. Dep. 139). Sun testified that she was "humiliated and insulted" because Xu was treating her "like a prostitute to advance himself." (Sun Dep. 143). Xu then returned to the United States. Sun felt she had "no other choice but to go back to [her] hometown." (Sun Dep. 148).)

There is no evidence to support Sun's allegation that Xu knowingly "recruit[ed], harbor[ed], transport[ed], provid[ed], or obtain[ed]" Sun to travel to Shanghai for the purpose of engaging in sex with Xu's colleagues. Sun argues that her assertion that she "agreed to go to Shanghai" with Xu indicates that Xu was directly involved in arranging for her to travel to China.   Even looking at the facts in the light most favorable to Sun, Sun did not provide any evidence that would permit a reasonable juror to find that Xu recruited, provided, or transported Sun to Shanghai in 2014. Sun testified that she traveled separately, paid for her own travel, and could not remember if Xu even asked her to go to Shanghai. Additionally, other students attended the same art show in Shanghai at the same time. (Zhao Dep. at 83.) Sun's testimony that she

agreed to go with Xu is insufficient to establish that Xu recruited, transported, or otherwise was responsible for her travel to Shanghai in 2014.[9]

For this reason, the Court grants Defendant Xu's Motion for Summary Judgment as to Count IV, trafficking into servitude, as to Plaintiff Sun.

### 4. Count V: Illinois Gender Violence

Count V alleges that Xu violated the Illinois Gender Violence Act, 740 Ill. Comp. Stat. 82/5, when he engaged in several acts of gender related violence against Plaintiff Sun. The Complaint points to Xu's alleged violence against Sun, alleging that the violent acts were based in part on Sun's gender.

"The Illinois Gender Violence Act authorizes anyone 'who has been subjected to gender-related violence' to sue the perpetrator of that violence." *Tavel v. Riddle,* 2021 WL 1121120 (N.D. Ill. March 24, 2021) (citing 740 ILCS 82/5).[10] Gender-related violence is "a physical intrusion or physical invasion of a sexual nature under coercive conditions satisfying the elements of battery under the laws of Illinois," regardless of whether the act was criminally charged or prosecuted. 740 Ill. Comp. Stat. 82/5(2).

"[T]he plain language of the Act clearly indicates that a plaintiff is required to prove an act or conditions 'satisfying the elements of battery under the laws of Illinois' (or a threat thereof)." *Flores v. Santiago*, 986 N.E.2d 1216, 1219 (Ill. App. Ct. 2013) (citing 740 ILCS 82/5(2). In Illinois, "battery is committed by an individual if: '(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.'" *Flores*, 986 N.E.2d at 1219.

Xu's only argument as to why he should be granted summary judgment as to Sun's claim under the Illinois Gender Violence Act is that Sun did not introduce evidence that any of Xu's purported violent conduct was because she was a woman. Xu

---

[9] The Court notes that it is immaterial that Sun did not have sex with Xu's colleagues. *See United States v. Wearing*, 865 F.3d 553, 557 (1st Cir. 2017) ("Nothing in the statute signals that the plan must be fully carried out before conviction is possible.").

[10] 740 ILCS 82/15 provides, "In an action brought under this Act, the court may award damages, injunctive relief, or other appropriate relief. The court may award actual damages, damages for emotional distress, or punitive damages. A judgment may also include attorney's fees and costs."

fails to recognize that 740 ILCS 82/5 provides three definitions of gender related violence, only one of which requires the act to be committed "on the basis of a person's sex." Subsection (2) includes the following definition of gender related violence: "A physical intrusion or physical invasion of a sexual nature under coercive conditions satisfying the elements of battery under the laws of Illinois, whether or not the act or acts resulted in criminal charges, prosecution, or conviction."[11] Therefore, to survive summary judgment on Count V, Sun need only show that a reasonable juror could conclude that Xu caused a physical intrusion of a sexual nature "under coercive conditions" that amount to a battery under Illinois law.

As detailed above, Sun testified that Xu physically pounded her head on the wall, threw her on the bed, and slapped her face until her teeth bled. Sun's testimony, if believed, shows that while she consented to sex with Xu, she did not consent to his purported violent actions that, if true, easily amount to battery under Illinois law.[12] Looking at the facts in the light most favorable to Sun, a reasonable juror could conclude that Xu engaged in these acts of violence to coerce Sun to continue to have sex with him. Xu's Motion for Summary Judgment under Count V, as to Plaintiff Sun, is denied.

### 5. Count VI: Illinois Involuntary Servitude

Count VI alleges that Xu committed involuntary servitude by knowingly subjecting Sun to commercial sex activity against her will in violation of the Illinois Trafficking Victims Protection Act, 720 ILCS 5/10-9(b). Xu's entire argument as to this count is "Sun cannot establish her claim under this Statute any more than she could under the Federal statute. She has failed to establish any facts to show her *labor*."

Similar to the Federal statute, the Illinois Act provides:

---

[11] Subsection (1) reads: One or more acts of violence or physical aggression satisfying the elements of battery under the laws of Illinois that are committed, at least in part, on the basis of a person's sex, whether or not those acts have resulted in criminal charges, prosecution, or conviction. Subsection (3) reads: A threat of an act described in item (1) or (2) causing a realistic apprehension that the originator of the threat will commit the act.

[12] *See Flores*, 986 N.E.2d at 1220 ("Illinois law recognizes that episodes of nonconsensual sex may occur within a generally consensual relationship, even if they are difficult to prove.").

"A person commits involuntary servitude when he or she knowingly subjects, attempts to subject, or engages in a conspiracy to subject another person to labor or services obtained or maintained through any of the following means, or any combination of these means.

> (1) causes or threatens to cause physical harm to any person;
> (2) physically restrains or threatens to physically restrain another person;
> (3) abuses or threatens to abuse the law or legal process;
> (4) knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person;
> (5) uses intimidation, or exerts financial control over any person; or
> (6) uses any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform the labor or services, that person or another person would suffer serious harm or physical restraint.

720 ILCS 5/10-9(b).[13]

Section 10-9 defines the term services: "'Services' means activities resulting from a relationship between a person and the actor in which the person performs activities under the supervision of or for the benefit of the actor. Commercial sexual activity and sexually-explicit performances are forms of activities that are 'services' under this Section. Nothing in this definition may be construed to legitimize or legalize prostitution." 720 ILCS 5/10-9(a)(8).

Xu's Motion argues only that the consensual sex between Sun and Xu did not constitute "labor or services" under the statute. The Illinois Trafficking Victims Protections Act specifically includes "commercial sexual activity" as services under the act. As Xu's Motion acknowledges, Illinois' prohibition of involuntary servitude includes "basically the same prohibitions that are set forth in the forced labor statute relevant to Count III." For the reasons provided in Section III(a)(i)(5), the Court finds

---

[13] 740 ILCS 128/15 provides for the recovery of civil damages for violations of 740 ILCS § 5/10-9: "A victim of the sex trade, involuntary servitude, or human trafficking may bring an action in civil court under this Act." 740 ILCS 128/20 allows for the recovery of declaratory relief, injunctive relief, attorneys fees, damages, and punitive damages.

that a reasonable juror could find that Xu's actions obtained services from Sun by one or more of the means identified by the Illinois Trafficking Victims Protection Act. Xu's Motion for Summary Judgment as to Count VI is denied.

### 6.  Count VIII: Illinois Trafficking in Persons

In Count VIII, Sun alleges that Xu knowingly transported Sun across state and international lines for the purpose of commercial sex, in violation of the trafficking in persons provision of the Illinois Trafficking Victims Protections Act, 720 ILCS 5/10-9(d).

Section 5/10-9(d) provides:

> Trafficking in persons. A person commits trafficking in persons when he or she knowingly: (1) recruits, entices, harbors, transports, provides, or obtains by any means, or attempts to recruit, entice, harbor, transport, provide, or obtain by any means, another person, intending or knowing that the person will be subjected to involuntary servitude; or (2) benefits, financially or by receiving anything of value, from participation in a venture that has engaged in an act of involuntary servitude or involuntary sexual servitude of a minor. A company commits trafficking in persons when the company knowingly benefits, financially or by receiving anything of value, from participation in a venture that has engaged in an act of involuntary servitude or involuntary sexual servitude of a minor.

720 ILCS 5/10-9(d).

The Illinois law uses the same verbiage as the Federal trafficking into servitude provision. For the reasons discussed above in Section III(a)(i)(3), the Court finds that even looking at the facts most favorable to Sun, Sun did not provide any evidence that would permit a reasonable juror to find that Xu recruited, enticed, harbored, transported, or provided Sun to travel to Shanghai in 2014. Sun testified that she traveled separately, paid for her own travel, and could not remember if Xu even asked her to go to Shanghai. Additionally, other students attended the same art show in Shanghai at the same time. (Zhao Dep. at 83.) The Court grants Defendant Xu's Motion for Summary Judgment as to Count VIII, Illinois law for trafficking in persons, as to Plaintiff Sun.

### ii.  Plaintiff Zhao's Claims

#### 1.  Count II: Forced Labor

Count II alleges that Defendant Xu threatened serious harm to Plaintiff Zhao to obtain her labor and services.  As laid out in Section III(a)(i)(2), Plaintiff Zhao must show that Defendant Xu obtained her services or labor by means of serious harm or threats of serious harm. 18 U.S.C. § 1589.

Xu argues: (1) Zhao testified that she never discussed payment with Xu for the work she completed, (2) Zhao testified that she did not keep track of the time she spent working on projects for Xu, (3) Zhao's student visa restricted her ability to work, (4) Zhao performed the translation work for Xu hoping that she would be acknowledged in Xu's book and improve as a grad student, and (5) there are no facts to support Zhao's claim that Xu threatened her to assist in the projects.

In response, Zhao maintains that the statute does not require the victim and perpetrator to have discussed payment and that Zhao testified that she remained silent because Xu made it known to her that he controlled her student status and financial aid.

The Court first considers whether Xu used threats of serious harm to obtain Zhao's services. Section 1589 defines "serious harm" broadly as: "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). "In other words, if a defendant 'knowingly obtains the labor or services' of someone by using 'any scheme, plan, or pattern' intended to cause that person to believe that they would encounter serious harm or physical restraint should they not perform such labor or services, that will suffice even without the use or threat of actual physical force or restraint." *Mouloki v. Epee*, 262 F.Supp.3d 684, 696 (N.D. Ill. 2017). "'[E]ven though the 'serious harm' that § 1589 encompasses is extremely broad it must at least pass a threshold objective standard such that it would cause a reasonable person in the victim's shoes to render forced labor.'" *Dinsay v. RN Staff Inc.*, 2022 WL 581033, at

*5 (S.D. Ind. Feb. 25, 2022) (quoting *David v. Signal Int'l, LLC*, 2012 WL 10759668, at *20 (E.D. La. Jan. 3, 2012)). If this threshold objective standard is met, a court will then consider "whether the victim was coerced subjectively to provide labor based on the defendant's threats." *Id.*

"When considering whether an employer's conduct was sufficiently serious to coerce the victim to provide labor or services against her will, [the court] must also 'consider the particular vulnerabilities of a person in the victim's position.'" *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017) (quoting *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015)). The Seventh Circuit has found that a reasonable jury could find that threats to one's immigration status, such as making threats of deportation and confiscating passports, could constitute threats of serious harm under § 1589. *United States v. Law*, 990 F.3d 1058, 1064 (7th Cir. 2021); *see also U.S. v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008). Financial threats, such as owed debts and withheld wages, also can constitute threats of serious harm. *Id.*; *see also Leiva v. Clute*, 2020 WL 8514822, at *7 (N.D. Ind. Dec. 16, 2020) ("Defendants' withholding of wages, threats to withhold wages, and threat of physical violence were sufficiently serious to compel a reasonable person to continue performing the contracted labor and services in order to avoid incurring the threatened harm.").

Xu distinguishes Zhao from other forced labor cases, noting that Zhao was not an uneducated immigrant who was lured to the United States on the promise of high wages. Xu emphasizes that Zhao went to college in the United States and started her Ph.D. program at another university in the United States.

In particular, Xu analogizes this case to *Salem v. Michigan State Univ.*, 2021 WL 1381149 (W.D. Mich. Apr. 13, 2021). In *Salem*, two foreign doctoral students at Michigan State University claimed that their academic advisor required them to work at his private company under unsafe and abusive working conditions for little or no pay.[14] *Id.* at *1. The plaintiffs alleged that the advisor told them that completion of research was a requirement for their degrees. *Id.* He required them to work long, overnight hours of

---

[14] The students did not know the private company was owned by their advisor.

arduous physical labor. *Id.* at *2. Michigan State University conducted an investigation where it found that the advisor "was able to 'isolate the students from the university campus, require them to work excessively with little or no pay, verbally abuse them, and repeatedly threaten them with academic consequences[,]' treating them like 'underpaid and abused workers[.]'" *Id.* at *3.

The district court granted the defendants' motion to dismiss, finding:

> The complaint contains few facts indicating that [the advisor] compelled Plaintiffs' labor through serious harm or threats of such harm. Much of the complaint centers on [the advisor's] *authority* as Plaintiffs' advisor to compel Plaintiffs to work, rather than specific threats of harm. Plaintiffs clearly believed that they needed to comply with [their advisor's] demands in order to be successful in the graduate program, but that compliance does not amount to forced labor. Likewise, [the advisor's] abusive comments and actions, which did not threaten specific harm for Plaintiffs' failure to continue their labor, did not create a forced-labor environment. That conduct suggests an abusive working relationship, which, as other courts have stated, is not a violation of the forced-labor statute.

> Even if [the advisor] had expressly, rather than implicitly, threatened to impede Plaintiffs' advancement in their program for failing to meet his work demands, those threats would not have *compelled* Plaintiffs' labor. Plaintiffs' working conditions may have been more arduous than the typical graduate experience in their program, and failure to complete their programs may have subjected Plaintiffs to a risk of significant financial burden and professional delay, but those consequences are not what compelled Plaintiff[s] to continue their labor.

> …
> Thus, what might look a bit like forced labor in another context (e.g., little or no pay, long hours, grueling work, and the possibility of significant financial or reputational harm from failure to meet a supervisor's demands) is simply an accepted feature of our education system, which assumes that the long-term benefits of the experience and the degree outweigh the risks and costs borne by the students. The key difference between this situation and forced labor is that a victim of forced labor remains in servitude to avoid negative consequences (i.e., "serious harm") inflicted or threatened by their employer. In other words, the consequences compel the labor; without them, the victim would not remain under the employer's power. A graduate student, on the other hand, accepts the risk of negative consequences in order to obtain substantial benefits. The benefits are what motivate the labor, not the

consequences; without them, the students would not enter or continue in the program.

In other words, Plaintiffs were in a position like that of many graduate students, particularly those who are financially strapped and find that the unreasonable expectations of an academic advisor stand in the way of achieving their career goals. Granted, Plaintiffs' experiences may have been somewhat unique in that their advisor apparently abused his position to require Plaintiffs to work for his private company, ostensibly for his own benefit rather than for theirs. Nevertheless, what motivated Plaintiffs' labor was not the threat of harm itself, but that which motivates any graduate student: the desire to complete their degree programs and attain their career goals. The Court does not believe that Congress intended to criminalize an academic advisor's abuse of his authority to compel his students to perform unreasonably difficult, or even self-enriching, labor.

*Id.* at 5-6.

The court in *Salem* relied on *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017), where the Court emphasized that "Section 1589 intended to address *serious* trafficking." (quoting *U.S. v. Dunn*, 652 F.3d 1160, 1170 (9th Cir. 2011)). In *Muchira*, the plaintiff was a domestic worker for a Saudi family. The plaintiff's forced labor claims were based on her allegations that Saudi culture "house rules" in addition to long work hours and verbal reprimands caused her to experience serious psychological harm. *Id.* at 620. The Fourth Circuit found that the plaintiff failed to present sufficient evidence to survive summary judgment on her forced labor claim. The court noted that the plaintiff was "not an especially vulnerable victim" and that she came to the United States willingly. *Id.* at 619-620. The Court further considered that the family did not physically abuse the plaintiff or threaten her or her family with physical harm. *Id.* at 619. The plaintiff did not live in intolerable living conditions, and "had an unobstructed ability to walk away at any time." *Id.* at 620-621. The Court emphasized that the plaintiff had access to a

private cell phone and the internet and that she did not experience the "extreme isolation" that is often present in forced labor cases. *Id.* at 621.[15]

As with the plaintiffs in *Muchira* and *Salem*, Zhao presents nothing to show that Xu obtained her translation services by threats of serious harm that would cause a reasonable person of the same background and in the same circumstances to continue performing the services without pay.  Looking at Zhao's testimony in the light most favorable to her, the only threat Xu made to Zhao was that he would kick her out of the program. He also implied that he would be able to cut her financial aid. For example, Zhao testified that she agreed to do the translation work because she only had one guaranteed year of the fellowship program and the second year depended on Xu's decision.[16] (Zhao Dep. at 66.) She further testified that she did not think she "should enrage him by refusing to do what he has requested." (Zhao Dep. at 66.) When asked why she agreed to do the translations, Zhao testified that "he requested assuming that I would not say no." (Zhao Dep. at 68-69.) Zhao further explained that Xu mentioned his authority over the financial aid and how much power he has over the students. (Zhao Dep. at 69.)

Importantly, Xu's threats to kick Zhao out of the program were made in response to Xu's belief that Zhao was talking about him behind his back. For instance, Xu made this threat after Zhao contacted another professor. Xu thereafter allegedly emailed Zhao asking her why she contacted the professor and noting that he was "going to kick [Zhao] out of the program." (Zhao Dep. at 119). Zhao stated that Xu threatened to kick anyone who "badmouth[ed]" him behind his back out of the program on a WeChat group. (Zhao Dep. at 123.) Zhao never testified that Xu threatened her financial aid or

---

[15] The district court found in *Salem* that an academic advisor's threat to harm a student's academic achievement or career potential is insufficient to qualify as a "threat of serious harm" under § 1589. At first glance, this seems to conflict with the ruling in *Noble v. Weinstein*, where the district court found that potential career growth is a thing of sufficient value to satisfy a "commercial sex act." However, the court in *Noble* was considering the broad language of § 1591, which defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." Section 1589, on the other hand, requires the person to obtain labor by means of serious harm or threats of serious harm. The harm or threat of harm is not required to make a claim for sex trafficking under § 1591.

[16] Zhao later further explained that Xu introduced Zhao to his student who previously received a fellowship and emphasized Xu's power over the selection committee. (Zhao Dep. at 221.)

place in the program if she failed to do the translation work. Similarly, Zhao's testimony does not reveal any express or implied threat that, if she refused to do the translation work, Xu would use his power to cut her financial aid.

The facts of Zhao's case suggest an abusive working relationship similar to the one in *Salem*. Xu's comments and actions at most threatened to impede Zhao's advancement in her program. As with the plaintiffs in *Salem*, what motivated Zhao's labor "was not the threat of harm itself, but that which motivates any graduate student: the desire to complete their degree programs and attain their career goals." *Salem*, 2021 WL 1381149 (W.D. Mich. Apr. 13, 2021).

The Court recognizes the vulnerability Zhao faced because of Xu's status as her advisor. But several factors show that Zhao did not face dire consequences[17] if she chose to stop the translation work: Zhao was proficient in English, she had been in the United States for many years, Xu did not control Zhao's living conditions or freedom of movement, Zhao was free to communicate with others, Xu did not physically abuse Zhao or threaten physical harm. The Court also recognizes that Zhao's family paid for her doctorate program at another university prior to her transfer to the University of Illinois, where she received financial aid. She was not in a position where her livelihood depended on her grad program funding. Like the *Salem* Court, the Court "does not believe that Congress intended to criminalize an academic advisor's abuse of his authority to compel his students to perform unreasonably difficult, or even self-enriching, labor." *Salem*, 2021 WL 1381149, at *6 (W.D. Mich. Apr. 13, 2021). Even if all the acts alleged by Zhao are true, Zhao has not established a claim under the forced labor provision.

Zhao's forced labor claim is distinguishable from Plaintiff Sun's. First, Sun testified that Xu expressly threatened to deport her if she reported his actions. Second,

---

[17] Congress intended § 1589 "to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." H.R. Conf. Rep. 106-939, at 101.

Xu allegedly engaged in physical and sexual violence to obtain Sun's sexual services. The only threat Xu made to Zhao was to kick her out of the program but that was only if she communicated with other professors, and it was not a threat made if she failed to complete the assigned work. Further, Zhao does not allege or produce any facts showing that Xu engaged in physical or sexual violence against her.

For these reasons, the Court grants Defendant's Motion for Summary Judgment as to Count II, Zhao's forced labor claim.

### 2.  Count IV: Trafficking into Servitude

Defendant Xu moves for summary judgment as to Plaintiff Zhao's claims under the trafficking into servitude provision of the TVPA, 18 U.S.C. § 1590. Zhao's Complaint alleges that Xu "knowingly recruited and transported Zhao from Kansas to Illinois to provide labor and services to him in violation of laws prohibiting these actions." Zhao's Complaint is referencing Zhao's transfer from the University of Kansas to the University of Illinois to complete her graduate program.

As provided in Section III(a)(i)(3) above, § 1590 applies to "Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter…." 18 U.S.C. § 1590.

Plaintiff Zhao argues that it is enough that Xu knowingly induced Zhao to transfer to the University of Illinois to obtain Zhao's forced labor. The Court granted summary judgment as to Defendant Xu on Zhao's forced labor claim. As Zhao failed to establish a claim for forced labor under § 1589, Zhao has also failed to establish a question for the jury as to whether Xu trafficked Zhao for the purposes of that forced labor. Accordingly, the Court grants Defendant Xu's Motion for Summary Judgment as to Zhao's claim under Count IV, trafficking into servitude.

### 3.  Count V: Illinois Gender Violence

Xu moves for summary judgment on Zhao's claim based on the Illinois Gender Violence Act, 740 ILCS 82/5 et al. The Complaint alleges that Xu engaged in acts of gender-related violence against Zhao when he: (1) punched another female student in

front of Zhao, (2) grabbed Zhao's shoulder and attempted to kiss her in a stairwell; and (3) repeatedly confined Zhao behind closed office doors and in a car.

As provided in Section III(a)(i)(4) above, the Illinois Gender Violence Act defines gender-related violence as "a physical intrusion or physical invasion of a sexual nature under coercive conditions satisfying the elements of battery under the laws of Illinois," regardless of whether the act was criminally charged or prosecuted. 740 ILCS § 82/5(2). "Illinois courts have stated that battery may be defined as the willful touching of the person of another or a successful attempt to commit violence on the person of another." *Flores*, 986 N.E.2d at 1219. "[T]he gist of the action for battery is not the hostile intent of the defendant, but rather the absence of consent to the contact on the part of the plaintiff." *Country Mut. Ins. Co. Olsak*, 908 N.E. 2d 1091, 1101 (1st App. Ct. 2009).

Under the plain language of the Act, Zhao must show that Xu's actions satisfied the elements of a battery under Illinois law.  Neither punching another woman in front of Zhao nor confining Zhao behind closed doors constitute a battery under Illinois law.[18] Neither of these acts include "harmful contact" with Zhao. However, Zhao's deposition testimony alleging that Xu "grabbed [Zhao's] shoulder with his face approaching" while isolated on a stairway fulfills the requirements for a battery. (Zhao Dep. 134.)

Looking at the available facts in the light most favorable to Zhao, a question of fact remains over whether Xu committed a battery when he allegedly grabbed Zhao's shoulder and turned his face toward hers in the stairwell. Prior to grabbing her shoulder, Zhao claims that Xu was laughing and ridiculing her. He allegedly said that because of her weaknesses, she was stressed out, and he laughed at her hard work. A reasonable person, after hearing these things, would not consent to having her shoulder grabbed. It is up for the jury to determine whether the alleged shoulder grab and attempted kiss qualify as a battery under Illinois law.

---

[18] In Illinois, "battery is committed by an individual if: '(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.'" *Flores*, 986 N.E. 2d at 1219.

Zhao must also show that the physical invasion was of "a sexual nature." The facts leave a question for the jury as to whether Xu was attempting to kiss Zhao. At trial, the jury will have the opportunity to hear competing testimony from Zhao and Xu about what happened in the stairwell that day. Because a material fact remains in dispute, Xu's Motion for Summary Judgment as to Count V is denied.

#### 4. Count VII: Illinois Involuntary Servitude

Count VII alleges that Xu knowingly obtained Zhao's labor and services by threatening to withhold admission and financial aid at UIUC in violation of Illinois' involuntary servitude provision, 720 ILCS 5/10-9(b). Xu's Motion for Summary Judgment simply adopts his argument set forth as to Count II (forced labor under the TVPA). Illinois' involuntary servitude provision is similar to the TVPA's forced labor provision. Zhao argues that the Illinois law is broader than the federal forced labor statute because it specifically states that a person commits involuntary servitude when he knowingly obtains labor or services through "intimidation, or exert[ing] financial control over any person."

The parties did not cite, and the Court did not find, any case comparing the forced labor provision of the TVPA and the involuntary servitude provision under Illinois law. Zhao is correct that the Illinois law specifically includes means of intimidation and financial control as methods of committing involuntary servitude. However, courts have found that the Federal law encompasses both intimidation and financial control. *See United States v. Law*, 990 F.3d 1058, 1064 (7th Cir. 2021); *Leiva v. Clute*, 2020 WL 8514822, at *7 (N.D. Ind. Dec. 16, 2020). The Cambridge Dictionary defines "intimidate" as "to frighten or threaten someone, usually in order to persuade them to do something that you want them to do." See https://dictionary.cambridge.org/us/dictionary/english/intimidate (last visited October 26, 2022). To intimidate someone, a person would act to frighten or threaten them. The Federal TVPA includes means of "force," "threats of force," "serious harm," and "threats of serious harm." The Court finds that the TVPA's broad terminology

would encompass the means of intimidation and financial control expressly stated in the Illinois law.

As discussed in Section III(a)(ii)(1) the Court finds that Zhao failed to show that Xu's acts, viewed in the light most favorable to Zhao, violated the forced labor provision or the ban on Illinois involuntary servitude. Even if the Court takes all facts testified by Zhao to be true, Zhao has not shown that Xu committed involuntary servitude under Illinois law. Defendant Xu's Motion for Summary Judgment as to Zhao's claim for involuntary servitude, Count VII, is granted.

### 5. Count VIII: Illinois Trafficking in Persons

Finally, Count VIII alleges that Xu knowingly recruited and transported Zhao from Kansas to Illinois to provide labor and services to him in violation of Illinois' ban on trafficking in persons, 720 ILCS 5/10-9(d).

As the Court noted in Section III(a)(i)(6), the Illinois provision of trafficking uses similar language as the federal trafficking into servitude provision. The Illinois statute provides:

> (d) Trafficking in persons. A person commits trafficking in persons when he or she knowingly: (1) recruits, entices, harbors, transports, provides, or obtains by any means, or attempts to recruit, entice, harbor, transport, provide, or obtain by any means, another person, intending or knowing that the person will be subjected to involuntary servitude; or (2) benefits, financially or by receiving anything of value, from participation in a venture that has engaged in an act of involuntary servitude or involuntary sexual servitude of a minor.

720 ILCS 5/10-9(d).

As with the Federal law, the Illinois law requires an intent or knowledge that the victim will be subjected to "involuntary servitude."[19] As the Court granted judgment in favor of Xu on Zhao's involuntary servitude claim, Zhao has no remaining claim under the Illinois' trafficking in persons provision. Defendant Xu's Motion for Summary Judgment as to Zhao's claim for Illinois trafficking in persons, Count VIII, is granted.

---

[19] The Federal provision against trafficking into servitude in the TVPA requires a showing of knowledge that the victim would be used for labor or services in violation of the TVPA. 18 U.S.C. § 1950.

### iii.  Plaintiff Wang's Claims

#### 1.  Count IX – Intentional Infliction of Emotional Distress

The Complaint alleges that Xu committed intentional infliction of emotional distress when Xu engaged in extreme and outrageous conduct toward Plaintiff Wang with his systemic campaign of threatening and bullying Wang into dropping his truthful claims against Xu.

To sustain a claim for intentional infliction of emotional distress under Illinois law, "first the conduct involved must be truly extreme and outrageous. Second, the actor must intend that his conduct inflict severe emotional distress or know that there is a high probability that his conduct will cause severe emotional distress. Third, the conduct must cause severe emotional distress in the victim." *Benton v. Little League Baseball, Incorporated*, 181 N.E.2d 902, 926 (Ill. App. Ct. 2020) (citing *Schweihs v. Chase Home Finance, LLC*, 77 N.E.3d 50, 63 (Ill. 2016).

Further, "It is clear that the tort 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Schweihs*, 77 N.E.3d at 63 (citing Restatement (Second) of Torts § 46 cmt. d, at 73 (1965)). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*.

"Whether conduct is extreme and outrageous is evaluated on an objective standard based on all of the facts and circumstances." *Thomas v. Fuerst*, 803 N.E.2d 618, 625 (Ill. 2004).  According to Wang, Xu's extreme and outrageous conduct consists of the following: Xu wrote an email to Wang asking Wang to take down the article Wang posted about Xu (Wang Dep. 38); Xu sent Wang a letter from Xu's Chinese lawyer threatening to sue Wang if he did not delete the article (Wang Dep. 39); Wang felt threatened by Xu because Xu copied many people in the same academic field on his first email to Wang (Wang Dep. 76-77); Xu allegedly spread a false rumor on WeChat saying that Wang was "bitter" toward Xu because Wang was rejected by Xu when Wang applied to UIUC (Wang Dep. 79, 91); Xu allegedly contacted Wang's friends in an

attempt to use them to send Wang messages that Wang found threatening (Wang Dep. 89-90); Xu allegedly wrote a public letter on WeChat in which he threatened that "in the end he will kill [Wang]." (Wang Dep. 105-106).

Wang failed to produce evidence showing that Xu engaged in "extreme and outrageous" conduct. Instead, Wang presents evidence of mere insults, indignities, threats, and annoyances, none of which constitute extreme and outrageous conduct. *Schweihs*, 77 N.E.3d at 63. "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id*.

Wang's strongest evidence on this point is Xu's public social media post in which Xu said that "in the end he will kill [Wang]." (Wang Dep. 106.) But this is simply not enough.  Whether conduct is extreme or outrageous must be evaluated on an objective standard based on the facts and circumstances of the case. A reasonable person in Wang's position would not find that a single post on social media in which Xu threatened that in the end he will kill Wang to be extreme and outrageous conduct. First, Xu and Wang never met in person. Second, the alleged threat to kill Wang was not imminent as Wang testified that Xu threatened to kill him "in the end." Moreover, this threat was likely intended metaphorically rather than literally. Xu made no other threats to Wang's safety, and most of his communications simply asked Wang to take the online post about Xu down. Fourth, Xu had no degree of power or authority over Wang as they worked for different universities. *See McGrath v. Fahey*, 533 N.E.2d 806, 809-10 (Ill. 1988) ("[T]he degree of power or authority which a defendant has over a plaintiff can impact upon whether that defendant's conduct is outrageous. The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment.").

The Northern District of Illinois noted that "Illinois courts have limited recovery on this tort to victims of only the most intolerable conduct." *Lara v. Diamond Detective Agency*, 412 F.Supp.2d 894, 903 (N.D. Ill. 2006). Xu's social media "threats" and alleged spreading of rumors about Wang simply do not amount to the level of intolerable conduct required in Illinois. A reasonable juror presented with the facts available to Wang could not find that Xu's conduct was extreme or outrageous.

Because Wang failed to show that Xu engaged in extreme and outrageous conduct, the Court need not consider the second and third elements of a claim for intentional infliction of emotional distress under Illinois law. Defendant Xu's Motion for Summary Judgment as to Count IX is granted.

### 2. Count X - Negligent Infliction of Emotional Distress

The Complaint alleges that Defendant Xu's conduct outlined above amounted to negligent infliction of emotional distress. "For a direct victim to state a claim of negligent infliction of emotional distress, she must allege: (1) that defendant owed plaintiff a duty; (2) that defendant breached that duty; and (3) that plaintiff's injury was proximately caused by that breach." *Parks v. Kownacki*, 737 N.E.2d 287, 296 (Ill. 2000).

Xu's Motion for Summary Judgement as to Wang's Negligent Infliction of Emotional Distress argues only that "Xu had no special relationship with Wang giving rise to a specific duty to Wang" and that "Wang suffered no damages as a result of any proximate causation of Xu's conduct."[20]

Xu's argument fails. The relationship between the parties is only one of several factors courts consider when determining if the defendant owed the plaintiff a duty. "Duty is defined as 'a legal obligation to conform one's conduct to a certain standard for the benefit or protection of another.'" *Pilotto v. Urban Outfitters West, L.L.C.*, 72 N.E.3d 772, 780 (Ill. App. 2017) (quoting *Kotarba v. Jamrozik*, 218 Ill.Dec. 659, 669 N.E.2d 1185 (Ill. App. 1996)).  To determine whether Xu had a duty to Wang, the Court considers "various policy considerations, such as the likelihood of harm, the gravity of the injury,

---

[20] In his Reply, Xu raises the argument that Wang did not suffer a contemporaneous physical impact or injury. For the reasons discussed in Section V below, the Court finds that Xu waived this argument.

the burden of guarding against the injury, and the relationship between the parties." *Corgan v. Muehling*, 574 N.E.2d 296, 306 (Ill. 1991).

In this case, Xu presents no argument regarding the likelihood of the harm, the gravity of the injury to Wang, or the burden to Wang of guarding against the injury. To succeed on a motion for summary judgment, a movant must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Xu failed to meet this burden. Xu's Motion for Summary Judgment on Count X is denied.

### b. Plaintiffs' Motion for Summary Judgment

Plaintiffs Sun, Zhao, and Wang move for summary judgment as to three counts of Defendant Xu's Counterclaim. All three counts on which Plaintiffs seek summary judgment are for intentional infliction of emotion distress. As noted above, to sustain a claim for intentional infliction of emotional distress under Illinois law, "first the conduct involved must be truly extreme and outrageous. Second, the actor must intend that his conduct inflict severe emotional distress or know that there is a high probability that his conduct will cause severe emotional distress. Third, the conduct must cause severe emotional distress in the victim." *Benton*, 181 N.E2d 902, 926 (citing *Schwihs*, 77 N.E.3d 50, 63. The Court will apply these elements to Xu's claims against each individual Plaintiff.

As stated above and equally relevant to Plaintiffs' Motion for Summary Judgment, "It is clear that the tort 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Schweihs*, 77 N.E.3d at 63 (citing Restatement (Second) of Torts § 46 cmt. d, at 73 (1965)). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*.

The Supreme Court of Illinois has described some factors the court can consider when determining if conduct was extreme and outrageous:

> [T]he degree of power or authority which a defendant has over a plaintiff
> can impact upon whether that defendant's conduct is outrageous. The

34

more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment. Threats, for example, are much more likely to be a part of outrageous conduct when made by someone with the ability to carry them out then when made by someone in a comparatively weak position. The Restatement mentions police officers, school authorities, landlords and collecting creditors as examples of the many types of individuals who may be positioned to exercise power or authority over a plaintiff.

*McGrath*, 126 Ill.2d 78, at 86-87.

### i. Count I – Intentional Infliction of Emotional Distress as to Sun

Xu's Counterclaim alleges that Sun engaged in extreme and outrageous conduct toward Xu with the statements she made during her interview with *CBS This Morning*. Plaintiff Sun argues that Xu's counterclaim against her for intentional infliction of emotional distress should be dismissed because her conduct was not extreme and outrageous.

At the summary judgment stage, the Court looks to the facts in the light most favorable to the nonmoving party, Xu. Both parties agree that during the CBS interview Sun accused Xu of trying to kill her with her car and of physical, sexual, and emotional abuse. Xu, in his deposition, claims that Sun's rape allegations are false. (Xu Dep. 92-93, #84, Exhibit 2.) A reasonable juror could hear testimony from both Sun and Xu and conclude that the sexual relationship was entirely consensual, considering that Sun repeatedly testified that she agreed to the sexual conduct, that same juror could reasonably conclude that Sun's allegations on *CBS This Morning* were false. Defamatory statements made to the public can constitute extreme and outrageous behavior. *See Dawson v. New York Life Ins. Co.*, 932 F.Supp. 1509, 156 (N.D. Ill. 1996) (denying summary judgment on intentional infliction of emotional distress claim when Plaintiff made alleged defamatory statements about illegal acts of Defendant at a large meeting

viewed by thousands).[21] Here, if Xu persuades the jury that all his acts toward Sun were consensual and that he did not engage in physical or other abuse, then a reasonable juror could conclude that Sun's comments made on a nationwide morning news broadcast accusing Xu of illegal activity amounted to extreme and outrageous conduct.

For these reasons, Plaintiffs' Motion for Summary Judgment as to Count I of the Counterclaim is denied.

### ii.  Count III – Intentional Infliction of Emotional Distress as to Zhao

Next, Xu's Counterclaim alleges that Zhao engaged in extreme and outrageous conduct with statements she made in an interview with China's English Language media *Sixth Tone*. Plaintiff Zhao acknowledges that she was one of two anonymous women who gave statements for the *Sixth Tone* article. But, Plaintiffs claim that the undisputed facts show that Zhao did not make any statements published in the interview.

Xu's Counterclaim attributes the following statements from the *Sixth Tone* article to Zhao:

1.  "Over the year after she met the professor, he harassed her for the first time, catching her completely off guard. 'I hadn't thought to be vigilant around him.'"

2.  "After the first instance, the woman said, Xu forced her into unwanted sexual behavior that she described as 'horrifying,' alternately using affectionate words and menacing threats to coerce her into obeying. For fear of being recognized, she did not specify when this occurred."

3.  "My life was ruined during that period." "My self-esteem was really low – I felt physically dirty." "She said she suffered both physical and psychological damage, and added that she was aware of other UIUC students who had had sexual relationships with Xu, including an undergraduate who reported him to the school in 2015."

---

[21] Plaintiffs cite to *Hoffman v. Hoffman*, where the Illinois Appellate Court found that a mother's accusations of sexual abuse by the father was not extreme and outrageous conduct. Importantly, in *Hoffman*, the mother only discussed the suspected abuse with family members, teachers, church members, and authorities, in other words, individuals who had contact with the family. 2011 IL App (2d) 101005-U, at *18. In contrast, Xu made her comments on national television.

(Defendant's Counterclaim, #21, ¶ 9-10; *Sixth Tone* article, available online at https://www.sixthtone.com/news/1001927/professor-accused-of-sexual-abuse-to-resign%2C-says-university (last visited October 26, 2022)).

Xu's Response to Plaintiffs' Motion for Summary Judgment argues that Xu made additional allegations in his Counterclaim, specifically that Zhao made statements in the WeChat group that Xu attempted to kiss her and that Xu engaged in tax evasion. While Count III of Xu's Counterclaim only references the interview with *Sixth Tone*, "it is factual allegations, not legal theories, that must be pleaded in a complaint." *Whitaker v. Milwaukee County, Wisconsin*, 772 F.3d 802, 808 (7th Cir. 2014). So even while Xu's claim of intentional infliction of emotional distress lists only Zhao's alleged comments in the *Sixth Tone* article, Xu is allowed to rely on other factual allegations that would support the Counterclaim.

Xu's Counterclaim alleged that Zhao made statements in a WeChat group that Xu had slept in the same room as his assistant and that the assistant was later promoted. The Counterclaim further alleges that Zhao claimed Xu committed tax evasion in the WeChat group. Xu attached copies of the WeChat conversation to his Response. (#84, Exhibit 1.)

As an initial matter, Zhao's comments made in the WeChat group, even if taken as true, do not amount to extreme and outrageous conduct. The group was a private message group that was accessible by only select individuals. (Zhao Dep. at 123-24.) Zhao's comments, while derogatory, alleged only that Xu slept in the same room as his assistant and evaded taxes. Neither of these comments is so extreme or outrageous that it goes beyond all possible bounds of decency, especially when made to a small group of individuals. Instead, Zhao's WeChat comments were at most mere insults and indignities.

Zhao's comments allegedly made in the *Sixth Tone* article are more complicated. First, Xu has put forth no evidence that Zhao made the second comment:

2. "After the first instance, the woman said, Xu forced her into unwanted sexual behavior that she described as 'horrifying,' alternately using

37

> affectionate words and menacing threats to coerce her into obeying.
> For fear of being recognized, she did not specify when this occurred."

Zhao denies stating this and there is no evidence to link Zhao to it. Zhao never testified that Xu forced her into unwanted sexual behavior or forced her into obeying his sexual demands. Xu fails to present any evidence to show that Zhao made this comment to the interviewer, and so it cannot be used to defeat the Motion for Summary Judgment.

Comments 1 and 3 are different. While Zhao disputes that she made the comments, Xu has put forth enough evidence to create a question of fact as to whether Zhao stated the things included in quotes 1 and 3:

1. "Over the year after she met the professor, he harassed her for the first time, catching her completely off guard. 'I hadn't thought to be vigilant around him.'"

3. "My life was ruined during that period." "My self-esteem was really low – I felt physically dirty." "She said she suffered both physical and psychological damage, and added that she was aware of other UIUC students who had had sexual relationships with Xu, including an undergraduate who reported him to the school in 2015."

Zhao admitted that she participated in the article, but denies that she was the source for comments 1 and 3. (Zhao Dep. at 251.) Nevertheless, the content of these comments is similar to the experience Zhao claims to have had with Xu.[22] The similarities between her allegations and the comments would be sufficient to create a question for the jury about whether Zhao was the source.

However, neither comment 1 nor 3 reflects extreme or outrageous conduct that could have harmed Xu. Looking at the facts most favorable to Xu, these statements are mostly commentary on how the woman felt during that period in her life. Stating them

---

[22] Zhao testified that during her time at UIUC, she felt constantly threatened and under Xu's control. She noted that she did not sleep well and could not form normal relationships. (Zhao Dep. at 211.) This testimony leads the Court to conclude that there is a question of fact as to whether Zhao was the source for comment 3.

during an interview, even with knowledge that they will be published, does not constitute extreme and outrageous conduct.[23]

Because no reasonable juror would find that comments 1 and 3 constitute extreme and outrageous conduct, and because Xu presents no evidence showing that Zhao was responsible for comment 2, the Court grants Plaintiffs' Motion for Summary Judgment as to Count III of Xu's Counterclaim, intentional infliction of emotional stress as to Zhao.

### iii. Count IV - Intentional Infliction of Emotional Distress as to Wang

Finally, Xu's Counterclaim alleges that Wang engaged in extreme and outrageous conduct toward Xu with his online statements and posts. Wang made a series of posts online claiming Xu had sexually harassed people and assaulted female colleagues for the past two decades. The post was titled, "U.S. professor sexually assaulting his students for more than 20 years." The post further claimed that Xu had worked at a different university where he was forced to resign.

Plaintiffs again dispute that Wang's comments were extreme and outrageous. Wang initially made his comments on a social media platform in China called Douban.com. (Wang Dep. at 15.) Wang later posted the same comments to other social media websites including Zhihu, Weibo, and platforms on WeChat called Transparent Earth and Ao Acadmy. (Wang Dep. at 81.) Wang's comments were not made in a closed group, but rather shared broadly on the Internet through social media.

The comments Wang posted online are similar to the comments Sun made on *CBS This Morning*. Wang accused Xu of illegal sexual actions and made his comments on numerous online social media forums. As with Sun, if Xu persuades the jury that he did not commit these illegal actions, a reasonable juror could conclude that Wang's widely made statements were defamatory and amount to extreme and outrageous conduct. *See Dawson v. New York Life Ins. Co.*, 932 F.Supp. 1509, 156 (N.D. Ill. 1996)

---

[23] The Court further considered that the *Sixth Tone* article was published online on a website discussing current affairs in China. So while it was widely available, its reach is not nearly as broad as *CBS This Morning* in the United States.

(denying summary judgment on intentional infliction of emotional distress claim when Plaintiff made alleged defamatory statements about illegal acts of Defendant at a large meeting viewed by thousands).

Looking at the facts most favorable to Xu, the Court finds that a material fact remains over whether Wang's online posts constituted extreme and outrageous conduct. Plaintiffs' Motion for Summary Judgment as to Count IV of Xu's Counterclaim is denied.

### IV.   Plaintiff's Motion for Leave to File Answer Instanter

On July 6, 2022, Plaintiffs filed a Motion for Leave to File Instanter (#87) seeking leave to file a late answer to Defendant's Counterclaim. Plaintiffs admit that due to an oversight they failed to file an answer to Defendant's Counterclaim after the Court denied Plaintiffs' Motion to Dismiss on May 6, 2020. Plaintiffs' answer was due on May 27, 2020.

Defendant argues that Plaintiffs' request should be denied because Plaintiffs' answer is more than two years late and because Plaintiffs offer no good reason for the delay.

Under Fed. R. Civ. P. 6, the Court may extend the time:

> (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or
> (B) on motion made after the time has expired if the party failed to act because of excusable neglect.

Because Plaintiffs' request was made after the original time expired, the Court must decide whether Plaintiffs failed to act because of excusable neglect. The Supreme Court found that excusable neglect "is not limited to situations where the failure to timely file is due to circumstances beyond the control of the filer." *Pioneer Inv. Services Co. v. Brunswick Associates Ltd Partnership*, 507 U.S. 380, 391 (1993). The Court further noted that "Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Id.* at 392. The Court

included several factors courts should consider when determining whether the neglect was excusable, "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id*. at 395.

Considering the factors provided in *Pioneer*, Plaintiffs' delay, while careless, was caused by excusable neglect. The only factor that falls in Defendant's favor is the length of delay, in this case more than two years. However, the length of time is overshadowed by the lack of prejudice to Defendant. Defendant cites no prejudice, and the Court, having reviewed Plaintiffs' proposed answer, finds none. Plaintiffs' proposed answer includes only information that has been known and explored by Defendant throughout the case. Plaintiffs do not add any unknown facts or defenses.

This case is similar to another case recently decided by this Court. In *Ollison v. Wexford Health Sources*, the Central District of Illinois found that a three-year delay in filing an answer constituted excusable neglect when there was no evidence of bad faith and allowing the late answer would have little if any prejudice. 2019 WL 11321228 (C.D. Ill. Sep. 13, 2019).

For these reasons, Plaintiffs' Motion for Leave to File Instanter (#87) is granted.

## V. Plaintiffs' Motion to Strike Portions of Defendant's Reply to Motion for Summary Judgment

Finally, Plaintiffs filed a Motion to Strike Portions of Defendant's Reply (#90). Plaintiffs' Motion seeks to strike portions of Defendants' Reply that Plaintiffs deem improperly introducing immaterial, impertinent, and scandalous facts, new arguments and new legal authority.

Plaintiffs first point to Fed. R. Civ. P. 12(f) to ask the Court to strike redundant, immaterial, impertinent, or scandalous facts. Rule 12(f) authorizes the Court to strike material from pleadings. Motions to strike are disfavored, and often waste considerable time. *See generally Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 72-28 (7th Cir. 2006). Importantly, "mere redundancy or immateriality is insufficient to trigger the

41

drastic measure of striking the pleading; the pleading must also be prejudicial to the defendant." *BBL, Inc. v. City of Angola*, 2013 WL 2383659, *3 (N.D. Ind. May 29, 2013) (*citing Hardin v. American Elec. Power*, 188 F.R.D. 509, 511 (S.D. Ind. 1999)); *see also Tektel Inc. v. Maier*, 813 F. Supp. 1331, 1334 (N.D. Ill. 1992) (Motions to strike are "usually denied unless the language in the pleading has no possible relation to the controversy and is clearly prejudicial.").

"Prejudice results where the challenged allegation has the effect of confusing the issues or is so lengthy and complex that it places an undue burden on the responding party." *Cumis Ins. Soc. v. Peters*, 983. F.Supp. 787, 798 (N.D. Ill. 1997). Although disfavored, allegations may be stricken as scandalous if the material "bears no possible relation to the controversy or may cause the objecting party prejudice." *Talbot v. Robert Matthews Distributing Co.*, 961 F.2d 654, 664 (7th Cir. 1992).

Plaintiffs argue they are prejudiced by Xu's inclusion of new facts, such as Sun's relationship history after her relationship with Xu. The Court does not find that Xu's reference to Sun's later relationships caused any prejudice to Plaintiffs.

Plaintiffs further object to Xu's inclusion of new legal argument in his Reply. Plaintiffs note that Xu referenced new caselaw and seek to strike Xu's entire Reply as it relates to Plaintiff Wang. Specifically, Plaintiffs argue that Xu's Reply argued for the first time: (1) that Xu's conduct was not extreme and outrageous to support's Xu's claim for intentional infliction of emotional distress, and (2) that Wang did not suffer a contemporaneous physical impact or injury relevant to the negligent infliction of emotional distress claim.

Plaintiffs are correct that "[o]rdinarily, arguments raised for the first time in a reply brief are waived." *McKeown v. Sears Roebuck & Co.*, 335 F.Supp.2d 917, 938 (W.D. Wisc. 2004); *See also Lawrenceburg Power, LLC v. Lawrencbug Municpal Utilities*, 410 F.Supp.3d 943, 949 (S.D. Ind. 2019) ("Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief."). "[T]he purpose of this rule is to insure that the opposing party has an opportunity to respond to the argument." *Id.*

42

In this case, the Court finds that Xu's initial Motion for Summary Judgment relating to Wang's claim of intentional infliction of emotional distress argued that Xu's conduct was not extreme and outrageous. Xu's reference to several cases providing the standard for conduct amounting to extreme and outrageous was sufficient to put Wang on notice.[24] Xu did not waive his argument that Wang failed to show that Xu engaged in extreme and outrageous conduct.

However, Xu clearly waived his argument as to whether Wang suffered a contemporaneous physical impact or injury to support Wang's claim for negligent infliction of emotional distress. Xu's Motion for Summary Judgment makes no reference to whether Wang suffered a contemporaneous physical impact or injury. Nor did Wang raise this element in her Response. Then, in his Reply, Xu argued for the first time that Wang failed to show that she suffered a contemporaneous physical impact or injury. Xu failed to include this argument in his initial Motion. As a result, Wang had no opportunity to provide evidence that she did in fact suffer a contemporaneous physical impact or injury. Defendant waived his argument as to the contemporaneous physical impact or injury. The Court grants Plaintiffs' Motion to Strike only as it relates to the argument contained in Xu's Reply in favor of summary judgment as to whether Wang's suffered a contemporaneous physical impact or injury. Plaintiffs' request for costs is denied.

## VI.    Conclusion

For the reasons provided above, the Court orders as follows:

As to Plaintiff Sun, Defendant Xu's Motion for Summary Judgment (#80) is DENIED as to Counts I, III, V, and VI and GRANTED as to Counts IV and VIII. Judgment is entered in favor of Defendant Xu and against Plaintiff Sun for Counts IV and VIII of the complaint.

---

[24] Xu's Motion for Summary Judgment's argument as to Count IX, Intentional Infliction of Emotional Distress, mistakenly refers to "Zhao" instead of "Wang" in the first sentence. It is possible that Wang misread this section as applying to Zhao. But the section heading and organization of the Motion makes it clear that it applies to Wang.

As to Plaintiff Zhao, Defendant Xu's Motion for Summary Judgment (#80) is DENIED as to Count V and GRANTED as to Counts II, IV, VII, and VIII. Judgment is entered in favor of Defendant Xu and against Plaintiff Zhao for Counts II, IV, VII, and VIII of the Complaint.

As to Plaintiff Wang, Defendant Xu's Motion for Summary Judgment (#80) is DENIED as to Count X and GRANTED as to Count IX. Judgment is entered in favor of Defendant Xu and against Plaintiff Wang for Count IX of the complaint.

Plaintiffs' Motion for Summary Judgment (#81) is DENIED as to Plaintiff Sun and Wang's claims for intentional infliction of emotional distress (Counts I and IV) and GRANTED as to Zhao's claim for intentional infliction of emotional distress (Count III). Judgment is entered in favor of Plaintiff Zhao as to Count III of Defendant Xu's Counterclaim.

Plaintiffs' Motion for Leave to File Instanter (#87) is GRANTED. The Court directs the Clerk to file Plaintiffs' Answer (#88-1) instanter.

Plaintiffs' Motion to Strike (#90) is GRANTED as to Xu's Reply's argument relating to Wang's claim for negligent infliction of emotional distress and denied in all other respects.

This case remains set for a Final Pretrial Conference on December 13, 2022, at 1:30 p.m., and jury trial on January 9, 2022, at 8:45 a.m., both before Judge Eric I. Long, Courtroom B, Urbana, IL.


ENTERED this 21st day of November, 2022

s/ERIC I. LONG
_____
UNITED STATES MAGISTRATE JUDGE
